ACCEPTED
03-15-00313-CV
7090671
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/24/2015 4:39:04 PM
JEFFREY D. KYLE
CLERK

CASE NO. 03-15-00313-CV

**IN THE COURT OF APPEALS**
**FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/24/2015 4:39:04 PM
JEFFREY D. KYLE
Clerk

HERMENIA JENKINS,
*Appellant,*

v.

CROSBY INDEPENDENT SCHOOL DISTRICT, and
MICHAEL L. WILLIAMS, COMMISSIONER OF EDUCATION
*Appellees.*

On Appeal from the 200th District Court of Travis County, Texas;
Cause No. D-1-GN-14-000619; The Honorable Amy Clark Meachum, presiding

**THE COMMISSIONER OF EDUCATION'S APPELLEE'S BRIEF**

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Defense Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law

ANDREW LUTOSTANSKI
State Bar No. 24072217
Assistant Attorney General
Administrative Law Division
OFFICE OF THE TEXAS ATTORNEY GENERAL
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 475-4200
Fax: (512) 320-0167
*andrew.lutostanski@texasattorneygeneral.gov*

*Attorneys for the Commissioner of Education*

# TABLE OF CONTENTS

TABLE OF CONTENTS .............................................................................................. ii

INDEX OF AUTHORITIES..................................................................................iv

STATEMENT OF THE CASE................................................................................ix

STATEMENT ABOUT ORAL ARGUMENT ......................................................ix

ISSUES PRESENTED ..........................................................................................x

STATEMENT OF FACTS .....................................................................................1

    The District Reassigns Ms. Jenkins to serve as an Assistant Principal ...............1

    The Commissioner Affirms the District's Reassignment ...................................3

    The Trial Court Affirms the Commissioner's Decision ..................................... 4

SUMMARY OF THE ARGUMENT ....................................................................5

ARGUMENT..........................................................................................................7

    I.     The Commissioner's interpretation of section 21.206(b)'s phrase "same professional capacity" is reasonable and proper...........................7

          A.     Standard of Review .................................................................................7

          B.     Chapter 21 of the Texas Education Code shows that a principal is an administrator........................................................ 8

          C.     Section 21.206 does not define "same professional capacity"......10

          D.     Section 21.201 does not define "same professional capacity" ...... 11

E.     The Commissioner has reasonably and consistently interpreted "same professional capacity," and the legislature has accepted the Commissioner's interpretation and not displaced it ............... 13

F.     Legislative intent further supports the Commissioner's interpretation of same professional capacity.............................241

G.     Ms. Jenkins's interpretation of same professional capacity is plausible but unconvincing. ........................................................ 24

II.     The reassignment from middle school principal to high school assistant principal with no change in compensation was permissibly within the same professional capacity. ...................................................26

A.     Standard of Review .......................................................................26

B.     The reassignment was permissible. ..............................................27

III.     The Commissioner properly concluded that according to her contract Ms. Jenkins may be assigned to serve as an assistant principal. ..............29

A.     Standard of Review .......................................................................29

B.     The Commissioner properly concluded that according to her contract Ms. Jenkins may be assigned to serve as an assistant principal................................................................................................32

CONCLUSION AND PRAYER ........................................................................34

CERTIFICATE OF COMPLIANCE.................................................................35

CERTIFICATE OF SERVICE...........................................................................36

# INDEX OF AUTHORITIES

## Cases

*20801, Inc. v. Parker*, 249 S.W.3d 392 (Tex. 2008) ..................................................... 8

*AEP Tex. Cent. Co. v. Pub. Util. Comm'n*, 286 S.W.3d 450
(Tex. App.—Corpus Christi 2008, pet. denied) ...................................................30

*Bullock v. Marathon Oil Co.*, 798 S.W.2d 353
(Tex. App.—Austin 1990, no writ)...................................................................... 20, 21

*City of Abilene v. Pub. Util. Comm'n*, 146 S.W.3d 742
(Tex. App.—Austin 2004, no pet.)...........................................................................30

*Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983) ......................................................... 28

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587
(Tex. 1996) ................................................................................................................. 28

*Dodd v. Meno*, 870 S.W.2d 4 (Tex. 1994)....................................................... 7, 13, 19

*Federal Crude Oil Co. v. Yount-Lee Oil Co.*, 122 Tex. 21,
52 S.W.2d 56 (1932)..................................................................................................21

*Grounds v. Tolar Independent School District*, 694 S.W.2d 241
(Tex. App.—Fort Worth 1985), *rev'd on other grounds*,
707 S.W.2d 889 (Tex. 1986) ................................................................................23, 24

*Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172 (Tex. 1967).......................... 20, 21

*J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223 (Tex. 2003) .................................29

*Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857 (Tex. 2000)...................29

*N.E. Indep. Sch. Dist. v. Kelley*, No. 03-09-00641-CV, 2010
Tex. App. LEXIS 9792, 2010 WL 5019850 at *5
(Tex. App.—Austin Dec. 9, 2010, pet. denied) ......................................................29

*Nucor Steel-Texas v. Pub. Util. Comm'n*, 363 S.W.3d 871
(Tex. App.—Austin 2012, no pet.) ................................................7

*Poole v. Karnack Indep. Sch. Dist.*, 344 S.W.3d 440
(Tex. App.—Austin 2011, no pet.) ........................................ 8, 19, 25

*R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*,
336 S.W.3d 619 (Tex. 2011) ................................................7

*Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527 (Tex. 1987) ......................................29

*Seifert v. Lingleville Indep. Sch. Dist.*, 692 S.W.2d 461 (Tex. 1985) ........................21

*State v. Pub. Util. Comm'n*, 883 S.W.2d 190 (Tex. 1994) ........................................26

*Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*,
408 S.W.3d 549 (Tex. App.—Austin 2013, pet. denied) .....................................7

*Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*,
665 S.W.2d 446 (Tex. 1984) ................................................26, 28

*Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114
(Tex. 1988) ................................................26

*TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432
(Tex. 2011) ................................................ 13

*Weslaco Fed'n of Teachers v. Texas Educ. Agency*, 27 S.W.3d 258
(Tex. App.—Austin 2000, no pet.) ........................................28, 29

**Statutes**

Act of June 17, 2011, 82nd Leg., R.S., ch. 1010, § 1,
sec. 21.102(a-1), 2011 Tex. Gen. Laws 1010 .....................................18

Act of Sept. 28, 2011, 82nd Leg., 1st C.S., ch. 8, § 9,
sec. 21.206, 2011 Tex. Gen. Laws 5463, 5465.....................................17

Acts 2011, 82nd Leg., R.S., Ch. 1093 (S.B. 1383),
    sec. 1, eff. June 17, 2011................................................................... 9

Term Contract Nonrenewal Act, 67th Leg., R.S., ch. 765,
    1981 Tex. Gen. Laws 2847 ...............................................................21

Term Contract Nonrenewal Act, 71st Leg., 6th C.S., ch. 1, § 3.14,
    1990 Tex. Gen. Laws 1................................................................ 15, 20

Term Contract Nonrenewal Act, 74th Leg., R.S., ch. 260 ch. 21
    subch. E and F, 1995 Tex. Gen. Law 2207 ................................. 16, 20

Term Contract Nonrenewal Act, 78th Leg., R.S., ch. 484, § 1,
    2003 Tex. Gen. Laws 1749............................................................ 16, 20

Term Contract Nonrenewal Act, 82nd Leg., 1st C.S., ch. 8, §§ 8-11,
    2011 Tex. Gen. Laws 5463 ............................................................... 20

Tex. Educ. Code § 7.057(d) ...............................................................vi, 25

Tex. Educ. Code § 11.201(d)(2) ............................................................32

Tex. Educ. Code § 11.202 ..............................................................24, 27

Tex. Educ. Code § 11.202(b)(1) ............................................................32

Tex. Educ. Code § 11.202(d)(2)............................................................25

Tex. Educ. Code § 21.003.................................................................8, 9

Tex. Educ. Code §§ 21.033, .047, .061, .207, .252, .354, .355, .4032, .4511............. 8

Tex. Educ. Code § 21.0452(b)(4)(B) .....................................................12

Tex. Educ. Code § 21.046.................................................................. 9

Tex. Educ. Code § 21.106(c)..................................................................12

Tex. Educ. Code § 21.154(4) ........................................................................12

Tex. Educ. Code § 21.201 ..................................................................... 8, 10

Tex. Educ. Code § 21.201(1) ......................................................... 11, 15, 23

Tex. Educ. Code § 21.206 ...................................................................passim

Tex. Educ. Code § 21.206(b) ..............................................................passim

Tex. Educ. Code § 21.354 ............................................................................ 8

Tex. Educ. Code § 21.354(a-1) .................................................................... 9

Tex. Educ. Code § 21.3541 .......................................................................... 9

Tex. Educ. Code § 21.355(a) ....................................................................... 9

Tex. Educ. Code § 21.402(a) ......................................................................12

Tex. Educ. Code § 21.4541 .........................................................................12

Tex. Educ. Code §§ 37.002, .0181, .019 .....................................................25

Tex. Gov't Code  § 2001.174 ........................................................... vi, 25, 28

**Rules**

19 Tex. Admin. Code § 157.1051(b) ...........................................................27

19 Tex. Admin. Code § 157.1058(a)(4).......................................................27

19 Tex. Admin. Code § 241.1(d) ................................................... 9, 28, 31

19 Tex. Admin. Code § 241.25(a) ...............................................................10

## Other Authorities

67th Leg., R.S. 3522 (1981)................................................................23

Tex. S.B. 341, 67th Leg., R.S. (1981) ..................................................... 22

Tex. S.B. 395, 73rd Leg., R.S. (1993) ..................................................... 15

## Commissioner's Decisions

*Barich v. San Felipe-Del Rio Consolidated School District*,
   Docket No. 117-R1a-484 (Comm'r Educ. 1985).............................passim

*Carpenter v. Wichita Falls Independent School District*,
   Docket No. 247-R3-491 (Comm'r Educ. 1993) ............................15, 33

*Gonzalez v. Donna Indep. Sch. Dist.*, Docket No. 074-R10-605
   (Comm'r Educ. 2007) ...............................................................19

*McCoy v. Kermit Indep. Sch. Dist.*, Docket No. 004-R3-0908
   (Comm'r Educ. 2012) ........................................................... 18, 19

*Montgomery v. Richardson Indep. Sch. Dist.*,
   Docket No. 007-R10-1008 (Comm'r Educ. 2012)..............................19

*Murillo v. Laredo Indep. Sch. Dist.*, Docket No. 027-R3-0108
   (Comm'r Educ. 2012) ...............................................................19

*Pasqua v. Fort Stockton Indep. Sch. Dist.*,
   Docket No. 011-R3-1102 (Comm'r Educ. 2004) ..............................19

*Perales v. Robstown Independent School District*,
   Docket No. 052-R10-104, 084-R3-604 (Comm'r Educ. 2006)..........16

*Underwood v. West Rusk County Consolidated Independent School
   District*, Docket No. 062-R3-198 (Comm'r Educ. 1998) ..............16, 19

*Wheeler v. Austin Indep. Sch. Dist.*, Docket No. 008-R3-1108
   (Comm'r Educ. 2011)................................................................19

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case* | Ms. Jenkins worked for the Crosby Independent School District and was reassigned from middle school principal to high school assistant principal with no change in pay. Ms. Jenkins filed a grievance contesting the reassignment, which the District denied. AR 324. Ms. Jenkins then appealed to the Commissioner who affirmed the District's decision. AR 5-30 (App. 1). Ms. Jenkins then brought a suit for judicial review of the Commissioner's decision pursuant to section 7.057(d) of the Texas Education Code and section 2001.174 of the Administrative Procedure Act. CR 3-8. |
| *Trial Court* | The Honorable Amy Clark Meachum, presiding in the 200th Judicial District Court, Travis County, Texas. |
| *Trial Court Disposition* | The trial court affirmed the Commissioner's decision. CR 376-77 (App. 2). |

## STATEMENT ABOUT ORAL ARGUMENT

Oral argument is unnecessary because this case presents an issue of statutory interpretation for which this Court is well equipped, an issue of substantial-evidence review where more than a scintilla of supporting evidence is apparent, and an issue of contract interpretation where the contract unambiguously permits the reassignment at issue.

# ISSUES PRESENTED

1. Whether the Commissioner's interpretation of section 21.206 of the Texas Education Code is entitled to deference because it does not conflict with the text of the statute and is a long-standing interpretation of a statute that the Commissioner is charged with enforcing?

2. Whether substantial evidence shows that the necessary certification and the responsibilities, duties, and compensation of the principal and assistant principal positions are comparable and within the same professional capacity?

3. According to her employment contract, may Ms. Jenkins be reassigned to serve as an assistant principal?

## STATEMENT OF FACTS

### The District Reassigns Ms. Jenkins to serve as an Assistant Principal

For several years leading up to the end of the 2010-2011 school year, Ms. Jenkins worked for the District as the principal of Charles Drew Intermediate School. AR 258. Then in March 2011, Ms. Jenkins and the District signed an employment contract that states:

> 1. The Board hereby agrees to employ the Employee and the Employee agrees to serve the Board by engaging in duties as assigned by the Superintendent of the Crosby Independent School District for the school years 2011-2013 . . . .
>
> . . . .
>
> 3. It is understood and agreed by the parties to this Contract that the Superintendent of the Crosby Independent School District shall have the right to assign such duties to the Employee as the Superintendent shall deem proper, and since the Employee is not employed to fill a specific position or assignment, the Superintendent may assign or reassign the Employee to other or additional duties for which he or she is professionally certified or otherwise qualified to perform.

AR 294. A few months later in June 2011, the District's superintendent Dr. Moore reassigned Ms. Jenkins from principal at Drew Intermediate to assistant principal at Crosby High School. AR 291.

Ms. Jenkins began employment as an assistant principal at the high school, and also filed a grievance contesting her reassignment; she claimed that "removing

1

[her] as campus principal change[d] [her] professional capacity without due process" and that "[t]he position of campus principal is not a generic administrative position . . . and is unlike any other school employee position." AR 287-88. Ms. Jenkins requested that she be assigned to a mutually agreeable position that, in her belief, would reflect forward career progression. AR 289.

A short time later the District held a level-two grievance hearing. AR 284. After the hearing, the District denied Ms. Jenkins's grievance and noted that Ms. Jenkins was merely reassigned from one administrative position to another. AR 284-86. In particular, the superintendent explained the reassignment:

> I continually examine ways to improve our school district and to match key administrative skills with corresponding administrative positions. After observing your previous campus and appraising your skills and abilities, I determined . . . that Drew Intermediate would benefit from new and fresh leadership, and that your skill set could meet a real need at our High School. As you are aware, Crosby High School has been deemed academically unacceptable and will require a great deal of administrative support and focus to turn the school around . . . and meet the needs of our students. Your previous experiences, and skills and abilities . . . will be very valuable and helpful in this important endeavor.

A.R. 285.

In her new assignment at the much larger high school campus Ms. Jenkins continued to have significant duties and responsibilities, including:

- Appraising and making recommendations about staff;

2

- Training teachers and assisting in staff development;

- Providing instructional leadership;

- Implementing student discipline;

- Developing an effective campus improvement plan; and

- Working directly with parents to solve problems.

A.R. 285-86. Also Ms. Jenkins's salary was unchanged. AR 286.

Ms. Jenkins was unsatisfied, however, so the matter proceeded to a level-three grievance hearing before the District's Board. AR 257. After considering the issue, the Board voted six-to-one to deny Ms. Jenkins's grievance. AR 267.

**The Commissioner Affirms the District's Reassignment**

Ms. Jenkins appealed to the Commissioner. AR 155-58. Her petition for review did not claim that her reassignment was inappropriate because the two jobs at issue were actually dissimilar. AR 155-58. Nor did her briefing raise the claim that the two jobs at issue were actually dissimilar. AR 129-52; 114-22. Ms. Jenkins wrote:

> Suffice it to say, both job descriptions are lacking in detail and are not useful to any legal analysis herein. FN2.
>
> FN2. State law defines and provides contour to the principal's duties, therefore a local job description for principal is not necessary for this appeal. However, there is no definition of assistant principal in any state law. Realizing the CISD's job description for assistant principal was wholly insufficient, the superintendent crafted one in his level-two decision for the purposes of this appeal.

AR 131.

In the end, the Commissioner issued a 26-page decision. AR 5-30 (App. 1). The decision parses prior administrative decisions interpreting the same professional capacity, the legislative history of the inclusion of that term in the Education Code, and Ms. Jenkins's contract. AR 5-30 (App. 1). Ultimately, the Commissioner concluded:

> 6.　　If a school district fails to timely give a teacher notice of proposed nonrenewal when the teacher's contract is about to expire, the school district is required to employ the teacher "in the same professional capacity" for the following school year. A requirement to employ a teacher "in the same professional capacity" for the following year is triggered only when a contract is about to expire and timely notice of proposed nonrenewal is not given. Tex. Educ. Code § 21.206(b).
> . . . .
>
> 12.　　[Ms. Jenkins's] professional capacity under Texas Education Code section 21.206(b) is administrator.
> . . . .
>
> 15.　　[The District] did not reassign [Ms. Jenkins] in violation of Texas Education Code section 21.206(b).

*See* App. 1 at 28-29. Ms. Jenkins filed a motion for rehearing and then brought a suit for judicial review. AR 339-357; CR 3-8.

### The Trial Court Affirms the Commissioner's Decision

After considering the administrative record and the arguments, the trial court affirmed the Commissioner's decision. CR 376-77 (Tab 2). This appeal followed.

4

## SUMMARY OF THE ARGUMENT

This case presents one issue of statutory interpretation, another of substantial-evidence review based on a comparison of the two jobs at issue, and a final issue of contract interpretation.

*Statutory Interpretation.* Chapter 21 of the Texas Education Code shows that a principal is an administrator. But section 21.206(b)'s phrase "same professional capacity" is undefined and ambiguous. So the Commissioner has reasonably assessed whether the two positions at issue are in the "same professional capacity" based on necessary certifications and on the authority, duties, and salaries of the positions. Indeed, over the past 30 years, the Commissioner has reasonably and consistently interpreted "same professional capacity" in this way and the legislature has accepted the Commissioner's interpretation and not displaced it. The Commissioner's interpretation is also supported by legislative intent. While Ms. Jenkins's interpretation of same professional capacity is plausible, it fails next to the Commissioner's reasonable interpretation which carries great weight and holds expertise.

*Substantial Evidence.* Principals and assistant principals are both administrators, are both principals, and both share the same certification. And in her new assistant principal position at a much larger school, Ms. Jenkins continued to have

significant and comparable duties and responsibilities. Also, Ms. Jenkins's salary was unchanged, and she was certified to hold the assistant principal position.

*Contract Interpretation.* While Ms. Jenkins's employment contract is ambiguous with respect to her professional capacity because it says only that she is an employee, her contract unambiguously provides that she may be reassigned to positions for which she is certified. Ms. Jenkins tries rewrite her contract so she may only be employed as a principal, but doing so conflicts with the contract's reassignment clause, conflicts with the superintendent's reassignment authority, and is unworkably stiff for the contract's aim. In contrast, the Commissioner read the contract as a whole, and properly concluded that according to her contract Ms. Jenkins may be assigned as an assistant principal.

**ARGUMENT**

**I.     The Commissioner's interpretation of section 21.206(b)'s phrase "same professional capacity" is reasonable and proper.**

**A.     Standard of Review**

While statutory construction is a question of law reviewed de novo, "an agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language." *R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011) (giving deference to and upholding the agency's interpretation of "public interest" in the statute it administers); *Sw. Pharmacy Solutions, Inc. v. Tex. Health & Human Servs. Comm'n*, 408 S.W.3d 549, 559, 561-62 (Tex. App.—Austin 2013, pet. denied) (holding agency's interpretation and application of certain Medicaid code provisions and agency rules was reasonable, in harmony with the statutes and rules, and entitled to deference); *Nucor Steel-Texas v. Pub. Util. Comm'n*, 363 S.W.3d 871, 878-79 (Tex. App.—Austin 2012, no pet.) (providing an agency's interpretation of a statute it is charged with administering only has to be reasonable and in accord with the statute's plain language to be entitled to deference).

Additionally, the Texas Supreme Court has held that in education law the Court should defer to the Commissioner's "reasonable determination in an area where he

possesses considerable authority and expertise." *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994); *Poole v. Karnack Indep. Sch. Dist.*, 344 S.W.3d 440, 443-44 (Tex. App.—Austin 2011, no pet.). And when the Education Code is ambiguous or silent as to a term, the question "is not whether an interpretation of the statute posed by [the plaintiff] is reasonable, but whether the Commissioner's interpretation is reasonable and does not contradict the plain language of the statute." *Poole*, 344 S.W.3d at 444.

## B.   Chapter 21 of the Texas Education Code shows that a principal is an administrator.

Ms. Jenkins states that the term "administrator" is not present in section 21.201 of the Texas Education Code. Appellant's Br. at 26. That's not the whole truth. Statutes must be read as a whole, *20801, Inc. v. Parker*, 249 S.W.3d 392, 396 (Tex. 2008), and here chapter 21 of the Texas Education Code uses the term "administrator" twenty times, and across ten different sections. Tex. Educ. Code §§ 21.003, .033, .047, .061, .207, .252, .354, .355, .4032, .4511. Chapter 21 shows that a principal is an administrator. Three sections bear mentioning.

First, section 21.354 and its history show that a principal is an administrator. Before June 2011, section 21.354 was titled "Appraisal of Administrators," provided that each school district shall appraise each administrator annually, and specifically addressed the appraisal of a principal. Tex. Educ. Code § 21.354 (2010)

8

(App. 3). Then, the legislature revised the section's title to "Appraisal of Certain Administrators," stated that section 21.354 "does not apply to the appraisal of the performance of a principal," and created a new and more specific appraisal system for principals in section 21.3541. Acts 2011, 82nd Leg., R.S., Ch. 1093 (S.B. 1383), Sec. 1, eff. June 17, 2011 (App. 4). Thus, the legislature originally identified principals as administrators, and continues to identify principals as administrators through the exclusion in section Tex. Educ. Code § 21.354(a-1).

Second, immediately following section 21.3541's appraisal system for principals, section 21.355(a) states that "[a] document evaluating the performance of a teacher or administrator is confidential." Tex. Educ. Code § 21.355(a). Section 21.355(a) applied in this case and was the basis for an agreed protective order covering Ms. Jenkins's evaluations—"documents evaluating the performance of an administrator." CR 367-69. Thus, for at least some purposes, Ms. Jenkins recognizes that she is an administrator, and that a principal is an administrator.

Last, section 21.003 lists employment categories that require certification, and a principal is not a category to itself but rather falls under the term "administrator." *See* Tex. Educ. Code § 21.003 (listing categories where principal can only fit as an administrator); *see also* Tex. Educ. Code § 21.046 (qualifications for certification as superintendent or principal). Also, administrative rules governing certification

9

treat principals and assistant principals as principals. 19 Tex. Admin. Code § 241.1(d) (providing that the holder of a principal certificate may serve as a principal or assistant principal in a Texas public elementary, middle, or secondary school); *see also* 19 Tex. Admin. Code § 241.25(a) (requiring principals and assistant principals to undergo the same one-year induction period).

In short, sections 21.201 and .206 must be read in the context of chapter 21 of the Texas Education Code, which confirms that a principal is an administrator.

**C.    Section 21.206 does not define "same professional capacity."**

Section 21.206 of the Texas Education Code provides:

NOTICE OF CONTRACT RENEWAL OR NONRENEWAL.

(a)  Not later than the 10th day before the last day of instruction in a school year, the board of trustees shall notify in writing each teacher whose contract is about to expire whether the board proposes to renew or not renew the contract.  The notice must be delivered personally by hand delivery to the teacher on the campus at which the teacher is employed, except that if the teacher is not present on the campus on the date that hand delivery is attempted, the notice must be mailed by prepaid certified mail or delivered by express delivery service to the teacher's address of record with the district.  Notice that is postmarked on or before the 10th day before the last day of instruction is considered timely given under this subsection.

(b)  The board's failure to give the notice required by Subsection (a) within the time specified constitutes an election to employ the teacher *in the same professional capacity* for the following school year.

(c)   This section does not apply to a term contract with a superintendent.

Tex. Educ. Code § 21.206 (emphasis added).

Section 21.206 does not define same professional capacity, nor does any other part of the Texas Education Code, nor is common usage sufficiently precise. The Commissioner's interpretation of same professional capacity does not violate the plain language of section 21.206 because that section does not define same professional capacity. Same professional capacity was left undefined and ambiguous.

**D. Section 21.201 does not define "same professional capacity."**

The Commissioner has never held that professional capacities are limited to those classes of positions set out in section 21.201(1)'s definition of teacher:

> "Teacher" means a superintendent, principal, supervisor, classroom teacher, school counselor, or other full-time professional employee who is required to hold a certificate issued under Subchapter B or a nurse. The term does not include a person who is not entitled to a probationary, continuing, or term contract under Section 21.002, an existing contract, or district policy.

Tex. Educ. Code § 21.201(1).

The reasons for this are simple. Section 21.201(1) does not define same professional capacity; it defines teacher. Nor does section Tex. Educ. Code § 21.206 define same professional capacity. And the two sections do not reference each other. Thus there is no textual indication that the definition of same

11

professional capacity in section 21.206 is the same as that of teacher in section 21.201. The statute is ambiguous.

Indeed, if the legislature had intended for section 21.201(1) to define same professional capacity, there were ample ways it could have done that consistent with the means used in other parts of chapter 21. Very simply, the legislature could have said same professional capacity "as defined by" section 21.201(1). *E.g.* Tex. Educ. Code §§ 21.0452(b)(4)(B) ("students of limited English proficiency, as defined by Section 29.052"), .154(4) ("is discharged for good cause as defined by Section 21.156"), .402(a) ("the state maximum compressed tax rate, as defined by Section 42.101(a)"). Or the legislature could have defined same professional capacity by reference as it did frequently with other terms in chapter 21. *E.g.* Tex. Educ. Code §§ 21.106(c) ("A teacher returned to probationary contract status must serve a new probationary contract period as provided by Section 21.102 as if the teacher were employed by the district for the first time."), .4541 ("serving a significant number of students identified as students at risk of dropping out of school, as described by Section 29.081(d)."). But the legislature did not do these things. It left same professional capacity undefined.

Thus, measured against the exacting and most comparable backdrop of chapter 21 of the Education Code, the term "same professional capacity" is undefined and ambiguous.

**E.    The Commissioner has reasonably and consistently interpreted "same professional capacity," and the legislature has accepted the Commissioner's interpretation and not displaced it.**

Because the Education Code does not define same professional capacity, the Commissioner has been called on to interpret and apply section 21.206 in many cases over the past 30 years. In doing so, the Commissioner, unlike Ms. Jenkins, acts as a disinterested arbiter seeking the most textually faithful reading of the Education Code. And the Commissioner's interpretation, unlike Ms. Jenkins's, carries great weight. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) ("If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, as there is here, we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule."); *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994) (providing that the Commissioner's interpretation of a statute is entitled to serious consideration if it is reasonable and does not contradict the statute's plain language).

The Commissioner first considered what constitutes reassignment to a position in the same professional capacity in 1985 in *Barich v. San Felipe-Del Rio Consolidated School District*, Docket No. 117-R1a-484 (Comm'r Educ. 1985). There the Commissioner considered whether the district violated the non-renewal statute by reassigning an ROTC instructor to a teaching position, and held that an ROTC instructor and a teacher were in the same professional capacity where there was "no reduction in salary or status." *Barich*, Docket No. 117-R1a-484 at COL #2 (App. 5). In analyzing and interpreting section 21.206, the Commissioner explained:

> It is more reasonable to conclude that the legislature, by using the term "same professional capacity" (instead of "the exact same position"), intended to allow school districts to be flexible in their personnel assignments while discouraging the abuse of the district's inherent or contractual reassignment authority. In other words, the district may place a teacher whose employment has been renewed by operation of law in a position different from that to which the teacher was assigned the previous year, as long as the position is one to which the district could have reassigned the teacher had the parties voluntarily entered into a contract for the following year. In some instances, the validity of a particular placement will be clear. For example, an administrator who does not receive the required notice by April 1 may not be placed in the capacity of a classroom teacher; a classroom teacher may not be placed in the capacity of a counselor; a counselor may not be placed in the capacity of a nurse; a nurse may not be placed in the capacity of a librarian; etc.
>
> In other instances, the validity of a particular placement might not be so clear. For example, a placement might be to another position within the same professional category (e.g., administrator), but nevertheless,

14

be invalid (e.g., from superintendent to assistant elementary school principal). Factors to be considered in determining the validity of such a placement include, but are not necessarily limited to, differences in authority, duties, and salary.

*Barich* (App. 5). In other words, a reassignment is in the same professional capacity if the district could have contracted with the employee for the reassignment, that is a district cannot reassign an employee to a position that the employee is not certified to hold, and when both positions are in the same category, such as administrator, where applying such factors as authority, duties, and salary shows that the two positions are actually similar and not in different professional capacities.

Since 1985, the Commissioner has applied the *Barich* test, examining whether the positions have similar authority, duties, and salary. App. 6. Indeed, over the past 30 years the Commissioner has consistently interpreted same professional capacity and the legislature has accepted that interpretation and not displaced it.

In 1990, following *Barich* and other administrative decisions, the legislature amended chapter 21 of the Texas Education Code but did not change section 21.206. Term Contract Nonrenewal Act, 71st Leg., 6th C.S., ch. 1, § 3.14, 1990 Tex. Gen. Laws 1, 30.

Then, in 1993, the Commissioner decided *Carpenter v. Wichita Falls Independent School District*, Docket No. 247-R3-491 (Comm'r Educ. 1993) (App. 7). There, Ms.

Carpenter brought the same argument that Ms. Jenkins brings, and the Commissioner rejected it:

> [Ms. Carpenter] would have the Commissioner of Education hold that the phrase "same professional capacity" as used in the TCNA is either defined by or in some way informed by the definition of "teacher" found in §21.201(1) of that Act. I do not believe the statutory language can permit of such an interpretation. Rather, this phrase is left undefined by the statute, and therefore its meaning is a matter for interpretation by the Commissioner, in the first instance, and by the courts.

*Id.* at 3 (App. 7).

Also in 1993, a bill was proposed to define same professional capacity for probationary and continuing contracts, but the bill did not pass. Introduced Bill, Tex. S.B. 395, 73rd Leg., R.S. (1993) (proposing to define same professional capacity as a position substantially equal in duties, responsibility, authority, certification, endorsement, education, and remuneration). And in 1995, the legislature again amended chapter 21 of the Texas Education Code but did not change section 21.206. Term Contract Nonrenewal Act, 74th Leg., R.S., ch. 260 ch. 21 subch. E and F, 1995 Tex. Gen. Law 2207, 2378-79.

Then in 1998, the Commissioner again addressed "same professional capacity" in *Underwood v. West Rusk County Consolidated Independent School District*, Docket No. 062-R3-198 (Comm'r Educ. 1998) (App. 8). There, like here, a middle school principal was reassigned to be a high school assistant principal, and her salary was

16

not changed. *Id.* at 1-2. Although the principal argued that this violated section 21.206 because she was not employed in the same professional capacity, the Commissioner noted *Barich*, analyzed the facts, and concluded that section 21.206 was inapplicable because a contract was not non-renewed and "[i]n addition, [the principal] is retained in her same professional capacity . . . ." *Id.* 3-4. Thus, the Commissioner interpreted same professional capacity and rejected a claim like this one.

In 2003, the legislature again amended chapter 21 of the Texas Education Code but did not change section 21.206. Term Contract Nonrenewal Act, 78th Leg., R.S., ch. 484, § 1, 2003 Tex. Gen. Laws 1749.

Then in 2006, the Commissioner again interpreted "same professional capacity"—this time in *Perales v. Robstown Independent School District*, Docket No. 052-R10-104, 084-R3-604 (Comm'r Educ. 2006) (App. 9).

> The parties dispute the meaning of the phrase "same professional capacity." The term "same professional capacity" is not defined in statute. Petitioner suggests that the definition of "teacher", found at Texas Education Code section 21.201, is helpful . . . .
>
> Petitioner contends that each individual classification is a different professional capacity for purposes of Texas Education Code section 21.206. There are a number of problems with this interpretation. The first problem is that the definition in question is that of "teacher", not of "professional capacity." The second difficulty is that the statutory category of "other full-time professional employee who is required to hold a certificate under Subchapter B" hardly seems a distinct

17

professional capacity. A third difficulty is that in a number of cases the Commissioner has interpreted "same professional capacity" in a different way.

*Id.* at 4-5. After noting *Barich*, the long-standing interpretation of same professional capacity, and comparing the positions and their compensation, the Commissioner concluded that the reassignment from Even Start Director to assistant principal was permissibly within the same professional capacity. *Id.* at 9-12.

In 2011, the legislature amended chapter 21 of the Texas Education Code, and this time specifically revised section 21.206 but did not change 21.206(b) or define same professional capacity. Act of Sept. 28, 2011, 82nd Leg., 1st C.S., ch. 8, § 9, sec. 21.206, 2011 Tex. Gen. Laws 5463, 5465. Rather, the revision gave school districts greater flexibility to implement staffing changes by reducing the notice period for non-renewals in section 21.206(a). *Id.* Additionally, the legislature added section 21.102(a-1) that provides that a person who voluntarily accepts an assignment "in a new professional capacity that requires a different class of certificate" may be employed under a probationary contract. Act of June 17, 2011, 82nd Leg., R.S., ch. 1010, § 1, sec. 21.102(a-1), 2011 Tex. Gen. Laws 1010. Thus, the legislature again adopted "professional capacity" and for purposes of probationary contracts coupled it with a specific trigger based on certification.

Then in 2012, the Commissioner again interpreted section 21.206(b)'s phrase "same professional capacity." *McCoy v. Kermit Indep. Sch. Dist.*, Docket No. 004-R3-0908 (Comm'r Educ. 2012) (App. 10). A well-formed habit at this point, the Commissioner noted that same professional capacity is not defined, and that from his earliest decision concerning this provision he has held that an "administrator" is a professional capacity. *Id.* at *4. Noting *Barich*, that principals and assistant principals are both principals under administrative rules, and that the employee's salary was unchanged, the Commissioner concluded that "[a]dministrator is a professional capacity as that term is used in Texas Education Code section 21.206(b)" and that the school district did not violate section 21.206(b) when it reassigned the principal to be an assistant principal. *Id.* at *11-12 (COL #7, 11). Thus, the Commissioner previously interpreted same professional capacity as he did here, and he previously rejected a claim like this one.

In summary, following *Barich* the Commissioner has consistently interpreted same professional capacity. The Commissioner has decided whether a principal was improperly reassigned to another position. *Underwood v. Rusk Indep. Sch. Dist.*, Docket No. 062-R3-198 (Comm'r Educ. 1998); *Pasqua v. Fort Stockton Indep. Sch. Dist.*, Docket No. 011-R3-1102 (Comm'r Educ. 2004); *Montgomery v. Richardson Indep. Sch. Dist.*, Docket No. 007-R10-1008 (Comm'r Educ. 2012); *Murillo v.*

*Laredo Indep. Sch. Dist.*, Docket No. 027-R3-0108 (Comm'r Educ. 2012); *McCoy v. Kermit Indep. Sch. Dist.*, Docket No. 004-R3-0908 (Comm'r Educ. 2012). The Commissioner has applied the *Barich* test to other types of reassignments—for example, from a central office position to an assistant principal position. *E.g., Gonzalez v. Donna Indep. Sch. Dist.*, Docket No. 074-R10-605 (Comm'r Educ. 2007). The Commissioner has declared reassignments improper because the reassignment was outside of the same professional capacity. *E.g.*, *Wheeler v. Austin Indep. Sch. Dist.*, Docket No. 008-R3-1108 (Comm'r Educ. 2011). In sum, the Commissioner has experience determining whether an assignment is proper based on the statute, facts, and contracts at issue. As in *Dodd v. Meno*, 870 S.W.2d 4, 7 (Tex. 1994) and *Poole v. Karnack Indep. Sch. Dist.*, 344 S.W.3d 440, 443-44 (Tex. App.—Austin 2011, no pet.), this Court should affirm the Commissioner's decision that is based on his technical knowledge and expertise in applying section 21.206 of the Education Code to teacher and administrator contracts.

In addition, the Commissioner's interpretation is so long-standing that it should not be changed in the absence of clear statutory authorization. *See Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967). In *Humble Oil*, the court noted that "a statute of doubtful meaning that has been construed by the proper administrative officers, when re-enacted without any substantial change in

20

verbiage, will ordinarily receive the same construction." *Id.* The statute in question had been uniformly construed in a particular manner for 46 years. *Id.* at 173. Here, section 21.206(b)'s phrase "same professional capacity" is ambiguous, the Commissioner has uniformly construed the provision for 30 years, and the legislature has amended the TCNA without changing section 21.206(b).[1] An administrative officer's construction of statutory language is entitled to great weight when the construction has continued for a long time. *Bullock v. Marathon Oil Co.*, 798 S.W.2d 353, 357 (Tex. App.—Austin 1990, no writ). And if an agency interpretation is in effect at the time the legislature amends the law without making any substantial change in the statute, the legislature is deemed to have accepted the agency's interpretation. *Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967); *Federal Crude Oil Co. v. Yount-Lee Oil Co.*, 122 Tex. 21, 52 S.W.2d 56, 62 (1932); *Marathon Oil Co.*, 798 S.W.2d at 357.

In sum, the Commissioner has reasonably and consistently interpreted section 21.206(b)'s phrase "same professional capacity," and the doctrine of legislative

---

[1] The legislature amended the TCNA in 1990, 1995, 2003, and 2011. Term Contract Nonrenewal Act, 71st Leg., 6th C.S., ch. 1, § 3.14, 1990 Tex. Gen. Laws 1 (allowing the hearing to be heard by a board designated impartial hearing officer); Term Contract Nonrenewal Act, 74th Leg., R.S., ch. 260 ch. 21 subch. E and F, 1995 Tex. Gen. Law 2207 (making many changes including modifying the definition of "teacher" and allowing boards to use the Independent Hearing Examiner Process); Term Contract Nonrenewal Act, 78th Leg., R.S., ch. 484, § 1, 2003 Tex. Gen. Laws 1749 (concerning distribution of district employment policies); Term Contract Nonrenewal Act, 82nd Leg., 1st C.S., ch. 8, §§ 8-11, 2011 Tex. Gen. Laws 5463 (allowing districts to hire their own hearing examiners and making several changes concerning notice).

acquiescence supports the Commissioner's interpretation and the conclusion that the reassignment from a principal to assistant principal is within the same professional capacity.

**F.     Legislative intent further supports the Commissioner's interpretation of same professional capacity.**

Legislative intent shows that same professional capacity falls short of covering all demotions and that school districts have some discretion in reassignments.

The Term Contract Nonrenewal Act (TCNA) was passed by the 67th Legislature in 1981. Term Contract Nonrenewal Act, 67th Leg., R.S., ch. 765, 1981 Tex. Gen. Laws 2847. The law fundamentally changed teachers' contracts: it required school districts to establish policy reasons for ending a contract and to identify the reasons why it was proposing to end the contract, and it gave teachers the right to a hearing where the administration bore the burden of proof. *See generally Seifert v. Lingleville Indep. Sch. Dist.*, 692 S.W.2d 461, 462 (Tex. 1985). But as originally filed, Senate Bill 341 was more ambitious than what was enacted.

Under SB 341 as filed, a term contract could only be ended for "just cause" after written notice of deficiencies, assistance, a time for improvement, and a hearing. Significantly, SB 341 as filed also defined "demotion" as

> an involuntary reduction of a teacher to a position of lesser rank, responsibility, or compensation, or the reassignment of a teacher

outside the scope of the teacher's teaching certificate or major or minor field of study.

Introduced Bill, Tex. S.B. 341, 67th Leg., R.S. (1981). Demotion could only occur for just cause after following the process for ending a term contract (notice, assistance, time for improvement, and a hearing). In that form SB 341 passed the Senate but not the House.

The House Education Committee passed its substitute for SB 341 with this language:

> In the event of failure to give such notice of proposed nonrenewal within the time herein specified, the board of trustees shall thereby elect to employ such employee in the same capacity for the succeeding school year.

House Committee Report, Tex. S.B. 341, 67th Leg., R.S. (1981). As the Commissioner explained in his decision, "same capacity" permits a range of interpretations—the fifth grade English teacher at Davis Elementary, or any classroom teaching position. Ultimately, the matter was not clarified: on second reading the word professional was added to make "same professional capacity" but no definition was provided. H.J. of Tex., 67th Leg., R.S. 3522 (1981). The House version went on to become law.

What is clear, however, is that the legislature knew how to restrict reassignments with specific triggers—lesser rank, or responsibility, or

compensation, or reassignment outside the scope of certification—but ultimately chose to give school districts some flexibility. This legislative intent informs and supports the Commissioner's interpretation of same professional capacity: the Commissioner considers similar factors—the *Barich* test of authority, duties, salary, and certification—to those originally proposed by the Senate, but does so in a more rounded way true to the enacted law than the Senate's restrictive version.

**G. Ms. Jenkins's interpretation of same professional capacity is plausible but unconvincing.**

Ms. Jenkins's interpretation of same professional capacity is plausible. In *Grounds v. Tolar Independent School District*, 694 S.W.2d 241, 244-245 (Tex. App.—Fort Worth 1985), *rev'd on other grounds*, 707 S.W.2d 889 (Tex. 1986), the Fort Worth Court of Appeals came close to adopting her interpretation after surveying the Education Code and concluding that the only two parts which appear to classify professional capacities are section 21.201(1) which defines "teacher" and the then section 16.056 which authorized school districts to use certain professional positions for determining state base pay. But that court lacked the Commissioner's expertise and the Commissioner's input (he was not a party), and that court's decision was flawed, vacated for lack of jurisdiction, and the Commissioner's decision was reinstated. *Grounds v. Tolar Indep. Sch. Dist.*, 707 S.W.2d 889, 29 Tex. Sup. Ct. J. 307 (Tex. 1986). Additionally, after the first

24

Commissioner's decision, the Commissioner issued another decision the following year and concluded that Grounds was employed as a teacher/football coach and entitled to be rehired in that same professional capacity. *Grounds v. Tolar Indep. Sch. Dist.*, Docket No. 340-R3-786 (Comm'r Educ. 1986); *see also Grounds v. Tolar Indep. Sch. Dist.*, 856 S.W.2d 417, 421 (Tex. 1993) (Gonzalez, J., concurring) (succinctly explaining factual history). After that the Commissioner continued on to consistently interpret same professional capacity. Put simply, Ms. Jenkins's argument would be more convincing if this case were presented on a basic slate. But law, like life, carries its history forward, and that history matters. Here, that history is the Commissioner's long-standing interpretation and the legislature's acquiescence. Additionally, the Commissioner's interpretation carries great weight and its subject falls squarely within his expertise.

Ms. Jenkins also correctly notes that that the Texas Education Code gives a specific and important role to principals but not to assistant principals. Section 11.202 makes the principal "the instructional leader of the school" and specifies a principal's duties, and a principal has specific duties under chapter 37 of the Texas Education Code concerning student placement. Tex. Educ. Code § 11.202; *e.g.*, Tex. Educ. Code §§ 37.002, .0181, .019. No doubt there are differences between principals and assistant principals. But principals and assistant principals are both

25

administrators, are both principals, and both share the same certification. And the legislature gave school districts some flexibility in reassignments, and the superintendent has statutory authority to assign principals and assistant principals. Tex. Educ. Code § 11.202(d)(2).

Ultimately, Ms. Jenkins's interpretation of same professional capacity is unconvincing. Where the Education Code is ambiguous or susceptible to multiple reasonable interpretations this Court has held that the Commissioner's reasonable interpretation prevails. *Poole v. Karnack Indep. Sch. Dist*, 344 S.W.3d 440, 444 (Tex. App.—Austin 2011, no pet.). Here, the Commissioner's interpretation does not conflict with the text, is long-standing, is supported by legislative acquiescence, and gives effect to legislative intent; it should therefore be followed.

## II. The reassignment from middle school principal to high school assistant principal with no change in compensation was permissibly within the same professional capacity.

### A. Standard of Review

Judicial review of the Commissioner's decision is governed by the substantial evidence rule, as described in section 2001.174 of the Administrative Procedure Act (APA). Tex. Educ. Code § 7.057(d); Tex. Gov't Code § 2001.174; *Poole v. Karnack Indep. Sch. Dist.*, 344 S.W.3d 440, 443-44 (Tex. App.—Austin 2011, no pet.). Under this standard, the Court may not substitute its judgment for that of the

agency. *State v. Pub. Util. Comm'n*, 883 S.W.2d 190, 203-204 (Tex. 1994). The agency's decision is presumed valid, and the opposing side has the burden to prove its invalidity. *Id.* Although substantial evidence is more than a mere scintilla, the evidence in the record may preponderate against the agency decision and still amount to substantial evidence. *Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex. 1984). *See generally Texas State Bd. of Dental Examiners v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988) (describing substantial evidence standard as whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency reached).

## B. The reassignment was permissible.

Ms. Jenkins did not exhaust administrative remedies as to whether a comparison of the two job assignments shows they differ in professional capacity. Before the Commissioner, Ms. Jenkins merely argued that the Commissioner should "revisit" the *Barich* test. A.R. 129-53. Her petition for review did not claim that her reassignment was inappropriate because the two jobs at issue were actually dissimilar. AR 155-58. Nor did she brief that the two jobs at issue were actually dissimilar. AR 129-52; 114-22. As the Commissioner put it, "[Ms. Jenkins's claim is not that in her particular circumstance, comparing authority, duties, compensation and other relevant factors, the two positions were in separate

27

professional capacities. [Her] claim is that a principal can only be assigned to another principal position." AR 26 (Tab 1). That is, Ms. Jenkins merely challenged the Commissioner's long-standing interpretation of "same professional capacity": she did not contest that should the Commissioner's interpretation apply, her reassignment fell within the same professional capacity. As a result, Ms. Jenkins failed to raise the factual comparison as required by Rules 157.1051(b) and 157.1058(a)(4). 19 Tex. Admin. Code § 157.1051(b) ("'all issues relied on … must be raised in the petition for review, and the commissioner will not consider any issues not raised in the petition for review."); 19 Tex. Admin. Code § 157.1058(a)(4) ("Argument. The brief must contain clear and concise argument for the contentions made with appropriate citations to authorities and to the record.").

Regardless, here the reassignment was within the same professional capacity. Principals and assistant principals are both administrators, are both principals, and both share the same certification. And in her new assistant principal position at a much larger school, Ms. Jenkins continued to have significant and comparable duties and responsibilities—appraising and making recommendations about staff, training teachers and assisting in staff development, providing instructional leadership, implementing student discipline, developing an effective campus improvement plan, and working directly with parents to solve problems. *Compare*

Tex. Educ. Code § 11.202 (listing some duties of principles) *with* AR 285-86 (listing Ms. Jenkins's responsibilities as assistant principal). Also, Ms. Jenkins's salary was unchanged. AR 286. And her principal certification was sufficient for the assistant principal position. 19 Tex. Admin. Code § 241.1(d) (providing that the holder of a principal certificate may serve as a principal or assistant principal). Thus, substantial evidence shows that the reassignment was proper. *See* Tex. Gov't Code § 2001.174 (substantial evidence standard); *Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984) (substantial evidence is more than a mere scintilla). That is, a reasonable person could conclude that the reassignment from middle school principal to assistant principal at a much larger high school and with no change in compensation was permissible.

**III.  The Commissioner properly concluded that according to her contract Ms. Jenkins may be assigned to serve as an assistant principal.**

**A.  Standard of Review**

The interpretation of an unambiguous contract is a question of law. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). An administrative interpretation of an unambiguous contract does not carry deference. *See Weslaco Fed'n of Teachers v. Texas Educ. Agency*, 27 S.W.3d 258, 263-64 (Tex. App.—Austin

2000, no pet.) (rejecting district's argument that employment contracts should be reviewed under the substantial-evidence standard, rather than de novo); *see also N.E. Indep. Sch. Dist. v. Kelley*, No. 03-09-00641-CV, 2010 Tex. App. LEXIS 9792, 2010 WL 5019850 at *5 (Tex. App.—Austin Dec. 9, 2010, pet. denied) (mem. op.) (finding similarly and following *Weslaco*). "[A]n agency's interpretation of an unambiguous contract is not binding on a district or appellate court." *Weslaco*, 27 S.W.3d at 264.

In construing a contract, the Court must ascertain and give effect to the parties' intentions as expressed in the document. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). The Court will consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *J.M. Davidson, Inc.*, 128 S.W.3d at 229. Contracts are construed "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and the court construes it as a matter of law. *J.M.*

*Davidson, Inc.*, 128 S.W.3d at 229. On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent. *Id.*

In the context of administrative determinations involving the factual issue of the parties' intent, this Court has explained that if an agreement is ambiguous the agency's interpretation will be affirmed so long as it is supported by substantial evidence. *See City of Abilene v. Pub. Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.) (stating court will affirm the agency's interpretation of a settlement agreement if the interpretation is supported by substantial evidence); *AEP Tex. Cent. Co. v. Pub. Util. Comm'n*, 286 S.W.3d 450, 471 (Tex. App.—Corpus Christi 2008, pet. denied) ("If the agreement is ambiguous, we will affirm the [agency's] interpretation of it, so long as the interpretation is supported by substantial evidence.").

Here, the contract unambiguously states that Ms. Jenkins may be reassigned to other duties for which she is professionally certified. But the contract is ambiguous as to the professional capacity in which Ms. Jenkins was employed: the contract states that she is an employee; however, employee is not a professional capacity under Texas Education Code section 21.206.

**B.     The Commissioner properly concluded that according to her contract Ms. Jenkins may be assigned to serve as an assistant principal.**

Employment contracts need not specify an employee's professional capacity. Here, Ms. Jenkins's employment contract is ambiguous with respect to her professional capacity; it says only that she is an employee. AR 294 (App. 11). While Ms. Jenkins would prefer to rewrite her contract from "employee" to read "principal" instead of "administrator," doing so conflicts with the contract's reassignment clause, conflicts with the superintendent's reassignment authority, and is unworkably stiff for the contract's aim.

The reassignment clause in Ms. Jenkins's employment contract provides:

> 3.     It is understood and agreed by the parties to this Contract that the Superintendent of the Crosby Independent School District shall have the right to assign such duties to the Employee as the Superintendent shall deem proper, and since the Employee is not employed to fill a specific position or assignment, *the Superintendent may assign or reassign the Employee to other or additional duties for which he or she is professionally certified or otherwise qualified to perform.*

A.R. 294 (emphasis added). As a principal, Ms. Jenkins was certified and qualified to serve as an assistant principal. 19 Tex. Admin. Code § 241.1(d) (a holder of the principal certificate "may serve as a principal or assistant principal in a Texas public school."). Thus, the superintendent was specifically permitted by contract to reassign Ms. Jenkins to be an assistant principal. Yet Ms. Jenkins's preferred contractual rewriting to "principal"—apparently excluding assistant principal—

32

prevents this, while the Commissioner's interpretation reconciles Ms. Jenkins's professional capacity with the contract's reassignment clause (and statutes and administrative decisions). For this reason, the Commissioner's interpretation is reasonable and gives meaning to the contract as a whole, while Ms. Jenkins's preferred reading fails.

Similarly, Ms. Jenkins's reading conflicts with the superintendent's assignment authority. Section 11.201(d)(2) provides:

> (d) The duties of the superintendent include:
>
> (2) except as provided by Section 21.202, assuming administrative authority and responsibility for the assignment, supervision, and evaluation of all personnel of the district other than the superintendent.

Tex. Educ. Code § 11.201(d)(2). Although there is an exception for section 21.202 involving personnel decisions made by principals, this merely ensures the superintendent need not make each and every personnel decision. In other words, although section 11.202 (b)(1) provides that principals "shall approve all teacher and staff appointments for that principal's campus," the superintendent has statutory authority for the assignment of principals and assistant principals. Tex. Educ. Code § 11.202(b)(1). Ms. Jenkins ignores this, and her interpretation conflicts with and restricts the superintendent's assignment authority.

Finally, Ms. Jenkins's preferred contractual reading is unworkably stiff given the contract's business aims—supplying personnel to meet needs. As the Commissioner has explained, "the [Term Contract Nonrenewal Act] balanced its grant of limited tenure rights against the considerable personnel management problems it might cause if imposed inflexibly," and "[t]he need for flexibility in making personnel changes is strongest, and the argument for a rigid tenure system weakest, at the administrative level." *Carpenter v. Wichita Falls Indep. Sch. Dist.*, Docket No. 247-3-491 (Comm'r Educ. 1993). And Ms. Jenkins's reading would prevent school districts from assigning talented administrative personnel to address local concerns like those here. *See* A.R. 285 (noting need at Crosby High School).

In short, the Commissioner properly interpreted the contract as a whole.

## CONCLUSION AND PRAYER

This case presents a settled issue. The Commissioner has repeatedly held that principal and assistant principal are in the same professional capacity and that a school district need not provide notice and a hearing to non-renew a principal's contract when reassigning a principal to be an assistant principal. This Court should not overturn nearly 30 years of precedent in formal adjudications, particularly where the Commissioner's interpretation of the Texas Education Code is reasonable, longstanding, supported by the legislative intent, and entitled to

deference. The Commissioner respectfully requests that his decision and the trial court's judgment be affirmed.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

DAVID A. TALBOT, JR.
Chief, Administrative Law Division

*/s/ Andrew Lutostanski*
ANDREW LUTOSTANSKI
Assistant Attorney General
State Bar No. 24072217
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Administrative Law Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: (512) 475-4200
Fax: (512) 320-0167
*[andrew.lutostanski@texasattorneygeneral.gov](mailto:andrew.lutostanski@texasattorneygeneral.gov)*

## CERTIFICATE OF COMPLIANCE

I certify that the brief submitted complies with Texas Rule of Appellate Procedure 9.4(i)(3) and the word count of this document is 7,649. Word 2013 was used to prepare this document and count the words in it.

*/s/ Andrew Lutostanski*
Andrew Lutostanski

35

## CERTIFICATE OF SERVICE

I hereby certify this document was served on September 24, 2015 to

Kevin F. Lungwitz                              Via e-service
State Bar No. 12698790
Elizabeth Poole
State Bar No. 24051201
The Lungwitz Law Firm, P.C.
3005 S. Lamar Blvd
Suite D-109-362
Austin, Texas 78704-4785
Kevin@LungwitzLaw.com
Elizabeth@LungwitzLaw.com
Attorneys for Plaintiff Hermenia Jenkins

David B. Hodgins                               Via e-service
State Bar No. 09775530
Frances Broussard
State Bar No. 24055218
Amber K. King
State Bar No. 24047244
THOMPSON & HORTON LLP
3200 Southwest Freeway, Suite 2000
Houston, TX 77027
dhodgins@thompsonhorton.com
fbroussard@thompsonhorton.com
aking@thompsonhorton.com
Attorneys for Defendant Crosby ISD

                                    */s/ Andrew Lutostanski*
                                    Andrew Lutostanski

# INDEX OF APPENDICES

**Specifically Listed**

1.    Commissioner's Decision

2.    Final Judgment

3.    Tex. Educ. Code § 21.354 (2010)

4.    Acts 2011, 82nd Leg., R.S., Ch. 1093 (S.B. 1383), Sec. 1, eff. June 17, 2011

5.    *Barich v. San Felipe-Del Rio Consolidated School District*, Docket No. 117-R1a-484 (Comm'r Educ. 1985)

6.    Summary of Administrative Decisions

7.    *Carpenter v. Wichita Falls Indep. Sch. District*, Docket No. 247-R3-491 (Comm'r Educ. 1993)

8.    *Underwood v. West Rusk County Consolidated Indep. Sch. District*, Docket No. 062-R3-198 (Comm'r Educ. 1998)

9.    *Perales v. Robstown Indep. Sch. District*, Docket No. 052-R10-104, 084-R3-604 (Comm'r Educ. 2006)

10.   *McCoy v. Kermit Indep. Sch. Dist.*, Docket No. 004-R3-0908 (Comm'r Educ. 2012)

11.   Ms. Jenkins's employment contract

**Legislation**

1.    Act of Aug. 31, 1981, 67th Leg., R.S., ch. 765, 1981 Tex. Gen. Laws 2847 (current version at Tex. Educ. Code § 21.206(a)).

2.    Act of Sept. 28, 2011, 82nd Leg., 1st C.S., ch. 8, § 9, sec. 21.206, 2011 Tex. Gen. Laws 5463, 5465.

3.      H.J. of Tex., 67th Leg., R.S. 3522 (1981).

4.      House Committee Report, Tex. S.B. 341, 67th Leg. R.S. (1981).

5.      Introduced Bill, Tex. S. B. 341, 67th Leg., R.S. (1981).

6.      Term Contract Nonrenewal Act, 71st Leg., 6th C.S., ch. 1, § 3.14,
        1990 Tex. Gen. Laws 1, 30.

7.      Term Contract Nonrenewal Act, 74th Leg., R.S., ch. 260 ch. 21 subch. E and
        F, 1995 Tex. Gen. Law 2207, 2378-79.

8.      Term Contract Nonrenewal Act, 78th Leg., R.S., ch. 484, § 1,
        2003 Tex. Gen. Laws 1749.

| HERMENIA JENKINS | § | BEFORE THE |
| --- | --- | --- |
| | § | |
| V. | § | COMMISSIONER OF EDUCATION |
| | § | |
| CROSBY | § | |
| INDEPENDENT SCHOOL DISTRICT | § | THE STATE OF TEXAS |

## DECISION OF THE COMMISSIONER

### Statement of the Case

Petitioner, Hermenia Jenkins, appeals the denial of her grievance by Respondent, Crosby Independent School District. Christopher Maska is the Administrative Law Judge appointed by the Commissioner of Education to preside over this cause. Petitioner is represented by Kevin F. Lungwitz, Attorney at Law, Austin, Texas. Respondent is represented by David B. Hodgins, Attorney at Law, Houston, Texas[1].

The Administrative Law Judge issued a Proposal for Decision recommending that Petitioner's appeal be denied in part and dismissed in part. Exceptions and replies were timely filed and considered.

The central issue in this case is whether a principal serving under a term contract can be reassigned to an assistant principal position in the year after the principal's contract has been renewed. By statute, such a reassignment must be in "same professional capacity." Petitioner contends that a bright line rule should be established so that a principal may only be reassigned to another principal position. For the Commissioner to so rule would require the Commissioner to overrule a string of cases going back to the Commissioner's earliest decisions under the Term Contract Nonrenewal Act. Further, such a ruling is not consistent with the intention of the Legislature which passed the statute in question. The Legislature did not create the purposed bright line rule, but instead used language that allows the Commissioner to

---

[1] The Texas Association of School Board's Legal Assistance Fund filed a Brief of *Amicus Curiae*.

043-R10-1211                                        1

exercise his broad experience in education to determine just what is the "same professional capacity" in each individual case.

## Findings of Fact

After due consideration of the record and matters officially noticed, it is concluded that the following Findings of Fact are supported by substantial evidence and are the Findings of Fact that best support Respondent's decision[2].

1.　In March 2011, Petitioner and Respondent signed a contract that provides in relevant part:

> 1.　The Board hereby agrees to employ the Employee and the Employee agrees to serve the Board by engaging in duties as assigned by the Superintendent of the Crosby Independent School District for the school years 2011-2013 with beginning and ending dates as set by the Board.
>
> . . .
>
> 3.　It is understood and agreed by the parties to this Contract that the Superintendent of the Crosby Independent School District shall have the right to assign such duties to the Employee as the Superintendent shall deem proper, and since the Employee is not employed to fill a specific position or assignment, the Superintendent may assign or reassign the Employee to other or additional duties for which he or she is professionally certified or otherwise qualified to perform

2.　Petitioner served as the principal of Charles R. Drew Intermediate School from 2003 to the end of the 2010-2011 school year.

3.　On June 28, 2011, Petitioner was reassigned from the position of principal at Charles R. Drew Intermediate to the position of assistant principal at Crosby High School.

4.　The local record does not indicate with specificity what Petitioner's duties as assistant principal at Crosby High School are.

---

[2] *See* 19 TEX. ADMIN. CODE §157.1073(h); *Bosworth v. East Central Independent School District*, Docket No. 090-R1-803 (Comm'r Educ. 2003).

043-R10-1211　　　　　　　　　2

## Discussion

Petitioner asserts that Respondent improperly reassigned her. Respondent denies this claim. In particular, Petitioner alleges that Respondent's actions violated Texas Education Code section 11.202, which designates a principal as the instructional leader of a campus; section 11.201, which grants supervisory rights to superintendents, and section 21.206(b) which requires a school board that does not timely give notice of proposed nonrenewal to hire the teacher in the same professional capacity for the following school year. Petitioner also alleges that Respondent violated 19 TEX. ADMIN. CODE § 150.1021, which concerns the Commissioner's Recommended Appraisal process for administrators and policy DN(LOCAL). Respondent denies these claims.

### Rights

Petitioner claims her reassignment violated her rights under Texas Education Code section 11.202, 19 TEX. ADMIN. CODE § 150.1021, and policy DN(LOCAL). Texas Education Code section 11.202 is entitled "Principals." It provides that a principal is the instructional leader of a school. It lists seven duties of a principal. It requires school boards to adopt a policy for selecting principals. It gives a superintendent or designee final authority to assign teachers transferred due to enrollment shifts or program changes. Texas Education Code section 11.202 does not give Petitioner the right to a principal position. Likewise, 19 TEX. ADMIN. CODE § 150.1021, and policy DN(LOCAL) do not give Petitioner a right to a principal position. However, if Petitioner were entitled to a principal position, she would be entitled to the rights provided by this statute and rule, but not local policy. Under Texas Education Code section 7.057(a)(2)(A), the Commissioner lacks jurisdiction over violations of school district policies. *Reeves v. Aledo Independent School District*, Docket No. 106-R10-496 (Comm'r Educ. 1999)

### TEX. EDUC. CODE § 11.201

Texas Education Code 11.201(d)(2) provides that superintendents have responsibility for most assignments. Petitioner contends that Respondent's

043-R10-1211                                    3

superintendent reassigned her in an arbitrary and capricious manner and, hence, the reassignment is invalid. However, a superintendent does not violate Texas Education Code 11.201(d) when a superintendent poorly exercises an authority granted by this section. The Commissioner has held that:

> The provisions in question do not require this responsibility to be exercised fairly or wisely. The provisions also do not prohibit a district from taking action against superintendents who act rashly or unfairly.

*S.R.S. v Groesbeck Independent School District*, Docket No. 025-R5-105 (Comm'r Educ. 2006). Texas Education Code 11.201(d) could only be violated by a refusal to exercise the statutory grant of authority.

A board's decision may be overturned for being arbitrary and capricious. However, this is only the case when the board's decision itself is arbitrary and capricious. That a superintendent's action was arbitrary and capricious does not make a school board's decision arbitrary and capricious. If any action of a superintendent that was alleged to be was arbitrary and capricious could be appealed to the Commissioner, the Commissioner's docket would greatly expand. This would be contrary to the intention of the Legislature of limiting the Commissioner's jurisdiction, which can be seen by comparing Texas Education Code section 7.057 to the prior jurisdictional statute, Texas Education Code section 11.13. The Commissioner lacks jurisdiction under Texas Education Code section 7.057(a)(2)(A) over a claim Respondent's superintendent arbitrarily and capriciously reassigned her.

Same Professional Capacity

Petitioner contends that her reassignment is not proper because the positions of principal and assistant principal are not in the same professional capacity. The phrase "same professional capacity" occurs twice in the Texas Education Code. In Texas Education Code section 21.206 provides:

043-R10-1211                                             4

(a) Not later than the 10th day before the last day of instruction in a school year, the board of trustees shall notify in writing each teacher whose contract is about to expire whether the board proposes to renew or not renew the contract. The notice must be delivered personally by hand delivery to the teacher on the campus at which the teacher is employed, except that if the teacher is not present on the campus on the date that hand delivery is attempted, the notice must be mailed by prepaid certified mail or delivered by express delivery service to the teacher's address of record with the district. Notice that is postmarked on or before the 10th day before the last day of instruction is considered timely given under this subsection.

(b) The board's failure to give the notice required by Subsection (a) within the time specified constitutes an election to employ the teacher in the same professional capacity for the following school year.

(c) This section does not apply to a term contract with a superintendent.

If a school district fails to timely give a teacher notice of proposed nonrenewal when the teacher's contract is about to expire, the school district is required to employ the teacher in the "same professional capacity" for the following school year. A requirement to employ a teacher in the "same professional capacity" is triggered only when a contract is about to expire and timely notice of proposed nonrenewal is not given. The other time the phrase "same professional capacity" is used in the Texas Education Code is found at Texas Education Code section 21.212. This provision is very similar to Texas Education Code section 21.206. The major distinction is that it applies exclusively to superintendents.

In the present case, it would seem that no violation of Texas Education Code section 21.206 could occur because when Petitioner was reassigned her contract was not about to expire. Petitioner's contract will not expire until the end of the 2012-2013 school year. Petitioner's claim concerning Texas Education Code section 21.206 would not appear to be ripe. However, Petitioner points out that she was employed by Respondent as a principal just prior to her signing her 2011-2013 contract. Hence, during the 2011-2012 school year, Respondent was required to employ Petitioner in the same professional capacity as Petitioner held during the 2010-2011 school year. However, if

043-R10-1211                                  5

Petitioner were to prevail on this claim, she would only be entitled to be employed in the same professional capacity for the 2011-2012 school year and not for the 2012-2013 school year. While this may be viewed as a result that does not favor teachers, some implications of multiple year term contracts favor teachers.

As the Commissioner pointed out in *Smithwick v. Castleberry Independent School District*, Docket No. 085-R1-0711 n. 2 (Comm'r Educ. 2011), multiple year contracts can also benefit teachers. A multiple year contract may only be nonrenewed when it is about to expire. A school district that wishes to end a multiple year contract at the end of the fist contract year must proceed by the more difficult process of termination as opposed to nonrenewal. In such a case, the district is required to prove good cause and the case is heard by an independent hearing examiner. TEX. EDUC. CODE §§ 21.211, 21.251 *et seq*.

Must Principals Remain Principals?

Petitioner argues that the Commissioner should overturn precedent and conclude that if a principal's contract is not nonrenewed, a school district is limited to reassigning a principal to another principal position for the next school year. Petitioner argues that the only position that is in the same professional capacity of a principal is the position of principal. Precedent should not be lightly overturned. Teachers and school districts base important decisions in reliance on Commissioner's Decisions. But the fundamental principle of statutory construction is to give effect to the intention of the Legislature. If the Commissioner's long standing interpretation of the statute is in conflict with the intention of the Legislature, the Commissioner's interpretation should change.

TCNA

The Term Contract Nonrenewal Act[3] ("TCNA") was passed by the 67th Legislature in 1981[4]. Term Contract Nonrenewal Act, 67th Leg., R.S., ch. 765, 1981 Tex.

[3] Section 1 of SB 341 itself provided that "this act shall be known as "The Term Contract Nonrenewal Act."
[4] The TCNA became effective on August 31, 1981. However, because most contracts for the 1981-1982 school year had already been signed by that date, the TCNA really became operational for the 1982-1983

043-R10-1211                                    6

Gen Laws 2847. This law fundamentally changed teacher[5] contracts. Before the TCNA many districts hired teachers and administrators on one-year contracts. When the contract term expired, the district was not required to offer a contract for the new school year. *Seifert v. Lingleville Indep. Sch. Dist.*, 692 S.W.2d 461, 462 (Tex. 1985). Prior to the passage of the TCNA, school districts were not required to establish policy reasons for ending a contractual relationship, to give teachers the reasons why ending the contractual relationship was proposed, and to provide teachers with the opportunity for a hearing where the administration had the burden of proof to show that the teacher's contract should be nonrenewed. A key passage of the original TCNA, then numbered as Texas Education Code section 21.204, required a district that did not nonrenew a teacher's contract to hire the teacher for the next school year:

Notice
   (a) In the event the board of trustees receives a recommendation for nonrenewal, the board after consideration of written evaluations required by Section 21.202 of this subchapter and the reasons for the recommendation, shall in its sole discretion, either reject the recommendation or shall give the teacher written notice of the proposed nonrenewal on or before April 1 proceeding the end of the employment fixed in the contract.
   (b) *In the event of failure to give such notice of proposed nonrenewal within the time herein specified, the board shall thereby elect to employ such employee in the same professional capacity for the succeeding school year.*
   (c) The notice of proposed nonrenewal required in this section shall contain a statement of all the reasons for such proposed action.

(Emphasis added). If a teacher's contract was not noticed for nonrenewal, the school board was not only required to hire the teacher for the next school year but also to employ the teacher in the same professional capacity for the next school year. The fundamental dispute in this case is over the meaning of the phrase "same professional capacity."

---

school year. That makes the 1984-1985 school year, the first time the issue of whether a teacher was rehired in the same professional capacity could actually be raised.
[5] From the beginning, the TCNA has used an expansive definition of "teacher" that includes many who are not normally referred to as teachers.

H. Jenkins v. Crosby ISD
TEA #: 000011

## Legislative History

The legislative history of the TCNA[6] sheds some light on the meaning of the phrase "same professional capacity." Senate Bill 341 created the TCNA. As originally filed, SB 341 was far more ambitious than the TCNA which became law. Under SB 341 as filed, a term or continuing contract could only be ended for "just cause." The contract could only be ended after the teacher was given written notice of deficiencies, assistance, and reasonable time for improvement. Evidence against a teacher could only be used if it was promptly brought to the teacher's attention. The hearing was to be held before an attorney selected by both parties. The hearing examiner's decision was final in that there was no appeal to the board or the Commissioner, but the hearing examiner's decision was appealable to district court under the Administrative Procedures and Texas Register Act.

More to the point of the current controversy, SB 341 as filed defined "demotion" in an expansive manner:

> . . . an involuntary reduction of a teacher to a position of lesser rank, responsibility, or compensation, or the reassignment of a teacher outside the scope of the teacher's teaching certificate or major or minor field of study.

Any loss of rank, responsibility, or compensation constituted a demotion. All of the procedures for ending a contract described in the preceding paragraph also applied when a teacher was proposed for demotion. Demotion could only occur after just cause was proved at a hearing. Demotion would apply to a change in professional capacity as well as many more situations. SB 341 made it through the Senate in substantially the same form as it was filed.

In the House, SB 341 became the TCNA. The House Education Committee passed its substitute for SB 341 with the following language in section 21.204(b).

---

[6] The relevant legislative history may be found at the website for the Legislative Reference Library of Texas. http://www.lrl.state.tx.us/index.cfm.

043-R10-1211         8

In the event of failure to give such notice of proposed nonrenewal within the time herein specified, the board of trustees shall thereby elect to employ such employee in the same capacity for the succeeding school year.

The meaning of the phrase "same capacity" is not defined in the Committee Substitute. "Same capacity" could perhaps be interpreted broadly to mean in a particular case: the fifth grade English teacher at Davis Elementary School. It could perhaps be interpreted strictly to mean any classroom teaching position. When SB 341 was heard by the House on Second Reading an amendment was made to include the word "professional" between the words "same" and "capacity." No definition was added for the phrase "same professional capacity."

*Barich*

The Commissioner has on numerous occasions ruled on the issue of whether a particular assignment was in the same professional capacity. There being no statutory definition of "same professional capacity," the Commissioner has described the meaning of the term. The seminal case as to the meaning of the phrase "same professional capacity" is *Barich v. San Felipe-Del Rio Consolidated Independent School District*, Docket No. 117-R1a-484 (Comm'r Educ. 1985):

> Petitioner argues that he did not receive an offer of employment in the "same professional capacity," because he was never offered the same position he had held during the 1982-83 school year; i.e., ROTC teacher. It would not be reasonable, however, to conclude that the legislature intended that every teacher who does not receive notice of his or her proposed nonrenewal by April 1 is entitled to be employed in the exact same position the following school year. Such a holding would require a school district to actually begin nonrenewal proceedings by April 1 against every teacher it might conceivably wish to assign to a different position the following year, or face a nonrenewal claim with any reassignment effected after April 1.
>
> *It is more reasonable to conclude that the legislature, by using the term "same professional capacity" (instead of "the exact same position"), intended to allow school districts to be flexible in their personnel assignments while discouraging the abuse of the district's inherent or contractual reassignment authority. In other words, the district may place a teacher whose employment has been renewed by operation of law in a position different from that to which the teacher was assigned the previous year, as long as the position is one to which the*

043-R10-1211                                        9

H. Jenkins v. Crosby ISD
TEA #: 000013

*district could have reassigned the teacher had the parties voluntarily entered into a contract for the following year. In some instances, the validity of a particular placement will be clear. For example, an administrator who does not receive the required notice by April 1 may not be placed in the capacity of a classroom teacher; a classroom teacher may not be placed in the capacity of a counselor; a counselor may not be placed in the capacity of a nurse; a nurse may not be placed in the capacity of a librarian; etc.*

*In other instances, the validity of a particular placement might not be so clear. For example, a placement might be to another position within the same professional category (e.g., administrator), but nevertheless, be invalid (e.g., from superintendent to assistant elementary school principal). Factors to be considered in determining the validity of such a placement include, but are not necessarily limited to, differences in authority, duties, and salary.*

In the present case, Petitioner was employed during the 1982-83 school year as an ROTC teacher. The district's offers of employment ranged from the general (i.e., a statement that the district would comply with the Commissioner's Order and that Petitioner should "report to work" at once) to the relatively - - though not completely - - specific (i.e., references to teaching an elementary grade, eighth grade social science, high school psychology, or high school industrial arts). Nevertheless, it is clear - - and Petitioner concedes (Tr. 77-79) - - that, although the district at no time offered to reinstate Petitioner as ROTC teacher, it did offer to place him in a teaching position of some sort. Further, the uncontested testimony is that Petitioner would not suffer any loss of salary due to the placement. (See Finding of Fact No. 4). In his Post-Hearing Brief, Petitioner asserts that the other positions "are substantially different, involve different responsibilities, and require different skills." (p. 3). However, Petitioner introduced no evidence which would support this contention. More importantly, no evidence was introduced which would support a holding that it would be improper to reassign an ROTC teacher to one of the positions referred to by the district.

Under the circumstances, it is concluded that the school district unconditionally offered Petitioner a position in the "same professional capacity" for the 1983-84 school year and that Petitioner rejected that offer. Petitioner was, therefore, not employed by the district during the 1983-84 school year by choice, and he has no cognizable claim against the district for correctly noting, on March 28, 1983, that he was not then employed by the district, and for advising him that it did not intend to employ him during the 1984-85 school year.

(Emphasis added)

As shown above, the Commissioner's interpretation of the Legislature's intent is supported by the legislative history. As the bill went through the Legislature more flexibility was granted to school districts. The Commissioner held that the first question to be asked to determine whether a reassignment is in the same professional capacity is

043-R10-1211                    10

whether the district could have contracted with the teacher for that position. This results in several conclusions. An administrator cannot be reassigned as a classroom teacher. A classroom teacher cannot be reassigned as a counselor. A counselor cannot be reassigned as a nurse. A nurse cannot be reassigned as a librarian. It should be noted that as the TCNA then read, classroom teacher and counselor were listed as such in the definition of "teacher" found at Texas Education Code section 21.201(1):

> "Teacher" means a superintendent, principal, supervisor, classroom teacher, counselor or other full-time professional employee, except paraprofessional personnel, who is required to hold a valid certificate or permit.

Administrator, nurse, and librarian were not listed as such in the definition of "teacher" found at Texas Education Code section 21.201(1). From the first substantive decision made in the first year the issue could be addressed by the Commissioner, the named positions found at Texas Education Code section 21.201(1) were not held to be professional capacities as the Commissioner used the term "administrator" that is not listed to include superintendents and assistant principals.

The Commissioner goes on to find that employing one in the same professional category is not sufficient to constitute same professional capacity in some instances. While a superintendent and an assistant elementary school principal might be in the same professional category of administrator they are not in the same professional capacity because of major distinctions in authority, duties, and salary. The Commissioner acknowledges that other factors could be considered. As to the issue directly presented in *Barich*, it was found that reassigning an ROTC teacher to another teaching position was valid because the positions were in the same professional capacity.

*Hester*

Decided just months after *Barich*, *Hester v. Canadian Independent School District*, Docket No. 106-R1-585 (Comm'r Educ. 1985) further sets out what is meant by "same professional capacity." Hester was employed under contract for the position

H. Jenkins v. Crosby ISD
TEA #: 000015

teacher/coach. The Commissioner found that Hester was employed in the professional capacity of teacher/coach and that since there was not substantial evidence to support the nonrenewal of his contract that Respondent was required to employ Hester in the same professional of teacher/coach for the next school year. It should be noted that coach was not listed as such in the definition of "teacher" found at Texas Education Code section 21.201(1). Nonetheless, the Commissioner found that by contract the district had made teacher/coach Hester's professional capacity. How a teacher's contract defines the teacher's professional capacity is significant but not necessarily dispositive. *Carpenter v. Wichita Falls Independent School District*, Docket No. 247-R3-491 (Comm'r Educ. 1991). The Commissioner has held in several cases that a school district is bound by professional capacities such as teacher/coach and teacher/dean that it creates in its contractual relationships. If a school district hires a teacher under a term contract in a particular capacity, even if such capacity is not specifically listed in the definition of "teacher" in the TCNA, the district must rehire the teacher in that capacity for the next school year if the district does not nonrenew the teacher's contract.

Progeny of *Barich*

Through the years since 1985, the Commissioner has consistently applied the principles enunciated in *Barich*. Contracted to be a teacher or a coach, the district properly reassigned the employee from the position of middle school teacher and high school coach to the position of physical education teacher with scheduling and budgeting responsibilities. *Lieberman v. Eagle Mountain-Saginaw Independent School District*, Docket No. 192-R3-785 (Comm'r Educ. 1985). Contracted to be Teacher/Coach Football (Head football coach), the district improperly reassigned the employee to a teaching position. *Grounds v. Tolar Independent School District*, Docket No. 340-R3-786 (Comm'r Educ. 1986). Contracted to be a teacher and head coach for duties as assigned, the district properly reassigned the employee from teacher and head coach for football, basketball, and track to the position of teacher and head coach for boys'

H. Jenkins v. Crosby ISD
TEA #: 000016

basketball. *Reyes v. Culberson County Independent School District*, Docket No. 229-R3-787 (Comm'r Educ. 1987). Contracted to be a teacher/coach, the district properly reassigned the employee from being a teacher and football coach to being a teacher and baseball coach. *Satcher v. Florence Independent School District*, Docket No. 363-R3-786 (Comm'r Educ. 1987). Contracted to be teachers/deans, the district improperly reassigned the employees from teacher/dean positions to teacher positions. *Abbott et al. v. Ector County Independent School District*, Docket No. 081-R3-1287, 105-R3-288 (Comm'r Educ. 1991). Contracted for 220 duty days, the district properly reduced duty days to 188 days for the following school year. *Marshall v. Seguin Independent School District*, Docket No. 177-R1-690 (Comm'r Educ. 1991). Contracted as an administrator, the district properly reassigned the employee from the district wide position of Science Support Specialist to the position of high school assistant principal. *Carpenter v. Wichita Falls Independent School District*, Docket No. 247-R3-491 (Comm'r Educ. 1991). The district properly reassigned employee from the position of high school assistant principal to the position of middle school assistant principal. *Andrews v. Houston Independent School District*, Docket No. 236-R1-897 (Comm'r Educ. 1997). Contracted as a professional employee[7], the district properly reassigned the employee from the position of athletic director to the position of teacher/assistant principal. *Keith v. Tarkington Independent School District*, Docket No. 459-R3-891(Comm'r Educ. 1992). Contracted as teachers, the district's reduction in salary by itself did not place the teachers in different professional capacities. *Goedeke v. Smyer Independent School District*, Docket No. 111-R3-1292 (Comm'r Educ. 1997). Contracted as teacher/assistant band director, the district improperly reassigned the employee to a teaching position. *Salinas v. Roma Independent School District*, Docket No. 058-R3-1196 (Comm'r Educ. 1997). Contracted as an administrator, the district properly reassigned the employee from

---

[7] *Keith* does not discuss whether "professional employee" is a legitimate professional capacity. It does not conclude that because the two positions at issue were professional that the reassignment is allowable. *Keith* simply mentions what the contract at issue states.

H. Jenkins v. Crosby ISD
TEA #: 000017

principal of an independent middle school campus to the position of principal or assistant principal for grades 7 to 9 at a unified junior high/high school campus. *Underwood v. Rusk Independent School District*, Docket No. 062-R3-198 (Comm'r Educ. 1998). Contracted as a teacher/coach, the district properly reassigned the employee from the position of varsity coach and teacher to the position of junior high school coach and teacher. *Young v. Leggett Independent School District*, Docket No. 175-R3-898 (Comm'r Educ. 1999). Contracted as an administrator, the district properly reassigned the employee from the district wide position of attendance coordinator to the position of middle school assistant principal. *Veliz v. Donna Independent School District*, Docket No. 011-R3-999 (Comm'r Educ. 2000). The district properly transferred the employee from one principal position to another. *Yturralde v. El Paso Independent School District*, Docket No. 001-R10-900 (Comm'r Educ. 2002). The district properly transferred the employee from the position of high school principal to the position of elementary principal. *Ramos v. El Paso Independent School District*, Docket No. 002-R10-900 (Comm'r Educ. 2002). Contracted as an administrator, the district properly reassigned the employee from the position of high school principal to the position of middle school assistant principal. *Pasqua v. Fort Stockton Independent School District*, Docket No. 011-R3-1102 (Comm'r Educ. 2004). Contracted as an administrator, the district properly reassigned the employee from a district-wide Director of Even Start to the position middle school assistant principal. *Perales v. Robstown Independent School District*, Docket Nos. 052-R10-104, 084-R3-604 (Comm'r Educ. 2006). Contracted as an administrator, the district properly reassigned the employee from a central office position to an assistant principal position. *Sanchez v. Donna Independent School District*, Docket No. 075-R10-605 (Comm'r Educ. 2007). Contracted as an administrator, the district properly reassigned the employees from a central office position to an assistant principal position. *Gonzalez v. Donna Independent School District*, Docket No. 074-R10-605 (Comm'r Educ. 2007). Contracted as an administrator, the district properly reassigned

043-R10-1211                                    14

H. Jenkins v. Crosby ISD
TEA #: 000018

the employee from a central office position to an assistant principal position. *Perez v. Donna Independent School District*, Docket No. 086-R1-705 (Comm'r Educ. 2007). Contracted as an administrator, the district properly reassigned the employee from the position of Executive Director of Special Education to the position of elementary school assistant principal. *Lehr v. Ector County Independent School District*, Docket No. 003-R3-0908 (Comm'r Educ. 2011). Contracted as professional employee, the district improperly reassigned the employee from the position of assistant principal to the position of classroom teacher. *Wheeler v. Austin Independent School District*, Docket No. 008-R3-1108 (Comm'r Educ. 2011). Contracted as a professional employee, the district properly reassigned the employee from the position of middle school principal to the position of Human Resources Coordinator. *Murillo v. Laredo Independent School District*, Docket No. 027-R3-0108 (Comm'r Educ. 2012). The district properly reassigned the employee from the position of elementary school principal to the position of Program Specialist II. *Montgomery v. Richardson Independent School District*, Docket No. 007-R10-1008 (Comm'r Educ. 2012). Contracted as a professional employee, the district improperly reassigned the employee from the position of Career Specialist to the position of teacher. *Tuck v. Alief Independent School District*, Docket No. 008-R10-1007 (Comm'r Educ. 2012). Contracted as an administrator, the district properly reassigned the employee from the position of principal to the position of assistant principal. *McCoy v. Kermit Independent School District*, Docket No. 004-R3-0908 (Comm'r Educ. 2012).

Administrators

As can be seen from the above, a great many of the same professional capacity cases involved administrators. In *Carpenter v. Wichita Falls Independent School District*, Docket No. 247-R3-491 (Comm'r Educ. 1991) the Commissioner held:

> The question presented by this appeal is the scope and reach of the Term Contract Nonrenewal Act, Texas Education Code section 21.204(b), in the context of the

043-R10-1211                                           15

reassignment of those school district personnel coming under its protections. Petitioner would have the Commissioner of Education hold that the phrase "same professional capacity" as used in the TCNA is either defined by or in some way informed by the definition of "teacher" found in § 21.201(1) of that Act. I do not believe the statutory language can permit of such an interpretation. Rather, this phrase is left undefined by the statute, and therefore its meaning is a matter for interpretation by the Commissioner, in the first instance, and by the courts. The decisions of the Commissioner (and the courts) have consistently looked to the language of the employment contract itself and attempted to give the parties the benefit of their bargain. In this case, the contract between the parties provides that the position to which Petitioner was entitled was that of a generic "administrator." Petitioner has not proven that hers was a contract of adhesion, which would clearly change the result in this case. It is true that the Commissioner has held that § 21.204(b) limits the right of the district to transfer a term contract teacher. *Barich v. San Felipe-Del Rio C.I.S.D.*, Docket No. 117-R1a-484 (Comm'r Educ. May 1985). It is possible to imagine situations where the transfer clause of an employment contract would be held to be unenforceable under § 21.204(b) [8]. However, this is not such a case. It has been the consistent view of the Commissioner that the TCNA balanced its grant of limited tenure rights against the considerable personnel management problems it might cause if imposed inflexibly. Districts have responded to this law by creating broad classes within which transfers do not implicate the TCNA. If taken to extremes, this tactic would be against public policy as expressed in the TCNA, but I cannot make such a finding in this case. The need for flexibility in making personnel changes is strongest, and the argument for a rigid tenure system weakest, at the administrative level. In short, I find the generic "administrator" position before me consistent with the policies of the TCNA.

Administrators can often be reassigned to different administrator positions, but that does not mean that they may be assigned to any administrator positions. Districts can by contract establish broad professional capacities. However, professional capacities that are too broad will not be allowed. *Tuck v. Alief Independent School District*, Docket No. 008-R10-1007 (Comm'r Educ. 2012).

Deference

If the Commissioner were to decide to issue a new interpretation of "same professional capacity" it would seem to be because his long standing interpretation was incorrect. To determine whether the Commissioner's interpretation is correct, some

---

[8] The old Texas Education Code section 21.204 is the predecessor of the current Texas Education Code section 21.206.

H. Jenkins v. Crosby ISD
TEA #: 000020

cannons of statutory interpretation will be considered. The standards for deferring to an agency's interpretation have been set by the Texas Supreme Court:

> If there is vagueness, ambiguity, or room for policy determinations in a statute or regulation, as there is here, we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule. *See Pub. Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *Stanford v. Butler*, 142 Tex. 692, 181 S.W.2d 269, 273 (Tex. 1944).

*TGS-NOPEC Geophysical v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). There is ambiguity about what the phrase "same professional capacity" means. The phrase is not defined in statute and is susceptible to multiple interpretations. The Commissioner's interpretation should be deferred to.

Further, as the Commissioner's interpretation is a long standing interpretation, the doctrine of legislative acquiescence applies:

> If an ambiguous statute that has been interpreted by a court of last resort or given a longstanding construction by a proper administrative officer is re-enacted without substantial change, the Legislature is presumed to have been familiar with that interpretation and to have adopted it. *See Grapevine Excavation, Inc. v. Md. Lloyds Ins. Co.*, 35 S.W.3d 1, 5, 43 Tex. Sup. Ct. J. 1086 (Tex. 2000) (Once the Texas Supreme Court and courts of appeals "construe a statute and the Legislature re-enacts or codifies that statute without substantial change, we presume that the Legislature has adopted the judicial interpretation."); *Sharp v. House of Lloyd, Inc.*, 815 S.W.2d 245, 248, 34 Tex. Sup. Ct. J. 652 (Tex. 1991) ("'[A] statute of doubtful meaning that has been construed by the proper administrative officers, when re-enacted without any substantial change in verbiage, will ordinarily receive the same construction.' This rule is only applicable where there has been an affirmative long-standing administrative policy.") (quoting *Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172, 180, 10 Tex. Sup. Ct. J. 254 (Tex. 1967)); *Tex. Employers' Ins. Ass'n v. Holmes*, 145 Tex. 158, 196 S.W.2d 390, 395 (Tex. 1946) ("There is another well-settled rule to guide us in the construction of a statute which is uncertain and ambiguous . . . .: 'Where a statute which has been construed, either by a court of last resort or by executive officers, is re-enacted without any substantial change of verbiage, it will continue to receive the same construction.'")

H. Jenkins v. Crosby ISD
TEA #: 000021

*Tex. Dept. of Protective & Regulatory Services v. Mage Child Care*, 145 S.W.3d 170, 175 (Tex. 2004). The Commissioner's interpretation is long standing. It goes back over one-quarter century. It has been repeatedly affirmed.

The statute at issue has been amended multiple times since the Commissioner has issued his interpretation. The TCNA has been amended by the Legislature in 1990, 1995, 2003, and 2011. Term Contract Nonrenewal Act, 71st Leg. 6th C.S., ch. 1 § 3.14, 1990 Tex. Gen. Laws 1 (allowing the hearing to be heard by a board designated impartial hearing officer); Term Contract Nonrenewal Act, 74th Leg. R.S., ch. 260 ch. 21 subch. E and F, 1995 Tex. Gen. Law 2207 (making many changes including modifying the definition of "teacher" and allowing boards to use the Independent Hearing Examiner Process); Term Contract Nonrenewal Act, 78th Leg R.S., ch. 484 § 1, 2003 Tex. Gen. Laws 1749 (concerning distribution of district employment policies); 82nd Leg. 1st C.S., ch. 8 §§ 8-11, 2011 Tex. Gen Laws 5463 (allowing districts to hire their own hearing examiners and making several changes concerning notice). The Legislature has acquiesced in the Commissioner's interpretation of the phrase "same professional capacity."

Must Principal be a Professional Capacity?

Petitioner contends that her theory that a principal may only be reassigned to another principal position is compatible with *Barich* although she does recognize that it would require overruling other Commissioner's Decisions. Petitioner's theory rests on the premise that because the definition of "teacher" found in the TCNA references the position "principal" that "principal" is a professional capacity.

Petitioner's theory is not compatible with *Barich*. Under *Barich*, the first question is could the teacher contract for the position at issue. A principal can contract for an assistant principal position as a principal certificate is needed for either a principal or assistant principal position. 19 TEX. ADMIN. CODE § 241(d). The next question is that even if the position could be contracted for are differences in authority, duties, salary and

H. Jenkins v. Crosby ISD
TEA #: 000022

other factors so great that the reassignment is actually in another professional capacity. This second consideration is set out right after the issue of reassigning a superintendent to the position of assistant elementary principal is raised. Texas Education Code section 21.201(1) in the original TCNA read as follows:

> "Teacher" means a superintendent, principal, supervisor, classroom teacher, counselor or other full-time professional employee, except paraprofessional personnel, who is required to hold a valid certificate or permit.

If Petitioner's theory was compatible with *Barich*, the Commissioner would have said the determination of whether a superintendent may be reassigned to the position of elementary school assistant principal is a simple issue, not an issue that is "not . . . so clear." Under Petitioner's theory, since "superintendent" is found in the definition of 21.201(1), "superintendent" is a professional capacity. The result would be that a superintendent cannot be reassigned to any position that is not a superintendent position. There would be no reason to apply the standards set out in *Barich* to determine whether a superintendent could be reassigned to an assistant principal position.

Petitioner's theory does have the virtue of simplicity. If a position is named in the definition of "teacher" any reassignment would have to be in that same position. However, it would be just as simple to apply the rule that if one holds an administrator's position one can be reassigned to any administrator's position. The Commissioner's solution is more complex than Petitioner's theory, but is more faithful to the statute at issue. If the Legislature intended "same professional capacity" to mean any position listed in the definition of "teacher," the Legislature would have said so. Instead, the Legislature used an undefined phrase that it intended the Commissioner to interpret using his experience in how schools operate. The Commissioner has consistently done so since the first opportunity to interpret the phrase at issue.

H. Jenkins v. Crosby ISD
TEA #: 000023

<u>Like a Superintendent?</u>

There are no Commissioner's Decisions that directly address whether a superintendent may be reassigned to another position. There is no Commissioner's Decision that finds that a superintendent was improperly reassigned. While *Barich* holds that a superintendent cannot be reassigned to the position of assistant elementary school principal, Barich was not a superintendent and was not reassigned to an assistant principal position. There is a pre-TCNA case, *Board of Trustees of Crystal City Independent School District v. Briggs*, 486 S.W.2d 829 (Tex. App. Beaumont 1972, writ ref'd n.r.e), which determined that a reassignment from superintendent to teacher was not allowed:

> Briggs was hired as superintendent of the public schools; under the statute, it is clear that there is a vast difference in the position of superintendent of a district answerable only to the Board of Trustees and that of a teacher in the schools. §§ 16.07, 16.08 Education Code.

The court in *Briggs* found the fact that a superintendent was only answerable to the board of trustees to be highly significant.

In the recent case of *Lehr v. Ector County Independent School District*, Docket No. 003-R3-0908 (Comm'r Educ. 2011), the issue was raised whether it was appropriate to reassign the Executive Director of Special Education to the position of assistant principal. The Commissioner held:

> The change in positions is unlike the move from superintendent to assistant principal described in *Barich*. A superintendent according to statute is "the educational leader and chief executive officer of the school district." TEX. EDUC. CODE § 11.201(a). The position of superintendent is *sui generis*. There is no administrator position that compares to it. The position of Executive Director of Special Education is not mentioned in the Texas Education Code. In fact, the certification mentioned in the job description for the position is "midmanagement/supervisor" is no longer awarded.[9] Currently, the only

---

[9] Hence, it is a good thing that the job description allows for alternative qualifications. While those who received midmanagement and supervisor certifications retain them, it is not perhaps wise to limit employment to those who have achieved a certification that is no longer issued.

H. Jenkins v. Crosby ISD
TEA #: 000024

certifications for administrator are superintendent and principal.[10] There is no certification that an Executive Director of Special Education is required to hold under the Texas Education Code or the rules adopted under the code.

Here like in *Briggs*, the Commissioner noted that the position of superintendent is unique. A superintendent is the chief executive officer of a school district. It almost goes without saying that a superintendent is answerable only to the board of trustees. Only the board of trustees has the authority to direct a superintendent. It is not the fact that the Texas Education Code specifies many of the superintendent's duties and creates unique procedures to nonrenew a superintendent's contract that makes the superintendent's role *sui generis*. TEX. EDUC. CODE §§ 11.201, 21.212. It is instead the fact the superintendent is only answerable to the school board as the chief executive officer of the school district that makes the office of superintendent *sui generis*.

Petitioner is correct that principals have many duties spelled out in the Texas Education Code. This does not make the position of principal *sui generis*. That the Texas Education Code defines many duties of a principal makes the principal position a well defined species. It does not make the principal position a genus all to itself. A principal is answerable to the superintendent and often to other high administrators such as deputy and assistant superintendents. A principal is answerable to the school board as the school board can nonrenewal or terminate a principal's contract.

Further, while there is a principal certification, it is required for both being a principal and an assistant principal. 19 TEX. ADMIN. CODE § 241(d). That the same training is required to be either a principal or an assistant principal is a further indication that the position of principal is not *sui generis*. It is true that one who holds a superintendent's certificate also is qualified to hold the positions of principal and assistant principal. 19 TEX. ADMIN. CODE § 242.1(d). It is not surprising that the training required to be a superintendent would also prepare one to a principal or an assistant principal. But a superintendent is required to have more than a principal's certificate.

---

[10] 19 TEX. ADMIN. CODE ch. 241 and 242. All other administrator certifications were not issued after 2000.

H. Jenkins v. Crosby ISD
TEA #: 000025

One who holds only a principal's certificate is not qualified to be a superintendent. A superintendent's certificate requires significantly more training than a principal's certificate. When a principal is reassigned, a school district is not limited to assigning the principal to another principal position. *Underwood v. Rusk Independent School District*, Docket No. 062-R3-198 (Comm'r Educ. 1998), *Pasqua v. Fort Stockton Independent School District*, Docket No. 011-R3-1102 (Comm'r Educ. 2004), *Murillo v. Laredo Independent School District*, Docket No. 027-R3-0108 (Comm'r Educ. 2012), *Montgomery v. Richardson Independent School District*, Docket No. 007-R10-1008 (Comm'r Educ. 2012), and *McCoy v. Kermit Independent School District*, Docket No. 004-R3-0908 (Comm'r Educ. 2012).

Present Reassignment

In the present case, Petitioner was reassigned from the position of principal of an intermediate school to the position of assistant principal of a high school. There is little in the record that indicates what duties Petitioner had at those two positions. The record does not demonstrate that applying the Commissioner's precedent as to what is the "same professional capacity" results in a conclusion that the two positions were in different professional capacities. However, Petitioner has not raised this issue. Petitioner's claim is not that in her particular circumstance, comparing authority, duties, compensation and other relevant factors, the two positions were in separate professional capacities. Petitioner's claim is that a principal may only be reassigned to another principal position. This is not the law. As the two positions are not shown to be in different professional capacities, Respondent did not violate Texas Education Code section 21.206.

Possible Consequences

Petitioner contends that if the Commissioner does not to change his interpretation of "same professional capacity" this could lead to a situation where a school district could reassign a principal to a position that does not require a chapter 21 contract and then make the principal an at-will employee for the following school year. It should be noted

043-R10-1211                    22

that this is not the situation the Commissioner is presented with in this case. After her reassignment Petitioner retains a chapter 21 contract.

But assuming without finding that this issue was properly raised, there are at least two major problems with this claim. Petitioner chose not to contest her reassignment under Commissioner's precedent but instead to solely argue that she could only be reassigned to a principal's position. Whether or not Respondent reassignment meets the Commissioner's standards has not been contested or ruled upon. Not contesting a reassignment based on the standards previously established by the Commissioner could result in not receiving a Chapter 21 contract, but the fault would not be with the Commissioner's interpretation of Chapter 21.

Further, the case Petitioner relies on *Harris v. Royse City Independent School District*, Docket No. 057-R1-0506 (Comm. Educ. 2009) had a very different fact situation. Harris began his employment with Royse City Independent School District by signing a contract for a non-certified administrator position that provided for renewal or nonrenewal under chapter 21 of the Texas Education Code. This is not the type of contract that Petitioner holds. Petitioner in her original assignment and her reassignment was required to hold a principal's certificate.

Conclusion

The Petition for Review should be dismissed in part and denied in part. In many cases, principals may be assigned to other administrative positions. In the present case, it is determined that Petitioner was properly reassigned in the same professional capacity.

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as Commissioner of Education, I make the following Conclusions of Law:

1.     The Commissioner, under Texas Education Code section 7.057(a)(2)(A), has jurisdiction over the claims that Respondent violated Texas Education Code section

H. Jenkins v. Crosby ISD
TEA #: 000027

21.206(b) and based on such a violation also violated Texas Education Code section 11.20 and 19 TEX. ADMIN. CODE § 150.1021.

2. The Commissioner, under Texas Education Code section 7.057(a)(2)(A), lacks jurisdiction over violations of school district policies.

3. The Commissioner, under Texas Education Code section 7.057(a)(2)(A), lacks jurisdiction over the claim Respondent violated its policy FN(LOCAL).

4. A superintendent does not violate Texas Education Code 11.201(d) when a superintendent poorly exercises an authority granted by this section.

5. The Commissioner lacks jurisdiction over the claim that Respondent's superintendent arbitrarily and capriciously reassigned her in violation of Texas Education Code section 11.201(d)   TEX. EDUC. CODE § 7.057(a)(2)(A).

6. If a school district fails to timely give a teacher notice of proposed nonrenewal when the teacher's contract is about to expire, the school district is required to employ the teacher in the "same professional capacity" for the following school year. A requirement to employ a teacher in the "same professional capacity" for the following school year is triggered only when a contract is about to expire and timely notice of proposed nonrenewal is not given. TEX. EDUC. CODE § 21.206(b).

7. Petitioner's claim that Respondent failed to employ her in the same professional capacity is ripe only as to the 2011-2012 school year.

8. One can be entitled to the protections of Texas Education Code Chapter 21, subchapter E based solely on a contract or district policy. One does not need to hold a position described in the first sentence of Texas Education Code section 21.201(1) to be entitled to a Chapter 21 term contract.

9. The positions described in the first sentence of Texas Education Code section 21.201(1) may or may not be professional capacities for purposes of Texas Education Code section 21.206(b).

043-R10-1211                    24

10. The fact that the position of "principal" is listed in the first sentence of Texas Education Code section 21.201(1) does not mean that if one is employed by a school district as a principal under a term contract that one is employed under the professional capacity of principal. TEX. EDUC. CODE § 21.206(b).

11. A contract can establish a teacher's professional capacity under Texas Education Code section 21.206(b) if the professional capacity is not impermissibly broad. Whether a professional capacity is impermissibly broad is determined by comparing differences in authority, duties, and salary and other relevant factors. In many cases, a professional capacity of "administrator" will not be impermissibly broad for a reassignment.

12. Petitioner's professional capacity under Texas Education Code section 21.206(b) is administrator.

13. As Petitioner did not contest that her contractual professional capacity of administrator is impermissibly broad under the standards set out in Conclusion of Law No. 11, Petitioner has not raised this issue.

14. As the fact that a term contract employee is employed in a principal position does not make the employee's professional capacity "principal," Respondent did not improperly reassign Petitioner to a non-principal position in violation of Texas Education Code section 21.206(b).

15. Respondent did not reassign Petitioner in violation of Texas Education Code section 21.206(b)

16. The Petition for Review should be denied in part and dismissed in part.

Order

After due consideration of the record, matters officially noticed and the foregoing Findings of Fact and Conclusions of Law, in my capacity as Commissioner of Edcuation, it is hereby

ORDERED that the Petitioner's appeal be, and is hereby, denied in part and dismissed in part.

SIGNED AND ISSUED this 19th day of December, 2013.

MICHAEL WILLIAMS
COMMISSIONER OF EDUCATION

CAUSE NO. D-1-GN-14-00619

| | | |
|---|---|---|
| HERMENIA JENKINS,<br>*Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |
| CROSBY INDEPENDENT<br>SCHOOL DISTRICT and<br>MICHAEL L. WILLIAMS<br>THE STATE COMMISSIONER<br>OF EDUCATION,<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§ | 200th JUDICIAL DISTRICT |

Filed in The District Court
of Travis County, Texas

FEB 26 2015

At _____10:20_____ A.M.
Velva L. Price, District Clerk

### FINAL JUDGMENT

On December 4, 2014, came to be heard and considered the cause of Plaintiff's suit for judicial review of an administrative decision of the Texas Commissioner of Education issued in Texas Education Agency Docket No. 043-R10-1211. Having considered the administrative record, pleadings, briefs, and arguments of counsel, the Court affirms the Commissioner's decision.

IT IS THEREFORE ORDERED that the Commissioner's decision is affirmed.

IT IS FURTHER ORDERED that all taxable costs of court are assessed against the party who incurred them; that all remedies not specifically granted herein are denied; and that this judgment disposes of all claims and all parties and is final and appealable.

SIGNED on this _____26th_____ day of _____February_____, 2015.

THE HONORABLE AMY CLARK MEACHUM



Case # D-1-GN-14-000619    Page 1 of 2

003910560



376

Approved as to form:

Kevin F. Lungwitz
State Bar No. 12698790
The Lungwitz Law Firm, P.C.
3005 S. Lamar Blvd., Suite D-109-362
Austin, Texas 78704-4785
Phone: (512) 461-0188
Fax: (866) 739-7138
kevin@lungwitzlaw.com
FOR PLAINTIFF HERMENIA JENKINS

David B. Hodgins
State Bar No. 09775530
Rebecca B. Weimer
State Bar No. 24062597
Thompson & Horton LLP
3200 Southwest Freeway, Suite 2000
Houston, Texas 77027
Phone: (713) 554-6745
Fax: (713) 583-8245
dhodgins@thompsonhorton.com
rweimer@thompsonhorton.com
FOR DEFENDANT CROSBY ISD

Andrew Lutostanski
Assistant Attorney General
State Bar No. 24072217
Office of the Attorney General of Texas
Administrative Law Division
P.O. Box 12548
Austin, Texas 78711-2548
Phone: (512) 475-4200
Fax: (512) 320-0167
andrew.lutostanski@texasattorneygeneral.gov
FOR DEFENDANT COMMISSIONER

## § 21.352. Local Role

### Research References

**Encyclopedias**

TX Jur. 3d Schools § 331, Frequency of Appraisal; Advance Notice.

TX Jur. 3d Schools § 332, Confidentiality; Retention and Distribution of Appraisal Copies.

TX Jur. 3d Schools § 333, Right to Another Appraisal and Rebuttal.

TX Jur. 3d Schools § 335, Appraisal of Teachers and Administrators.

## § 21.353. Appraisal on Basis of Classroom Teaching Performance

### Research References

**Encyclopedias**

TX Jur. 3d Schools § 335, Appraisal of Teachers and Administrators.

## § 21.354. Appraisal of Administrators

(a) The commissioner shall adopt a recommended appraisal process and criteria on which to appraise the performance of various classifications of school administrators. The criteria must be based on job-related performance.

(b) The commissioner may solicit and consider the advice of teachers and administrators in developing the appraisal process and performance criteria.

(c) Each school district shall appraise each administrator annually using either:

(1) the commissioner's recommended appraisal process and performance criteria; or

(2) an appraisal process and performance criteria:

(A) developed by the district in consultation with the district- and campus-level committees established under Section 11.251; and

(B) adopted by the board of trustees.

(d) Funds of a school district may not be used to pay an administrator who has not been appraised under this section in the preceding 15 months.

(e) The appraisal of a principal shall include consideration of the performance of a principal's campus on the student achievement indicators established under Section 39.053 and the campus's objectives established under Section 11.253, including performance gains of the campus and the maintenance of those gains.

Added by Acts 1995, 74th Leg., ch. 260, § 1, eff. May 30, 1995. Amended by Acts 2009, 81st Leg., ch. 895, § 21, eff. June 19, 2009.

### Research References

**Encyclopedias**

TX Jur. 3d Schools § 334, Recommended Appraisal Process and Performance Criteria for Teachers and Administrators.

TX Jur. 3d Schools § 335, Appraisal of Teachers and Administrators.

TX Jur. 3d Schools § 336, Appraisal of School Principals.

## § 21.355. Confidentiality

### Research References

**Encyclopedias**

TX Jur. 3d Administrative Law § 67, Construction of Requirement.

TX Jur. 3d Administrative Law § 69, Type of Information Subject to Disclosure—Categories Classified as Public Information.

TX Jur. 3d Schools § 332, Confidentiality; Retention and Distribution of Appraisal Copies.

S.B. No. 1383

AN ACT
relating to an appraisal and professional development system for
public school principals.
        BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:
        SECTION 1.  The heading to Section 21.354, Education Code,
is amended to read as follows:
        Sec. 21.354.  APPRAISAL OF CERTAIN ADMINISTRATORS.
        SECTION 2.  Section 21.354, Education Code, is amended by
adding Subsection (a-1) to read as follows:
        (a-1)  This section does not apply to the appraisal of the
performance of a principal.
        SECTION 3.  Subchapter H, Chapter 21, Education Code, is
amended by adding Section 21.3541 to read as follows:
        Sec. 21.3541.  APPRAISAL AND PROFESSIONAL DEVELOPMENT
SYSTEM FOR PRINCIPALS. (a)  The commissioner by rule shall
establish and shall administer a comprehensive appraisal and
professional development system for principals.
        (b)  The commissioner may establish a consortium of
nationally recognized experts on educational leadership and policy
to:
                (1)  assist the commissioner in effectively
researching and developing the comprehensive appraisal and
professional development system described by Subsection (a); and
                (2)  evaluate relevant research and practices and make
recommendations to the commissioner to improve the quality of the
training, appraisal, professional development, and compensation of
principals.
        (c)  If the commissioner establishes the consortium, the
commissioner shall select a presiding officer of the consortium.
The presiding officer:
                (1)  must be an expert on educational leadership and
policy;
                (2)  must have a demonstrated ability to lead a
statewide school leadership reform initiative; and
                (3)  may not be employed by a school district in this
state.
        (d)  The commissioner shall establish school leadership
standards and a set of indicators of successful school leadership
to align with the training, appraisal, and professional development
of principals.
        (e)  In carrying out the commissioner's powers and duties
under this section, the commissioner may use only money available
from private sources that may be used for that purpose.
        (f)  In appraising principals, each school district shall
use either:
                (1)  the appraisal system and school leadership
standards and indicators developed or established by the
commissioner under this section; or
                (2)  an appraisal process and performance criteria:
                        (A)  developed by the district in consultation

with the district-level and campus-level committees established under Section 11.251; and
                (B)   adopted by the board of trustees.
        (g)   Each school district shall appraise each principal annually.
        (h)   Not later than December 1 of 2012 and 2014, the commissioner shall submit a written report to the governor, lieutenant governor, speaker of the house of representatives, and presiding officer of each standing legislative committee with primary jurisdiction over public education of:
                (1)   any action taken under this section; and
                (2)   any recommendations for legislative action concerning the training, appraisal, professional development, or compensation of principals.
        (i)   Subsection (h) and this subsection expire January 1, 2015.
        SECTION 4.   Section 21.451, Education Code, is amended by amending Subsections (a) through (d) and adding Subsection (a-1) to read as follows:
        (a)   The staff development provided by a school district to an educator other than a principal must be:
                (1)   conducted in accordance with standards developed by the district; and
                (2)   designed to improve education in the district.
        (a-1)   Section 21.3541 and rules adopted under that section govern the professional development provided to a principal.
        (b)   The staff development described by Subsection (a) must be predominantly campus-based, related to achieving campus performance objectives established under Section 11.253, and developed and approved by the campus-level committee established under Section 11.251.
        (c)   For staff development under Subsection (a), a [A] school district may use district-wide staff development developed and approved through the district-level decision process under Section 11.251.
        (d)   The staff development:
                (1)   may include training in:
                        (A)   technology;
                        (B)   conflict resolution; and
                        (C)   discipline strategies, including classroom management, district discipline policies, and the student code of conduct adopted under Section 37.001 and Chapter 37; and
                (2)   subject to Subsection (e) and to Section 21.3541 and rules adopted under that section, must include training based on scientifically based research, as defined by Section 9101, No Child Left Behind Act of 2001 (20 U.S.C. Section 7801), that:
                        (A)   relates to instruction of students with disabilities; and
                        (B)   is designed for educators who work primarily outside the area of special education.
        SECTION 5.   Subsection (e), Section 21.354, Education Code, is repealed.
        SECTION 6.   Notwithstanding Sections 21.354 and 21.451, Education Code, as amended by this Act, until an appraisal and professional development system for principals under Section 21.3541, Education Code, as added by this Act, is implemented, public school principals shall be appraised under Section 21.354,

Education Code, as that section existed before amendment by this Act, and the staff development of principals is governed by Section 21.451, Education Code, as that section existed before amendment by this Act.

SECTION 7. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2011.

_____                    _____
President of the Senate                                          Speaker of the House

I hereby certify that S.B. No. 1383 passed the Senate on April 26, 2011, by the following vote: Yeas 31, Nays 0.

_____
Secretary of the Senate

I hereby certify that S.B. No. 1383 passed the House on May 25, 2011, by the following vote: Yeas 147, Nays 0, one present not voting.

_____
Chief Clerk of the House

Approved:

_____
Date

_____
Governor



SAMUEL BARICH
v.
SAN FELIPE-DEL RIO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

DOCKET NO. 117-R1a-484

Copyright (c) 1985 Texas Education Agency

*1985 TX Educ. Agency LEXIS 91*

May 6, 1985

**PANEL:** [*1]   W. N. KIRBY, COMMISSIONER OF EDUCATION

**OPINION:** DECISION OF THE COMMISSIONER

Statement of the Case

Samuel Barich, Petitioner, brings this appeal concerning his employment relationship with San Felipe-Del Rio Consolidated Independent School District, Respondent. A hearing on this matter was conducted on September 24, 1984 before Mark W. Robinett, the Hearing Officer appointed by the Commissioner of Education. Petitioner is represented by Dean A. Pinkert and Leonard J. Schwartz, Attorneys at Law, Austin, Texas. Respondent is represented by William C. Bednar, Attorney at Law, Austin, Texas, and Haygood Gulley, Attorney at Law, Del Rio, Texas.

On February 25, 1985, the Hearing Officer issued a Proposal for Decision recommending to the State Commissioner of Education that Petitioner's appeal be denied. Our records reflect that a copy of the Proposal for Decision was received by both parties. Petitioner filed Exceptions to the Proposal for Decision on March 25, 1985. No reply to the exceptions was filed.

Findings of Fact

After due consideration of the evidence and matters officially noticed, in my capacity as State Commissioner of Education, I make the following Findings of Fact:

1. In a previous [*2]   case between the same parties, Barich v. San Felipe-Del Rio Consolidated ISD, No. 086-R1a-483 (Comm. Educ., May 1983), the Commissioner held, in Conclusion of Law No. 2, that the school district had, pursuant to *Tex. Educ. Code Ann. § 21.204*, "elected to employ Petitioner in his current professional capacity for the 1983-84 school year."

2. The Commissioner's Decision was affirmed by the State Board of Education on September 10, 1983. A Motion for Rehearing was not filed by either party.

3. It is uncontested that, during the 1982-83 school year, Petitioner served the district as an ROTC teacher. (Pet. Ex. 15).

4. After the State Board of Education had entered its decision, the school district's attorney, Mr. Gulley, called Petitioner's attorney, Mr. Schwartz. Mr. Gulley represented that Petitioner could not be reinstated as ROTC teacher, because the school district did not believe that he could be certified by the Air Force in that position, inasmuch as Petitioner was past retirement age and had already received the maximum one year extension of his certification. (Tr. 41-42). Mr. Gulley further stated that reinstatement in another position   [*3]   would be at the salary of an ROTC teacher. (Tr. 52). Petitioner's attorney replied that he wanted his client to return to work in the exact same position he had held during the 1982-83 school year. (Tr. 41-42).

5. On October 3, 1983, Petitioner's attorney sent a letter to the school district's attorney, which reads, in pertinent part, as follows:

Thank you for offering to settle the above-referenced case. However, while we appreciate your offer of immediate reinstatement, we must reject it as it is, in our opinion, incomplete.

Mr. Barich has authorized us to extend to you the following counteroffer. Mr. Barich will report to school and undertake his duties if the district will comply with the following:

1. Mr. Barich must be assigned in the "same professional capacity," Tex. Education Code subsection 21.204(b), as he was previously employed; i.e., as the head of the R.O.T.C.;

2. Mr. Barich must be made whole for all lost salary and benefits for the period that he has been unemployed;

3. Mr. Barich must be paid his attorneys' fees and court costs. The fees are currently, at our normal billing rate, $ 9,337.50, while costs are $ 2,644.84. We think that $ 10,000 is a reasonable compromise [*4] of attorneys' fees and costs. Of course, this offer on attorneys' fees is only if this settlement offer is accepted within the next thirty (30) days; and

4. All references in Mr. Barich's personnel files to the wrongful breach of his employment contract must be expunged.

(Pet. Ex. 1).

6. On October 21, 1983, Michael C. Boyle, attorney at law, San Antonio, Texas, sent a letter to Petitioner's attorney, which reads, in pertinent part, as follows:

This firm will be working as co-counsel with Mr. Haygood Gulley in the above matter. In that regard, as attorneys for the School District, I would like to reiterate what Mr. Gulley expressed to you in your telephone conversation of September 26, 1983. The School District is quite willing to abide by the Order of the Commissioner that Mr. Barich be retained in his same professional capacity for the present school year. As you know, that Order is now final; no appeal has been taken to the District Court by either party. Mr. Gulley's conversation with you of September 26, 1983, is not an offer of settlement as you seem to indicate in your correspondence to him of October 3, 1983. Mr. Gulley merely expressed the sentiments of the District to abide [*5] by the Commissioner's Order and permit Mr. Barich to remain as a teacher for the current year.

Mr. Gulley likewise expressed to you the very real problem that the United States Air Force has refused to sanction Mr. Barich as a R.O.T.C. teacher. We would welcome any suggestions that you have whereby the School District can permit Mr. Barich to function in the same professional capacity when the Air Force has taken the position that he is not qualified to act as an R.O.T.C. teacher. Mr. Gulley suggested that you contact the Air Force directly and attempt to obtain a reversal of that decision.

Nevertheless, as indicated herein, the School District is willing to abide by the Commissioner's decision to retain Mr. Barich for the present year. Thus, the School District expects Mr. Barich to report for duty at once.

(Pet. Ex. 2).

7. On October 25, 1983, Petitioner's attorney sent a letter to Mr. Boyle, which reads, in pertinent part, as follows:

As soon as you can assure my client, Samuel E. Barich, that he will be returned "to the same professional capacity," as ordered by the Commissioner of Education, he will report for duty. Until then, you are not completely abiding by the decision of [*6] the State Board of Education. Furthermore, Mr. Barich is entitled to be made whole for the breach of his contract.

In your letter of October 21, 1983, you state that you would welcome any suggestions that we have regarding the problem with the Air Force. We do, indeed, have a suggestion: Write the Air Force and request a waiver for Mr. Barich. The Air Force routinely grants the requests of school districts for a waiver of the age requirement. In fact, I have been advised that the Air Force told your client this several months ago.

As soon as you receive the official waiver and the school notifies my client that he is to report to work "in the same professional capacity" as he held prior to the breach of his contract, we are sure that he would be willing to sign a new one-year contract and report to work. Of course, he will still proceed to obtain redress for the prior illegal termination of his employment.

In order to give the school district an opportunity to obtain a waiver from the Air Force, we will not take any further action on this matter for forty-five days. If you have not made Mr. Barich whole (including reinstatement to his prior position with the R.O.T.C.) at the expiration [*7] of that period, we will file suit for breach of contract. We will seek damages, attorneys fees, and injunctive relief.

As we are sure you are aware, the question of liability is now finally decided and may not be relitigated.

We believe that our position in this matter is clear and has been consistent throughout the litigation. Our client is entitled to full relief; not just a cryptic promise that the school will "permit Mr. Barich to remain as a teacher for the current year." After being unemployed for several months, having litigated in the courts and the administrative agency which oversees the operations of local school systems and having won throughout the course of this matter in every forum, the school's refusal to completely abide by the State Board of Education's Order affirming the Commissioner, we believe that our stand is entirely justifiable.

In particular, the Commissioner ordered that "Petitioner's appeal be, in all things, GRANTED." Emphasis added. If you will refer to the Prayer for Relief in Petitioner's Petition for Review, you will find that the appeal included the request that the teacher be made whole for all damages arising out of the wrongful discontinuation [*8] of Petitioner's employment, including attorneys' fees. We expect nothing less.

(Pet. Ex. 3).

8. On November 7, 1983, Mr. Boyle sent a letter to Petitioner's attorney, which reads, in pertinent part, as follows:

Thank you for your letter of October 25, 1983. I have discussed the same with Mr. Gulley and with Superintendent Evins.

I have been advised to report the following:

1. By telephone conversation on September 21, 1983, you were advised by Haygood Gulley, local counsel for the School that the School would abide by the decision of the Commission (sic) and further, that Lt. Col. Barich should report to work forthwith.

Six weeks have now elapsed and Lt. Col. Barich has not reported for work as instructed. In fact, Lt. Col. Barich has not communicated with the School in any manner whatsoever.

2. Lt. Col. Barich's qualifications to hold any particular position with the School is within the realm of his personal responsibilities. Lt. Col. Barich should have requested the required Department of Air Force authorizations long ago. However, you now desire to place this responsibility upon the school. The School denies any such responsibility. Nonetheless, in a continuing effort to resolve [*9] this matter, the School is requesting such authorization from the Department of Air Force. You will be furnished a copy of this request.

3. The fact remains that Lt. Col. Barich has totally failed to report for work. Again, demand is hereby made that Lt. Col. Barich report immediately to the School for a work assignment.

4. Should Lt. Col. Barich fail to report for work immediately, you are advised that the School will take under consideration the termination of Lt. Col. Barich's relationship with the School. You will be advised, in accordance with the law, of any such consideration.

Lastly, as I interpret the order of the Commissioner, after a review of all evidence presented, the only issue litigated concerned the reinstatement of Lt. Col. Barich. Thus, his reinstatement is the only issue before us, which issue, if you wish to call it an issue, was resolved long ago when Mr. Gulley advised you that the School would abide by the ruling of the Commission (sic). Therefore, I do not understand your offer not to take further action "within forty-five days" when compliance with the Commission's (sic) order rests squarely with Lt. Col. Barich, not the School.

(Pet. Ex. 4).

9. On November [*10] 14, 1983, Petitioner's attorney sent a letter to Mr. Boyle, the substance of which reads, in its entirety, as follows:

As soon as we are furnished the authorization from the Department of the Air Force and the school agrees to fully comply with the Commissioner's Order, Mr. Barich will report to work. However, he will not report until the school remedies its breach of contract.

As to your review of the Commissioner's Order we feel that you are incorrect in your interpretation. Our Petition for Review set out the following prayer for relief:

that the Respondent is required to set aside and disregard its announced decision to consider the non-renewal of Petitioner's contract for the School Year 1983-84;

that Respondent be required to expunge any reference in any personnel file of Petitioner's to said discontinuance of employment;

that Respondent be required to offer Petitioner a contract to continue Petitioner's professional employment as a teacher for the Respondent School District unless and until the at (sic) employment is discontinued under circumstances which fully comply with applicable law;

that Respondent be required to make Petitioner whole for all damages arising out of the [*11] wrongful discontinuation of Petitioner's employment, including attorneys fees pursuant to Title 42, United States Code Section 1988; and

that Petitioner have such other and further relief to which he may show himself entitled.

The Commissioner's Order reads as follows:

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact and Conclusions of Law, in my capacity as State Commissioner of education, it is hereby

ORDERED that Petitioner's appeal be, in all things, GRANTED.

Emphasis added.

If you really wish to "resolve this matter" as you state in your letter of November 7, 1983 you need only to agree to make Col. Barich whole for all lost salary and benefits for the period that he has been unemployed, reinstate him in the "same professional capacity" which he previously held, expunge his personnel file and agree to pay him his reasonable attorneys fees.

On the other hand, if you wish to prolong this matter and needlessly waste taxpayers money, proceed to terminate him on the grounds that he refuses to return to work in the absence of a complete settlement. We will litigate this issue for the next few years -- then, if we are successful, [*12] the backpay award will be in excess of $ 75,000.00. I, for one, cannot undertand (sic) the benefits to be derived by the school system by taking this course of action. We will be paid our fees, nevertheless, as I am sure you will. Hence, the only losers will be the taxpayers and the students within the system. Mr. Barich may lose the termination question but he will still be entitled to the backpay due him until he is terminated. Given the amount of money he may ultimately have coming by the school's recalcitrance in fully complying with the Commissioner's Order, Col. Barich is willing to stand firm.

Even if it successfully terminates Col. Barich, the school district will expend more in attorneys fees in litigating the question of the termination's validity than it will spend in simply abiding by the Commissioner's Order.

If you wish to discuss settlement, please call me. Thank you.

(Pet. Ex. 5).

10. On December 21, 1983, Mr. Boyle sent a letter to Petitioner's attorney, the substance of which reads, in its entirety, as follows:

Thank you for your letter of November 14, 1983.

In addition, since that time we have had an opportunity to talk over the telephone.

If I understand your position [*13] correctly you are arguing that the District elected to retain Mr. Barich "in the same professional capacity" for the current year and that as such the District must pay his salary despite the fact that he is unable to perform his duties as an instructor in the ROTC program. I have discussed your view with Mr. Gulley, and he with the District. They are not in agreement with your argument; however, as I have mentioned in past correspondence to you and as Mr. Gulley has stressed to you over the telephone, the District is willing to employ Mr. Barich in some other position if he would kindly report to them. It is my understanding that Mr. Barich is qualified to teach the following subjects:

1. Any elementary grade;

2. Eighth grade social science;

3. High school psychology; and

4. High school industrial arts

Of course the district cannot be sure as to where he will be placed but if he would report for duty that uncertainty could be cleared up at once and Mr. Barich could begin earning a salary for the current year and mitigating his own alleged damages.

It is the position of the District that they are not attempting to evade whatsoever the Order of the Commissioner. However, because of [*14] the impossibility of performance and the inability to perform by one of the contracting parties, namely Mr. Barich, he cannot be employed in the same professional capacity. This inability of Mr. Barich to perform is a result of the position taken by the Air Force, a party over whom neither Mr. Barich nor the District has control. The District firmly believes it is not in breach of any contractual duty it owes to Mr. Barich and is more than willing to go the extra step by offering him a position in one of the other areas of education if Mr. Barich would merely report to the District that he wishes to return and continue. Surely, Mr. Barich should be interested in at least mitigating the damages you have alleged he shall sustain in your letter of November 14, 1983. Please have Mr. Barich contact the District at once.

(Pet. Ex. 6).

11. On March 28, 1984, Joe L. Sanders, President of the school district's Board of Trustees, sent a letter to Petitioner, the substance of which reads, in its entirety, as follows:

You are not now an employee or teacher in the San Felipe-Del Rio Independent School District.

Nonetheless, and out of an abundance of precaution, you are hereby advised that you [*15] shall not be an employee or teacher in the San Felipe-Del Rio Independent School District during the 1984-85 school year.

(Pet. Ex. 8).

Discussion

In his Petition for Review, Petitioner argues that the letter he received from the school district dated March 28, 1984 did not comply with the requirements of the Term Contract Nonrenewal Act (TCNA), *Tex. Educ. Code Ann. §§ 21.201 - .211 (Vernon Supp. 1984)*, and, therefore, his contract was renewed by operation of law for the 1984-85 school year.

The first issue that must be considered is whether Petitioner had a valid claim to employment with the district on March 28, 1984. If so, the notice he received could be construed as a nonrenewal notice. If not, it constitutes nothing more than a statement of the school district's understanding of the status of the dispute.

If Petitioner had an employment relationship with the school district on March 28, 1984, it was directly attributable to the Decision of the Commissioner in Docket No. 086-R1a-483, in which the Commissioner held that the school district had, as a matter of law, "elected to employ Petitioner in his current professional capacity for the [*16] 1983-84 school year." What that holding entitled Petitioner to was an offer from the school district of continued employment in the "same professional capacity." That holding did not create a contract between the parties or bind Petitioner to accept any offer from the district that did not comply with the Order. It only required the school district to make a valid offer, which Petitioner was free to accept or reject. His acceptance would create a contract binding on both parties. His rejection of a bona fide offer of continued employment in the "same professional capacity" would end any cognizible claim he might have to continued employment with the school district. See e.g., *Gosney v. Sonora Independent School Dist., 603 F.2d 522, 524-25 (5th Cir. 1979); Jordan v. Board of Regents, Univ. System, 583 F. Supp. 23, 25-27 (S.D. Ga. 1983)*.

Petitioner argues that he did not receive an offer of employment in the "same professional capacity," because he was never offered the same position he had held during the 1982-83 school year; i.e., ROTC teacher. It would not be reasonable, however, to conclude that the legislature intended that [*17] every teacher who does not receive notice of his or her proposed nonrenewal by April 1 is entitled to be employed in the exact same position the following school year. Such a holding would require a school district to actually begin nonrenewal proceedings by April 1 against every

teacher it might conceivably wish to assign to a different position the following year, or face a nonrenewal claim with any reassignment effected after April 1.

It is more reasonable to conclude that the legislature, by using the term "same professional capacity" (instead of "the exact same position"), intended to allow school districts to be flexible in their personnel assignments while discouraging the abuse of the district's inherent or contractual reassignment authority. In other words, the district may place a teacher whose employment has been renewed by operation of law in a position different from that to which the teacher was assigned the previous year, as long as the position is one to which the district could have reassigned the teacher had the parties voluntarily entered into a contract for the following year. In some instances, the validity of a particular placement will be clear. For example, [*18] an administrator who does not receive the required notice by April 1 may not be placed in the capacity of a classroom teacher; a classroom teacher may not be placed in the capacity of a counselor; a counselor may not be placed in the capacity of a nurse; a nurse may not be placed in the capacity of a librarian; etc.

In other instances, the validity of a particular placement might not be so clear. For example, a placement might be to another position within the same professional category (e.g., administrator), but nevertheless, be invalid (e.g., from superintendent to assistant elementary school principal). Factors to be considered in determining the validity of such a placement include, but are not necessarily limited to, differences in authority, duties, and salary.

In the present case, Petitioner was employed during the 1982-83 school year as an ROTC teacher. The district's offers of employment ranged from the general (i.e., a statement that the district would comply with the Commissioner's Order and that Petitioner should "report to work" at once) to the relatively -- though not completely -- specific (i.e., references to teaching an elementary grade, eighth grade social science, [*19] high school psychology, or high school industrial arts). Nevertheless, it is clear -- and Petitioner concedes (Tr. 77-79) -- that, although the district at no time offered to reinstate Petitioner as ROTC teacher, it did offer to place him in a teaching position of some sort. Further, the uncontested testimony is that Petitioner would not suffer any loss of salary due to the placement. (See Finding of Fact No. 4). In his Post-Hearing Brief, Petitioner asserts that the other positions "are substantially different, involve different responsibilities, and require different skills." (p. 3). However, Petitioner introduced no evidence which would support this contention. More importantly, no evidence was introduced which would support a holding that it would be improper to reassign an ROTC teacher to one of the positions referred to by the district.

Under the circumstances, it is concluded that the school district unconditionally offered Petitioner a position in the "same professional capacity" for the 1983-84 school year and that Petitioner rejected that offer. Petitioner was, therefore, not employed by the district during the 1983-84 school year by choice, and he has no cognizable claim [*20] against the district for correctly noting, on March 28, 1983, that he was not then employed by the district, and for advising him that it did not intend to employ him during the 1984-85 school year.

Respondent's Request for Additional Findings of Fact

Subsequent to the issuance of the Proposal for Decision, the school district filed a request that the Finding of Fact No. 8 be renumbered as 10, Findings of Fact Nos. 9 - 11 be renumbered as 12 - 14, respectively, and that the following additional Findings of Fact be made:

8. On March 19, 1983, Jesse L. Mathews, Deputy Director for Operations and Training, Air Force Reserve Officer's Training Corps, had written a letter to Mr. R. S. Evins, Superintendent of the district, in substance as follows:

"This is a follow-up on a phone conversation I had with Mr. Jac Mota, principal at Del Rio High School, regarding your Air Force JROTC Aerospace Education Instructor."

"Air Force ROTC Regulation 30-1 contains job specifications which state that the aerospace education instructor must be less than 65 years of age, however, a one-year waiver may be granted for exceptionally well-qualified applicants. In the case of Lt. Col. Samuel Barich, a waiver [*21] was granted to approve his continuation through the 1982-83 school year. The Commandant's current policy is that no waivers be granted beyond one year. Therefore, in view of this policy, Lt. Col. Barich is no longer eligible for instructor duty beyond the expiration of his current contract. We will not entertain additional waiver requests." [P's Exh. 24].

9. Superintendent Evins wrote to Jesse L. Mathews on November 2, 1983, requesting another age waiver for petitioner, in substance as follows:

"Lt. Col. Samuel Barich was employed by the San Felipe-Del Rio Independent School District for the school year 1982-1983 in the ROTC Program. So that Lt. Col. Barich may fulfill the same duties for school year 1983-84, the San Felipe-Del Rio Independent School District does hereby request the following:

"1. That the Department of the Air Force authorize Samuel Barich to fulfill such duties for the San Felipe-Del Rio Independent School District for school year 1983-1984 as he fulfilled in school year 1982-1983;

"2. That the Department of the Air Force waive any problems which it may have concerning the fact that Lt. Col. Barich is not more than 65 years of age.

"Your immediate reply to this [*22] request would be appreciated."

11. On November 9, 1983, Jesse L. Mathews wrote back to Superintendent Evins in substance as follows:

"Reference your 2 November 1983 request to waive the age 65 requirement on Lt. Col. Samuel Barich, USAF, ret., former Aerospace Education Instructor at Del Rio High School.

"Age waiver requests are entertained on an individual basis and are applicable to current instructor personnel who will attain age 65 during the academic year. Further, these instructors must consistently conform to Air Force standards to include dress and personal appearance. They must be recommended for waiver by the principal of the school and the appropriate Area Commandant.

"Additionally, the A.F.J.R.O.T.C. Unit at Del Rio High School is currently fully manned with three instructors and an approximate cadet enrollment of 214. Since Lt. Col. Barich was terminated as an A.F.J.R.O.T.C. Instructor effective 27 May 1983, and is no longer affiliated with A.F.J.R.O.T.C., we have no reason to consider an age waiver." [P's Exh. 14]

The requested Findings of Fact will not be made. They are relevant to one of the school district's defenses -- that Petitioner could not have been offered reemployment [*23] as R.O.T.C. instructor because he could not have obtained an age waiver from the Air Force to serve in that capacity during the 1983-84 school year -- but that issue need not be reached, inasmuch as the issue concerning Petitioner's rejection of a valid offer of employment is dispositive of this appeal. Further, if the age waiver issue were reached, it would be necessary to conduct further proceedings for the purpose of receiving evidence on that issue, because Petitioner has asserted at all times that Air Force regulations would have allowed a waiver to have been granted by the Air Force if the school district had requested one. (See Tr. 73-74; Prehearing Conference Tr.: 16-17; and Petitioner's Response to Respondent's Request for Additional Findings of Fact).

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as State Commissioner of Education, I make the following Conclusions of Law:

1. The school district was required, pursuant to *§ 21.204 of the Education Code* and the Commissioner's Decision in Docket No. 086-R1a-483, to offer Petitioner a position for [*24] the 1983-84 school year in the "same professional capacity" in which he was employed during the 1982-83 school year.

2. The school district, by offering Petitioner a position for the 1983-84 school year as a teacher, with no reduction in salary or status, complied with *§ 21.204 of the Education Code* and the Commissioner's Order in Docket No. 086-R1a-483.

3. Any claim by Petitioner to continued employment with the School District ended when he rejected the district's offer to employ him in the same professional capacity.

4. Because Petitioner was not employed by the school district on March 28, 1984, he has no cognizable claim against the district for its alleged nonrenewal of his employment on that date.

5. Petitioner's appeal should be DENIED.

ORDER

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact and Conclusions of Law, in my capacity as State Commissioner of Education, it is hereby

ORDERED that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ENTERED this 6th day of May, 1985.

| Case | Application of Barich Principles |
|---|---|
| *Lieberman v. Eagle Mountain-Saginaw Independent School District*, Docket No. 192-R3-785 (Comm'r Educ. 1985) | Contracted to be a teacher or a coach, the district properly reassigned the employee from the position of middle school teacher and high school coach to the position of physical education teacher with scheduling and budgeting responsibilities. |
| *Grounds v. Tolar Independent School District*, Docket No. 340-R3-786 (Comm'r Educ. 1986) | Contracted to be Teacher/Coach Football (Head football coach), the district improperly reassigned the employee to a teaching position. |
| *Reyes v. Culberson County Independent School District*, Docket No. 229-R3-787 (Comm'r Educ. 1987) | Contracted to be a teacher and head coach for duties as assigned, the district properly reassigned the employee from teacher and head coach for football, basketball, and track to the position of teacher and head coach for boys' basketball. |
| *Satcher v. Florence Independent School District*, Docket No. 363-R3-786 (Comm'r Educ. 1987) | Contracted to be a teacher/coach, the district properly reassigned the employee from being a teacher and football coach to being a teacher and baseball coach. |
| *Abbott et al. v. Ector County Independent School District*, Docket No. 081-R3-1287, 105-R3-288 (Comm'r Educ. 1991) | Contracted to be teachers/deans, the district improperly reassigned the employees from teacher/dean positions to teacher positions. |
| *Marshall v. Seguin Independent School District*, Docket No. 177-R1-690 (Comm'r Educ. 1991) | Contracted for 220 duty days, the district properly reduced duty days to 188 days for the following school year. |
| *Carpenter v. Wichita Falls Independent School District,* Docket No. 247-R3-491 (Comm'r Educ. 1993) | Contracted as an administrator, the district properly reassigned the employee from the district wide position of Science Support Specialist to the position of high school assistant principal. |
| *Andrews v. Houston Independent School District*, Docket No. 236-R1-897 (Comm'r Educ. 1997) | The district properly reassigned employee from the position of high school assistant principal to the position of middle school assistant principal. |
| *Keith v. Tarkington Independent School District*, Docket No. 459-R3-891(Comm'r Educ. 1992) | Contracted as a professional employee , the district properly reassigned the employee from the position of athletic director to the position of teacher/assistant principal. |
| *Goedeke v. Smyer Independent School District*, Docket No. 111-R3-1292 (Comm'r Educ. 1997) | Contracted as teachers, the district's reduction in salary by itself did not place the teachers in different professional capacities. |
| *Salinas v. Roma Independent School District*, Docket No. 058-R3-1196 (Comm'r Educ. 1997) | Contracted as teacher/assistant band director, the district improperly reassigned the employee to a teaching position. |
| *Underwood v. Rusk Independent School District*, Docket No. 062-R3-198 (Comm'r Educ. 1998) | Contracted as an administrator, the district properly reassigned the employee from principal of an independent middle school campus to the position of principal or assistant principal for grades 7 to 9 at a unified junior high/high school campus. |
| *Young v. Leggett Independent School District*, Docket No. 175-R3-898 (Comm'r Educ. 1999) | Contracted as a teacher/coach, the district properly reassigned the employee from the position of varsity coach and teacher to the position of junior high school coach and teacher. |
| *Veliz v. Donna Independent School District*, Docket No. 011-R3-999 (Comm'r Educ. 2000) | Contracted as an administrator, the district properly reassigned the employee from the district wide position of attendance coordinator to the position of middle school assistant principal. |
| *Yturralde v. El Paso Independent School District*, Docket No. 001-R10-900 (Comm'r Educ. 2002) | The district properly transferred the employee from one principal position to another. |
| *Ramos v. El Paso Independent School District*, Docket No. 002-R10-900 (Comm'r Educ. 2002) | The district properly transferred the employee from the position of high school principal to the position of elementary principal. |
| *Pasqua v. Fort Stockton Independent School District*, Docket No. 011-R3-1102 (Comm'r Educ. 2004) | Contracted as an administrator, the district properly reassigned the employee from the position of high school principal to the position of middle school assistant principal. |
| *Perales v. Robstown Independent School District*, Docket Nos. 052-R10-104, 084-R3-604 (Comm'r Educ. 2006) | Contracted as an administrator, the district properly reassigned the employee from a district-wide Director of Even Start to the position middle school assistant principal. |

| Case | Application of Barich Principles |
|---|---|
| *Sanchez v. Donna Independent School District*, Docket No. 075-R10-605 (Comm'r Educ. 2007) | Contracted as an administrator, the district properly reassigned the employee from a central office position to an assistant principal position. |
| *Gonzalez v. Donna Independent School District*, Docket No. 074-R10-605 (Comm'r Educ. 2007) | Contracted as an administrator, the district properly reassigned the employees from a central office position to an assistant principal position. |
| *Perez v. Donna Independent School District*, Docket No. 086-R1-705 (Comm'r Educ. 2007) | Contracted as an administrator, the district properly reassigned the employee from a central office position to an assistant principal position. |
| *Lehr v. Ector County Independent School District*, Docket No. 003-R3-0908 (Comm'r Educ. 2011) | Contracted as an administrator, the district properly reassigned the employee from the position of Executive Director of Special Education to the position of elementary school assistant principal. |
| *Wheeler v. Austin Independent School District*, Docket No. 008-R3-1108 (Comm'r Educ. 2011) | Contracted as professional employee, the district improperly reassigned the employee from the position of assistant principal to the position of classroom teacher. |
| *Murillo v. Laredo Independent School District*, Docket No. 027-R3-0108 (Comm'r Educ. 2012) | Contracted as a professional employee, the district properly reassigned the employee from the position of middle school principal to the position of Human Resources Coordinator. |
| *Montgomery v. Richardson Independent School District*, Docket No. 007-R10-1008 (Comm'r Educ. 2012) | The district properly reassigned the employee from the position of elementary school principal to the position of Program Specialist II. |
| *Tuck v. Alief Independent School District*, Docket No. 008-R10-1007 (Comm'r Educ. 2012) | Contracted as a professional employee, the district improperly reassigned the employee from the position of Career Specialist to the position of teacher. |
| *McCoy v. Kermit Independent School District*, Docket No. 004-R3-0908 (Comm'r Educ. 2012) | Contracted as an administrator, the district properly reassigned the employee from the position of principal to the position of assistant principal. |

ROSE M. CARPENTER § BEFORE THE STATE
§
§
V. § COMMISSIONER OF EDUCATION
§
WICHITA FALLS INDEPENDENT §
SCHOOL DISTRICT § THE STATE OF TEXAS

## DECISION OF THE COMMISSIONER

### Statement of the Case

Petitioner was employed as an administrator by the Wichita Falls Independent School District for the 1989-90 school year. Her assignment at that time was science supervisor. Petitioner appeals the denial of her grievance claiming the reassignment was in violation of Texas Education Code § 21.204(d).

A hearing on the merits of this appeal was heard on January 13, 1992, before James C. Thompson, the Hearings Examiner appointed by the State Commissioner of Education. Petitioner was represented by Mark Robinett, Attorney at Law, Austin, Texas. Respondent was represented by Roger Hepworth, Attorney at Law, Austin, Texas.

On July 20, 1993, the Hearings Examiner issued a Proposal for Decision recommending that Petitioner's appeal be denied. Exceptions and replies were timely filed and considered.

### Findings of Fact

After due consideration of the evidence and matters officially noticed, in my capacity as State Commissioner of Education, I make the following Findings of Fact:

1.     At all times relevant to this appeal Petitioner was employed by the Respondent as an administrator in the Wichita Falls Independent School District.  (Joint  Stip.; PX-1.)

2.     Both the administrator's contract for the 1989-90 school year and the administrator's contract for 1990-91 signed by Petitioner contain a clause providing that

> employee shall be subject to assignment and reassignment of positions or duties, additional duties, changes in responsibilities or work, transfers, or reclassification at any time during the contract term.

(PX-1; RX-2.)

3.     In June or July of 1990, the Wichita Falls Independent School District reorganized its administrative structure.  As a result of the administrative reorganization of Wichita Falls Independent School District, some of the area supervisors were reassigned to campus-based administrative positions.  (Joint Stip.)

4.     In July of 1990, Petitioner received notice from the Wichita Falls Independent School District that Petitioner would be reassigned to the position of Assistant High School Principal.  (Joint Stip.)

5.     Petitioner received no decrease in salary or benefits from her reassignment.  (Joint Stip.)

6.     At the time of the hearing Petitioner remained employed with the Wichita Falls Independent School District as an administrator in the position of Assistant Principal.  (Joint Stip.)

7.     Petitioner voiced disapproval of the administrative reorganization.

8.     The Assistant Superintendent recommended that Petitioner would not be well suited to the new role as Science Support Specialist

because of a problem she had working with principals and teachers in the past.

9.     Petitioner did not apply for the position of Science Support Specialist.

10.     Petitioner's former position of Science Supervisor was among those positions abolished by the reorganization plan.

11.     Petitioner's position as Assistant Principal is an administrative position and Petitioner's prior position as Science Supervisor was an administrative position. These positions are in the same professional capacity. (PX-2 and RX-2.)

## DISCUSSION

The question presented by this appeal is the scope and reach of the Term Contract Nonrenewal Act, Texas Education Code section 21.204(b), in the context of the reassignment of those school district personnel coming under its protections. Petitioner would have the Commissioner of Education hold that the phrase "same professional capacity" as used in the TCNA is either defined by or in some way informed by the definition of "teacher" found in §21.201(1) of that Act. I do not believe the statutory language can permit of such an interpretation. Rather, this phrase is left undefined by the statute, and therefore its meaning is a matter for interpretation by the Commissioner, in the first instance, and by the courts. The decisions of the Commissioner (and the courts) have consistently looked to the language of the employment contract itself and attempted to give the parties the benefit of their bargain. In this case, the contract between the parties provides that the position to which Petitioner was entitled was that of a generic "administrator." Petitioner has not proven that hers was a

contract of adhesion, which would clearly change the result in this case. It is true that the Commissioner has held that §21.204(b) limits the right of the district to transfer a term contract teacher. Barich v. San Felipe-Del Rio C.I.S.D., Docket No. 117-R1a-484 (Comm'r Educ. May 1985). It is possible to imagine situations where the transfer clause in an employment contract would be held unenforceable under §21.204(b). However, this is not such a case. It has been the consistent view of the Commissioner that the TCNA balanced its grant of limited tenure rights against the considerable personnel management problems it might cause if imposed inflexibly. Districts have responded to the law by creating broad classes within which transfers do not implicate the TCNA. If taken to extremes, this tactic would be against public policy as expressed in the TCNA, but I cannot make such a finding in this case. The need for flexiblity in making personnel changes is strongest, and the argument for a rigid tenure system weakest, at the administrative level. In short, I find the generic "administrator" position before me to be consistent with the policies of the TCNA.

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as State Commissioner of Education, I make the following Conclusions of Law:

1. The Commissioner of Education has jurisdiction over this appeal under Texas Education Code §11.13(a).

2. Respondent's decision to reassign Petitioner was neither arbitrary, capricious, nor unlawful.

3. Respondent's decision to reassign Petitioner was not a violation of state law.

#0247-R3-491                    -4-

4. Petitioner had no contractual entitlement not to be reassigned from Science Supervisor to Assistant Principal.

5. Petitioner had no property interest in the non-economic benefit of serving as Science Supervisor.

6. Petitioner's appeal should be denied.

## **O R D E R**

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact and Conclusions of Law, in my capacity as State Commissioner of Education, it is hereby

ORDERED that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ISSUED this _____ day of _____, 199_.

_____
LIONEL R. MENO
COMMISSIONER OF EDUCATION



JANIS K. UNDERWOOD
v.
WEST RUSK COUNTY CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

DOCKET NO. 062-R3-198

Copyright (c) 1998 Texas Education Agency

*1998 TX Educ. Agency LEXIS 93*

1998

**PANEL:** [*1] MIKE MOSES, COMMISSIONER OF EDUCATION

**OPINION: DECISION OF THE COMMISSIONER**

Statement of the Case

Petitioner, Janis K. Underwood, appeals the denial of her grievance concerning her reassignment from junior high school principal to either principal of the seventh through ninth grades or to assistant high school principal by Respondent, West Rusk County Consolidated Independent School District, subsequent to the merger of the junior and senior high school campuses.

The Administrative Law Judge appointed by the Commissioner of Education is Paula Hamje. Petitioner is represented by Kevin F. Lungwitz, Attorney at Law, Austin, Texas. Respondent is represented by John C. Hardy, Attorney at Law, Tyler, Texas.

On February 17, 1998, the Administrative Law Judge issued a Proposal for Decision recommending that Petitioner's appeal be denied. Exceptions and replies were timely filed and considered.

Findings

It is determined that the following findings are supported by substantial evidence:

1. Petitioner, Janis K. Underwood, was employed by Respondent, West Rusk County Consolidated Independent School District, as West Rusk Junior High principal for six years prior to filing her appeal to [*2] the Commissioner.

2. A proposed merger of the West Rusk Junior High and High School resulted in Respondent's notice, on or about September 30, 1997, to Petitioner of a reassignment from her position as junior high principal under the immediate supervision of Superintendent of schools to "seventh through ninth grade principal" or to assistant high school principal under the immediate supervision of the high school principal.

3. On February 18, 1997, Petitioner and Respondent entered into a written contract pertaining to Petitioner's employment with Respondent in the position of "administrator" for the term of July 1, 1997 to June 30, 1999. At the time of the appeal, the contract remained in effect. The contract provides that Petitioner is subject to reassignment of positions or duties, additional duties, changes in responsibilities or work, transfers, or reclassification at any time during the term of the contract.

4. The reassigned position includes responsibility for more students and teachers, but with similar duties as Petitioner's previous position. As a result of the reassignment, Petitioner's salary remains the same, her professional responsibilities are not lessened, and the [*3] degree of skill required is not lessened.

5. Petitioner remains an administrator after the reassignment and continues to function in that same professional capacity at the merged junior and senior high schools.

Discussion

Petitioner seeks reinstatement as head principal of West Rusk Junior High School, reporting directly to the superintendent of schools, and seeks an award of compensation for actual or potential economic and other losses. Relief is sought due to her reassignment to either "seventh through ninth grade principal" or to assistant high school principal at the newly merged junior and senior high school in West Rusk CISD. Petitioner argues that the reassignment is a demotion and breach of her employment contract. In addition, she argues that the reassignment will have a negative impact on her future earning potential; however, no evidence was offered in support of that argument.

Petitioner has a written contract with Respondent for employment as an administrator which is not intended to mean she always retains the "exact same position" she occupied prior to the reassignment. *Barich v. San Felipe-Del Rio Consolidated Independent School District,* Docket No.117-R1a-484 [*4] (Comm'r Educ.1985). The reassigned position is very similar to the previous position with regard to duties and responsibilities. Petitioner is expected to function as principal to seventh, eighth and ninth grade students instead of seventh and eighth grades only. Petitioner's salary does not change. Petitioner's written contract provides in paragraph "2" that Petitioner is subject to "...reassignment of positions or duties, additional duties, changes in responsibilities or work ...at any time during the contract term." Respondent has acted within the parameters of Petitioner's contract while attempting to accomplish the merger of two school campuses. There is no evidence that Respondent intended to demote Petitioner, and Petitioner suffered no reduction in pay, responsibilities, or required skills, all important elements to consider in determining whether a reassignment constitutes a demotion. *Reyes v. Culberson County Independent School District,* Docket No. 229-R3-787 (Comm'r Educ. 1989) and *Cody v. Graham Independent School District,* Docket No. 247-R3-787 (Comm'r. Educ. 1989). Petitioner remains an administrator at the same pay.

Respondent considered the needs of the district [*5] in the decision to reassign Petitioner. There was no evidence presented that Respondent failed to consider criteria for personnel decisions set out in its local board policies as asserted by Petitioner; therefore, there is no need to address the issue of whether local board policy is a school law as defined by statute. Petitioner argues that Respondent violated the *Texas Education Code § 21.206* which requires a school district to employ an employee in the same professional capacity from one year to the next. Pertinent portions of the rule read as follows:

> (a) Not later than the 45th day before the last day of instruction a school year, the board of trustees shall notify in writing each teacher whose contract is about to expire whether the board proposes to renew or not renew the contract.
>
> (b) The board's failure to give the notice required by Subsection (a) within the time specified constitutes an election to employ the teacher in the same professional capacity for the following school year.

This case does not concern renewal or nonrenewal of a contract; therefore the above provision does not appear applicable. In addition, Petitioner [*6] is retained in her same professional capacity as previously addressed in this proposal.

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings, in my capacity as Commissioner of Education, I make the following Conclusions of Law:

1. The Commissioner of Education has jurisdiction over the instant matter pursuant to *Tex. Educ. Code § 7.057*.

2. Respondent's reassignment of Petitioner to an administrator position in the newly merged junior and senior high school was not a violation of the school laws of this state.

3. Respondent's reassignment of Petitioner was not a demotion and was not in violation of any provision of her written employment contract with Respondent that caused or would cause monetary harm to Petitioner.

4. Petitioner's appeal should be DENIED.

ORDER

After due consideration of the record, matters officially noticed, and the foregoing Findings and Conclusions of Law, in my capacity as Commissioner of Education, it is hereby

ORDERED that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ISSUED this ___ day of ___, 1998.



LAURA PERALES
v.
ROBSTOWN INDEPENDENT SCHOOL DISTRICT

DOCKET NO. 052-R10-104, DOCKET NO. 084-R3-604

Copyright (c) 2006 Texas Education Agency

*2006 TX Educ. Agency LEXIS 63*

November 28, 2006

**PANEL:** [*1] ROBERT SCOTT, CHIEF DEPUTY COMMISSIONER, BY DESIGNATION

**OPINION: DECISION OF THE DESIGNEE OF THE COMMISSIONER**

Statement of the Case

Petitioner, Laura Perales, appeals the action of Respondent, Robstown Independent School District, concerning her grievances. Christopher Maska is the Administrative Law Judge appointed by the Commissioner of Education. Petitioner is represented by Mark W. Robinett, Attorney at Law, Austin, Texas. Respondent is represented by John D. Bell, Attorney at Law, Corpus Christi, Texas.

The Administrative Law Judge issued a Proposal for Decision recommending that Petitioner's appeal be denied. Exceptions and replies were timely filed and considered.

Findings of Fact

The following Findings of Fact are based upon Petitioner's pleadings:

1. Respondent employed Petitioner under term contracts for the 2001-2005 school years. Respondent has not non-renewed Petitioner's contract.

2 Respondent employed Petitioner as the Director of the Even Start Program for the 2001-2002 and 2002-2003 school years and the beginning of the 2003-2004 school year.

3. Even Start is a federal program designed "to help break the cycle of poverty and illiteracy by improving the educational [*2] opportunities of the Nation's low-income families by integrating early childhood, adult literacy, or adult education, and parenting education into a unified family literacy program."

4. The Even Start program is district-wide and at the time of the January 2004 board hearing served 64 part-time students. As the Even Start Director, Petitioner directed three teachers, a secretary, two daycare workers, and a custodian. Petitioner's position of Director of Even Start is similar to the position of a principal of a very small school.

5. On November 17, 2003, Petitioner was notified that she would be reassigned to the position of assistant principal at Ortiz Intermediate School. For the full 2003-2004 school year, Petitioner continued to receive her salary of $ 58,840. As assistant principal, Petitioner lacked the final decision making authority of a principal.

6. On April 8, 2004, Petitioner was notified that for the 2004-2005 school year, Petitioner received a salary of $ 51,090.

7. For the 2002-2003 and 2003-2004 school years, Petitioner was employed under a teacher term contract for the position of administrator. This contract provides:

Employee agrees that the Superintendent of [*3] Schools shall have the right to assign such duties to the Employee as the Superintendent shall deem proper, and the Superintendent may, from time to time, assign or reassign the Employee to other or additional duties or assignments to the fullest extent permitted by state law and board policy.

8. On the September 9, 2003 organizational chart, the Even Start Director is shown to be at Level II along with other directors and principals. Assistant principals are found on Level III along with coordinators and facilitators.

9. The salary schedule for the 2003-2004 school year lists the position of Even Start Director at Job Level 5 which has a minimum salary of $ 38,120, a midpoint of $ 46,380, and a maximum of $ 54,640. Junior high school principals are listed at Job Grade 4 with a minimum salary of $ 35,660, a midpoint of $ 43,380, and a maximum of $ 51,090.

Discussion

Petitioner contends that Respondent failed to employ her in the same professional capacity and demoted her. Petitioner contends that removing her from her position as Director of the Even Start Program violated a federal grant.

Jurisdiction

*Texas Education Code section 7.057* [*4] grants the Commissioner jurisdiction over written employment contracts and "the school laws of this state." "The school laws of this state" are defined as portions of the Texas Education Code and rules adopted under the Texas Education Code. This does not give the Commissioner jurisdiction to determine whether a school district has complied with federal grant requirements.

Same Professional Capacity

Petitioner notes that *Texas Education Code section 21.206* requires Respondent to employ her in the same professional capacity during the 2003-2005 school years as she held during the 2002-2003 school years because Respondent has not nonrenewed her contract. Respondent does not disagree with this claim. The parties dispute the meaning of the phrase "same professional capacity." The term "same professional capacity" is not defined in statute. Petitioner suggests that the definition of "teacher", found at *Texas Education Code section 21.201*, is helpful:

"Teacher" means a superintendent, principal, classroom teacher, counselor, or other full-time professional employee who is required to hold a certificate [*5] under Subchapter B or a nurse.

Petitioner contends that each individual classification is a different professional capacity for purposes of *Texas Education Code section 21.206*. There are a number of problems with this interpretation. The first problem is that the definition in question is that of "teacher", not of "professional capacity." The second difficulty is that the statutory category of "other full-time professional employee who is required to hold a certificate under Subchapter B" hardly seems a distinct professional capacity. A third difficulty is that in a number of cases the Commissioner has interpreted "same professional capacity" in a different way. In *Barich v. San Felipe - Del Rio Consolidated Independent School District,* Docket No. 117-R1a-484 (Comm'r Educ 1985), the Commissioner did not rule that the definitional categories created distinct professional capacities:

In other instances, the validity of a particular placement might not be so clear. For example, a placement might be to another position within the same professional category (e.g. administrator), but nevertheless, be invalid (e.g., from superintendent to [*6] assistant middle school principal).

In *Abbott v. Ector County Independent School District,* Docket No. 081-R3-127, 105-R3-1287 (Comm'r Educ. 1991), the Commissioner found that one hired as teacher/dean could not be reassigned to a pure teacher position. The Commissioner noted that as deans the employees in question had administrative duties. While there is no defined category of teacher/dean, the Commissioner found that such an employee had to be retained in the capacity of teacher/dean. In *Carpenter v. Wichita Falls Independent School District,* Docket No. 247-3-491 (Comm'r Educ. 1993), Carpenter was employed under an administrator's contract. She was first assigned as the science supervisor. She was then reassigned as an assistant high school principal. The Commissioner determined that the two positions were in the same professional capacity:

It has been the consistent view of the Commissioner that the TCNA    n1 balanced its grant of limited tenure rights against the considerable personnel [*7]   management problems it might cause if imposed inflexibly. Districts have responded to the law by creating broad classes within which transfers do not implicate the TCNA. If taken to extremes, this tactic would be against the public policy expressed in the TCNA, but I cannot make such a finding in this case. The need for flexibility in making personnel changes is strongest, and the argument for a rigid tenure system weakest, at the administrative level. In short, I find the generic "administrator" position before me to be consistent with the TCNA.

In *Keith v. Tarkington Independent School District,* Docket No. 459-R3-891 (Comm'r Educ. 1992), the Commissioner found that a transfer from athletic director to teacher/assistant principal was a reassignment in the same professional capacity even though athletic director and assistant principal are not listed in *Texas Education Code section 21.201(1).* In *Veliz v. Donna Independent School District,* Docket No. 011-R3-999 (Comm'r Educ. 2000), the Commissioner found that the professional capacity of certified administrator legitimately encompassed both attendance coordinator and middle school   [*8]   assistant principal. These cases are incompatible with Petitioner's claim that the same professional capacity is determined in reference to the definition of "teacher" found at *Texas Education Code section 21.201.* Since the language in question was first enacted in 1981 and the Education Code was reenacted without change in 1995, the Commissioner's long standing construction is affirmed by the doctrine of legislative acceptance. *Texas Dept. of Protective and Regulatory Services v. Mega Child Care, 145 S. W. 3d 170, 176-177 (Tex. 2004).*

Comparison of Positions

The Commissioner has held that in determining whether two positions are within the same professional capacity, the first question is whether both positions are within the professional capacity stated in the contract and the second question is whether the professional capacity is a legitimate professional capacity. *Young v. Leggett Independent School District,* Docket No. 175-R3-898 (Comm'r Educ. 1999). The professional capacity stated in Petitioner's contract is "administrator." In the present case, the two positions are administrator positions. Whether [*9]   "administrator" is a legitimate professional capacity that encompasses the positions in question is determined principally by comparing professional skills and responsibilities.

In the present case, Petitioner first held the position of Director of the Even Start Program. Even Start was a small program, but a district-wide program. The program was designed to combat illiteracy by keeping the whole family involved. Petitioner was responsible for 64 part-time students. Petitioner directed three teachers, a secretary, two daycare workers, and a custodian. In effect, Petitioner's position was the equivalent to that of a principal of a very small magnet school. For the 2003-2004 school year, as Even Start Director, Petitioner earned $ 58,840. On the district's organizational chart, Even Start Director was on the same level as principals.

Petitioner's second position was that of an assistant middle school principal. Petitioner's duties as assistant principal impacted more students, teachers, and other employees, but as assistant principal she had less authority. Except in the absence of the principal, in many situations, Petitioner lacked final authority. For the 2003-2004 school year,   [*10]   as an assistant principal, Petitioner earned $ 58,840. On the district's organizational chart assistant principals are on the level below principals.

The positions of Even Start Director and assistant principal are within the same professional capacity. While the duties and responsibilities are not identical, they are sufficiently similar. Petitioner went from a position that was the equivalent of being the principal of a very small school to being a middle school assistant principal. Petitioner's pay remained the same for the 2003-2004 school year. While there was movement on the organizational chart, the movement was only one level. This case seems most similar to *Keith v. Tarkington Independent School District,* Docket No. 459-R3-891 (Comm'r Educ. 1992). In *Keith,* the movement was from a central office position to the position of assistant principal. The Commissioner held that the two positions were in the same professional capacity.

Demotion/Reduction in Salary

For the entire 2003-2004 school year, Petitioner continued to receive her salary of $ 58,840. On April 8, 2004, Petitioner was notified that for the 2004-2005 school year, she would receive a salary of $ 51,090.   [*11]   Petitioner maintains that the reduction in salary plus the reduction in responsibilities constitutes a demotion. This claim is a contract claim. The Commissioner has stated that in addition to reductions in pay, such factors of reduction in responsibilities and required skills are relevant factors when considering a demotion claim. *Underwood v. Rusk Independent School District,* Docket No. 062-R3-198 (Comm'r Educ. 1998). However, since any reduction in responsibilities or required

skills is in accordance with Petitioner's contract, Respondent has not violated Petitioner's written employment contract. *Tex. Educ. Code § 7.057(a)(2)(B)*. Further, even if Petitioner could identify a violation of her contract, Petitioner cannot show that this caused or would cause monetary harm. *Smith v. Nelson, 53 S.W.3d 792* (Tex. App.-Austin 2001, pet. denied). The only contract in evidence is Petitioner's contract for the 2002-2004 school years. This contract does not require that Petitioner receive the same or greater compensation for the 2004-2005 school year. While Petitioner may have expected to receive the same or a higher [*12] salary, she had no contractual right to receive such a salary. When a school district informs a teacher of a salary reduction at a time when the teacher can unilaterally withdraw from the contract, the district may reduce compensation from one school year to the next as long as the compensation complies with the state minimum salary schedule. *Tex. Educ. Code § 21.402*-21.403.

Conclusion

Petitioner's reassignment from Even Start Director to assistant middle school principal was a reassignment within the same professional capacity. Respondent has not impermissibly reduced Petitioner's salary or demoted her.

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as Designee of the Commissioner of Education, I make the following Conclusions of Law:

1. The Commissioner has jurisdiction to hear this cause under *Texas Education Code section 7.057*, except as noted in Conclusion of Law No. 3.

2. *Texas Education Code section 7.057* grants the Commissioner jurisdiction over written employment [*13] contracts and "the school laws of this state."

3. The Commissioner lacks jurisdiction to consider whether Respondent violated the requirements of the Even Start grant under *Texas Education Code section 7.057*.

4. "Same professional capacity", as used in *Texas Education Code section 21.206*, is not limited to the individual classifications used in *Texas Education Code section 21.201(1)*. This interpretation of the Commissioner is affirmed by the doctrine of legislative acceptance.

5. "Administrator" is a legitimate professional capacity under *Texas Education Code section 21.206*.

6. Whether the professional capacity of "administrator" properly includes two positions is determined principally by comparing the professional skills and responsibilities of the two positions.

7. Petitioner's positions of Even Start Director and middle school assistant principal both legitimately fall under the professional capacity of administrator.

8. Respondent did not violate *Texas Education Code section 21.206* [*14] by reassigning Petitioner from Even Start Director to middle school assistant principal.

9. Petitioner's claims of demotion and reduction in salary are contract claims. *Texas Educ. Code § 7.057(a)(2)(B)*.

10. Reassigning Petitioner from Even Start Director to middle school assistant principal did not violate her contract.

11. Even if reassigning Petitioner from Even Start Director to middle school assistant principal violated Petitioner's contract, it did not cause nor would it cause monetary harm.

12. Reducing Petitioner's salary from the amount received for the 2003-2004 school year to the amount for the 2004-2005 school year did not violate Petitioner's contract as the salary offered was not below the salary required by the state minimum salary schedule. *Tex. Educ. Code § 21.401*-21.402.

13. Petitioner was not demoted in violation of her contract.

14. Petitioner's appeal should be denied.

ORDER

After due consideration of the record, matters officially noticed and the foregoing Findings of Fact and Conclusions of Law, in my capacity as Designee of the Commissioner of Education, it is hereby

ORDERED [*15] that Petitioner's appeal be, and is hereby, DENIED.

SIGNED AND ISSUED this 28<th> day of November, 2006.

**FOOTNOTES:**

n1 "TCNA" stands for the "Term Contract Nonrenewal Act." Prior to the rewrite of the Education Code in 1995, the statutory provisions concerning term contracts were officially known as the Term Contract Nonrenewal Act.



HOLLY McCOY
v.
KERMIT INDEPENDENT SCHOOL DISTRICT

DOCKET NO. 004-R3-0908

Copyright (c) 2012 Texas Education Agency

*2012 TX Educ. Agency LEXIS 2*

April 13, 2012

**PANEL:** [*1] ROBERT SCOTT, COMMISSIONER OF EDUCATION

**OPINION: DECISION OF THE COMMISSIONER**

Statement of the Case

Petitioner, Holly McCoy, appeals the action of Respondent, Kermit Independent School District, concerning her grievance. Christopher Maska is the Administrative Law Judge appointed by the Commissioner of Education. Petitioner is represented by Mark W. Robinett, Attorney at Law, Austin, Texas. Respondent is represented by Christine Badillo, Attorney at Law, Austin, Texas.

The Administrative Law Judge issued a Proposal for Decision recommending that Petitioner's appeal be dismissed in part and denied in part.

Findings of Fact

After due consideration of the record and matters officially noticed, it is concluded that the following Findings of Fact are supported by substantial evidence and are the Findings of Fact that best support Respondent's decision    n1.

1. Petitioner was employed by Respondent under a term contract for the 2007-2008 school year in the position of principal. This contract expired [*2] at the end of the 2007-2008 school year.

2. For the 2008-2009 school years, Petitioner signed a term contract with Respondent. The contract is entitled "For Certified Administrator."

3. For the 2008-2009 school year, Respondent assigned Petitioner to the position of assistant principal. Petitioner's salary or benefits for the 2008-2009 school year were not decreased from that received for the 2007-2008 school year.

Discussion

Petitioner contends that Respondent changed her professional capacity when it reassigned her from the position of principal to the position of assistant principal. In particular, Petitioner maintains that the position of a campus principal is a distinct professional capacity. Petitioner also contends that she was demoted. Respondent denies Petitioner's claims.

Demotion

The Texas Education Code does not prohibit a school district from demoting a teacher. Petitioner has not alleged that any section of the Texas Education Code prohibits demotions. To the extent the Commissioner has jurisdiction over demotions, that authority must come from Texas Education Code section 7.057(a)(2)(B) which gives the Commissioner jurisdiction over violations of written employment [*3] contracts that cause or would cause monetary harm. Because Petitioner has not lost salary or benefits Petitioner cannot show the requisite monetary harm. *Smith v. Nelson, 53 S.W.3d 792* (Tex. App.-Austin 2001, pet denied). The Commissioner lacks jurisdiction over Petitioner's demotion claim.

Same Professional Capacity

A "teacher    n2" who holds a term contract under Texas Education Code chapter 21, subchapter E that is about to expire cannot be reassigned to new a position for the next school year unless the position is within the same professional capacity as the position the "teacher" held in the current school year:

> (a) Not later than the 45th day before the last day of instruction in a school year, the board of trustees shall notify in writing each teacher whose contract is about to expire whether the board proposes to renew or not renew the contract.
>
> (b) the board's failure to give the notice required by Subsection (a) within the time specified constitutes [*4] an election to employ the teacher in the same professional capacity for the following school year.

Tex. Educ. Code § 21.206. The term "same professional capacity" is not defined in the Texas Education Code. However, the Commissioner from the earliest substantive decision concerning this provision has held that "administrator" is a professional capacity.

> It is more reasonable to conclude that the legislature, by using the term "same professional capacity" (instead of "exact same position"), intended to allow school districts to be flexible in their personnel assignments while discouraging the abuse of the district's inherent or contractual authority. In other words, the district may place a teacher whose employment has been renewed by operation of law in a position different from that to which the teacher was assigned the previous year, as long as the position is one to which the district could have reassigned the teacher had the parties voluntarily entered into a contract for the following year. In some instances the validity of a particular placement will be clear. For example, an administrator who does not receive the required notice by April 1    n3
> [*5]   may not be placed in the capacity of a classroom teacher. . .

In other instances, the validity of a particular placement might not be so clear. For example, a placement might be to another position within the same professional category (e.g., administrator), but nevertheless be invalid (e.g., from superintendent to assistant elementary school principal). Factors to be considered in determining the validity of such an assignment include, but are not limited to differences in authority, duties, and salary.

*Barich v. San Felipe-Del Rio Consolidated Independent School District*, Docket No. 117-R1a-484 (Comm'r Educ. 1985). Further, the Commissioner has found that the professional capacity of "administrator" is to be broadly interpreted:

> It is possible to imagine situations where the transfer clause of an employment contract would be held to be unenforceable under § 21.204(b)    n4

. However, this is not such a case. It has been the consistent view of the Commissioner that the TCNA balanced its [*6] grant of limited tenure rights against the considerable personnel management problems it might cause if imposed inflexibly. Districts have responded to this law by creating broad classes within which transfers do not implicate the TCNA. If taken to extremes, this tactic would be against public policy as expressed in the TCNA, but I cannot make such a finding in this case. The need for flexibility in making personnel changes is strongest, and the argument for a rigid tenure system weakest, at the administrative level. In short, I find the generic "administrator" position before me consistent with the policies of the TCNA.

*Carpenter v. Wichita Falls Independent School District*, Docket No. 247-R3-491 (Comm'r Educ. 1993). In many cases, it will not constitute a violation of Texas Education Code section 21.206, for a district to reassign a term contract administrator from a position with one administrative job title to a position that has a different administrative job title.

Principal and Assistant Principal Certification

Texas Education Code section 21.046 provides guidance for the State Board for Educator Certification in creating standards for principal certification. The [*7]   State Board for Educator Certification issues only one type of certificate for both principals and assistant principals:

> Principal Certificate.

(a) Due to the critical role the principal plays in campus effectiveness and student achievement, and consistent with the Texas Education Code (TEC) § 21.046(c), the rules adopted by the State Board for Educator Certification will ensure that each candidate for the Principal Certificate is of the highest caliber and possesses the knowledge and skills necessary for success.

(b) As required by TEC § 21.046(b)(1)-(6), the standards identified in § 241.15 of this title (relating to Standards for the Principal Certificate) emphasize instructional leadership; administration, supervision, and communication skills; curriculum and instruction management; performance evaluation; organization; and fiscal management.

(c) Each individual serving as a principal or assistant principal is expected to actively participate in professional development activities to continually update his or her knowledge and skills. Currency in best practices and research as related to both campus leadership and student learning is essential.

(d) The holder of the Principal [*8] Certificate issued under the provisions of this chapter may serve as a principal or assistant principal in a Texas public elementary, middle, or secondary school.

19 Tex. Admin. Code § 241.1. Both principals and assistant principals are treated by the State Board for Educator Certification as principals:

Requirements for the First-Time Principal in Texas

(a) Principals or assistant principals employed for the first time as campus administrators (including the first time in the state) shall participate in, at least, a one-year induction period.

(b) The induction period should incorporate the assessment and professional growth requirements contained in § 241.30 (b) of this title (relating to Requirements to Renew the Standard Principal Certificate).

(c) The induction period should be a structured, systemic process for assisting the new principal or assistant principal in further developing skill in guiding the everyday operation of a school, adjusting to the particular culture of a school district, and developing a personal awareness of self in the campus administrator role. Mentoring support must be an integral component of the induction period.

19 Tex. Admin. Code § 241.20. [*9] The fact that principals and assistant principals are both required to have the same certificate and to undergo the same one-year induction period is significant evidence that principals and assistant principals normally share the same professional capacity.

Principal's Role

Petitioner is correct that an assistant principal reports to a principal. Petitioner is also correct that the Texas Education Code gives specific and important roles to principals but not to assistant principals. Texas Education Code 11.202 makes clear that "the principal of a school is the instructional leader of the school" and goes on to specify duties of a principal. A principal has specific duties under Texas Education Code chapter 37 concerning the placement of students. There are real differences between principals and assistant principals. However, principals and assistant principals are both administrators. Principals and assistant principals share the same certification. The mere fact that a term contract "teacher" is reassigned from the position of principal to the position of assistant principal does not mean that a "teacher" is being employed in a different professional capacity.

In certain cases, [*10] it may be the case that a "teacher" would be employed in a different professional capacity when a "teacher" is reassigned from being a principal to a position of assistant principal. A district could give an employee the title of "assistant principal" but give that individual none of the duties normally associated with the job of assistant principal. In such a case, the factors set forth in *Barich* and perhaps additional factors might result in a conclusion that a change of professional capacity has occurred. However, in the present case Petitioner's argument is that the change from principal to assistant principal alone is sufficient to show a violation of Texas Education Code section 21.206(b). It is not.

Conclusion

A change from a position of principal to a position of assistant principal does not necessarily involve a change of professional capacity as that term is in Texas Education Code section 21.206(b).

Conclusions of Law

After due consideration of the record, matters officially noticed, and the foregoing Findings of Fact, in my capacity as Commissioner of Education, I make the following Conclusions of Law:

1. The Commissioner has jurisdiction to over Petitioner's [*11]   Texas Education Code section 21.206 claim under Texas Education Code section 7.057(a)(2)(A).

2. The Commissioner lacks jurisdiction over Petitioner's demotion claim. Tex. Educ. Code § 7.057(a)(2)(B).

3. The Commissioner does not have jurisdiction over demotion claims based on Texas Education Code section 7.057(a)(2)(A).

4. The Commissioner may have jurisdiction over a demotion claim if a violation of a written employment contract is alleged that causes or would cause monetary harm. Tex. Educ. Code § 7.057(a)(2)(B).

5. The monetary harm referred to in Texas Education Code section 7.057(a)(2)(B) must be a contract damage. If an employee does not lose salary or benefits based on an alleged violation of a written contract, the employee has not suffered monetary harm.

6. Because Petitioner did not suffer monetary harm as that term is used in Texas Education Code section 7.057(a)(2)(B), the Commissioner lacks jurisdiction over Petitioner's demotion claim.

7. Administrator is a professional capacity as that term is used in Texas Education Code section 21.206(b).

8. The professional capacity of administrator, as it applies to Texas Education Code section 21.206(b), is a broad professional [*12]   capacity.

9. The positions of principal and assistant principal are normally within the same professional capacity. Tex. Educ. Code § 21.046, 19 Tex. Admin. Code § 241.1, and 19 Tex. Admin. Code § 241.20.

10. The fact alone that a principal is reassigned to the position of assistant principal is not sufficient to show a change of professional capacity as that term is used in Texas Education Code section 21.206(b).

11. Respondent did not violate Texas Education Code section 21.206(b) when Petitioner was reassigned from the position of principal to the position of assistant principal.

12. The Petition for Review should be dismissed in part and denied in part.

Order

After due consideration of the record, matters officially noticed and the foregoing Findings of Fact and Conclusions of Law, in my capacity as Commissioner of Education, it is hereby

ORDERED that Petitioner appeal be and is hereby dismissed in part and denied in part.

SIGNED AND ISSUED this      day of     , 2012.

**FOOTNOTES:**

n1 *See* 19 Tex. Admin. Code § 157.1073(h); *Bosworth v. East Central Independent School District*, Docket No. 090-R1-803 (Comm'r Educ. 2003).
 [*13]

n2 The definition of "teacher" found at Texas Education Code section 21.201 is truly a creature of statute. It includes individuals who would never in common speech be referred to as teachers.

n3 In the original Term Contract Nonrenewal Act, a district had to propose nonrenewal on or before April 1, instead of the current requirement of "the 45th day before the last day of instruction." Term Contract Nonrenewal Act, 67th Leg., R.S., ch. 765, § 2, 1981 Tex. Gen Laws 2847.

n4 The old Texas Education Code section 21.204 is the predecessor of the current Texas Education Code section 21.206.

# CROSBY INDEPENDENT SCHOOL DISTRICT
# TWO-YEAR TERM CONTRACT

State of Texas)
County of Harris)                                    Date given employee ___3/7/11___

This contract is entered into by and between the Board of Trustees of the Crosby Independent School District (Board) and _R. Mary Jenkins_ _____ (Employee) under the following terms and conditions:

1. The Board hereby agrees to employ the Employee and the Employee agrees to serve the Board by engaging in duties as assigned by the Superintendent of the Crosby Independent School District for the school years _2011_ - _2013_ with beginning and ending dates as set by the Board.

2. The Board agrees to pay the Employee for the services rendered an annual salary according to the compensation plan adopted by the Board. The Employee understands and agrees that only the Board is authorized to establish an annual salary and any representations made by any other person regarding salary is of no effect and shall not be relied upon.

3. It is understood and agreed by the parties to this Contract that the Superintendent of the Crosby Independent School District shall have the right to assign such duties to the Employee as the Superintendent shall deem proper; and since the Employee is not employed to fill a specific position or assignment, the Superintendent may assign or reassign the Employee to other or additional duties for which he or she is professionally certified or otherwise qualified to perform. Administrative changes will be made with the approval of the Board.

4. Supplemental duties may be assigned to the Employee for which a stipend may or may not be paid. No property right to continued employment exists in such supplemental duties regardless of whether stipends are paid, and such duties may be terminated for any reason or for no reason, at the sole discretion of the Superintendent with the Board approval.

5. It is understood and agreed that if the Employee is employed in more than one position such as teacher/coach or teacher/band director, the Employee's performance will be evaluated in each assignment, and that unsatisfactory performance in either assignment constitutes grounds for nonrenewal or termination of this Contract. The employee cannot resign one position without resigning both unless with the approval of the Superintendent.

6. It is understood and agreed by the parties to this Contract that the Employee shall carry out his or her duties to the best of his or her skill and ability and shall discharge the duties required by the federal law, by school laws of this state, and by this District. The Contract is specifically subject to the policies, procedures, administrative directives, rules and regulations of the District which are in effect at this time, any amendments which may hereafter be enacted or any which may be adopted during the term of this Contract.

7. This Contract is conditioned on the Employee providing the necessary certification and experience records, medical records, oath of office and other records required by the District. At the beginning of this Contract, and at any time during this Contract, the Employee specifically agrees to submit to a review of his or her national criminal history record information (NCHRI) if required by the District, TEA, or SBEC. Any misrepresentation contained in any of these records shall be grounds for the termination of employment.

8. Any action or event that the Board determines creates a financial exigency and a need to reduce expenditures for personnel, such as, but not limited to, declines in enrollment or tax revenues, reductions in funding, or change of program shall constitute cause for termination at any time during the term of this Contract.

9. Employment in a federally or categorically funded position is expressly conditioned upon the availability of full funding for the position, and any reduction of such funding constitutes good cause for termination of this Contract.

10. The Board of Trustees shall notify Employee in writing, not later than the 45th day before the last day of instruction in the school year covered by this Contract, whether it intends to renew or not renew the Contract. Renewal or nonrenewal will be in accordance with the Board policy and state law.

11. The Board has not adopted any policy, rule, regulation, law or practice providing for tenure. No right of tenure is created by this Contract. This Contract shall not grant or create any contractual or other expectancy of continued employment or claim of entitlement to employment beyond the term of the Contract.

12. During the term of this Contract, the Employee may be terminated for good cause as determined by the Board, financial exigency that requires a reduction in personnel, or for any reason stated in Board policy for this Contract. The Board may suspend Employee without pay for good cause as determined by the Board for a period not to extend beyond the end of the school year covered in this Contract pending discharge of Employee or in lieu of termination.

13. It is understood and agreed by the Board and the Employee, that upon acceptance of this Contract by the Employee, all previous contracts of employment with the Board are superseded and terminated and are of no force and effect.

14. The salary for the last month of the term of this Contract shall be payable only upon receipt from the Employee of all District property, textbooks, documents and reports required by the District.

15. The Employee may resign at the end of the school year covered by this Contract by filing a written resignation with the Board so long as the written resignation is filed by the 45th day before the first day of the following school year. A written resignation mailed by prepaid certified or registered mail to the President of the Board at the post office address of the District is considered filed at the time of mailing. If the Employee attempts to resign at any other time, the Employee will be released from this Contract only with the written consent of the Board. If the Board does not consent to release the Employee and the Employee nevertheless abandons the Contract, the District may file a complaint seeking sanctions against the Employee, with the State Board for Educator Certification.

16. Invalidity of any portion of this Contract under the laws of the State of Texas or of the United States shall not effect the validity of the remainder of the Contract.

17. This offer of employment expires if this Contract is not signed and returned to the Superintendent by the Employee on or before _March 31_ _____ _2011_ .

I have signed this Contract and agree to comply with its terms and conditions.

_____ 2/2/2011
                    Date

_____ 5/11/2010
                    Date

_____
Employee's Signature

_Beus Blankenship_
Board President's Signature

EXHIBIT
1

(13)

H. Jenkins v. Crosby ISD
TEA #: 000294

# Appendix -- Legislation

1. Act of Aug. 31, 1981, 67th Leg., R.S., ch. 765, 1981 Tex. Gen. Laws 2847 (current version at Tex. Educ. Code § 21.206(a)).

2. Act of Sept. 28, 2011, 82nd Leg., 1st C.S., ch. 8, § 9, sec. 21.206, 2011 Tex. Gen. Laws 5463, 5465.

3. H.J. of Tex., 67th Leg., R.S. 3522 (1981).

4. House Committee Report, Tex. S.B. 341, 67th Leg. R.S. (1981).

5. Introduced Bill, Tex. S. B. 341, 67th Leg., R.S. (1981).

6. Term Contract Nonrenewal Act, 71st Leg., 6th C.S., ch. 1, § 3.14, 1990 Tex. Gen. Laws 1, 30.

7. Term Contract Nonrenewal Act, 74th Leg., R.S., ch. 260 ch. 21 subch. E and F, 1995 Tex. Gen. Law 2207, 2378-79.

8. Term Contract Nonrenewal Act, 78th Leg., R.S., ch. 484, § 1, 2003 Tex. Gen. Laws 1749.

1.

## TERM CONTRACT NONRENEWAL ACT—TEACHERS AND SUPERINTENDENTS

### CHAPTER 765

### S. B. No. 341

**An Act relating to standards and procedures for the nonrenewal of contracts for teachers and superintendents under term contracts and to probation in the public schools of this state; adding Sections 21.201 through 21.211 to Subchapter G in Chapter 21 of the Texas Education Code, as amended.**

*Be it enacted by the Legislature of the State of Texas:*

Section 1.[63] This Act shall be known as "The Term Contract Nonrenewal Act."

Sec. 2. Subchapter G, Chapter 21, Texas Education Code, as amended, is amended by adding[64] Sections 21.201 through 21.211 to read as follows:

"Sec. 21.201. Definitions

"As used in this subchapter, the following terms shall have the meaning ascribed to them in this section.

"(1) 'Teacher' means a superintendent, principal, supervisor, classroom teacher, counselor, or other full-time professional employee, except paraprofessional personnel, who is required to hold a valid certificate or teaching permit.

"(2) 'Board' and 'board of trustees' means the governing board of a public school district.

"(3) 'School district' means any public school district in this state.

"(4) 'Term contract' means any contract of employment for a fixed term between the school district and a teacher.

"Sec. 21.202. Teacher Evaluations

"The board of trustees of each school district shall provide by written policy for the periodic written evaluation of each teacher in its employ at annual or more frequent intervals. Such evaluation shall be considered by the board of trustees prior to any decision by the board not to renew the term contract of any teacher.

"Sec. 21.203. Nonrenewal of Term Contracts

"(a) The board of trustees of each school district may choose not to renew the employment of any teacher employed under a term contract effective at the end of the contract period.

"(b) The board of trustees of each school district shall establish policies consistent with this subchapter which shall establish reasons for nonrenewal.

"(c) The board of trustees of each school district shall establish policies and procedures for receiving recommendations from its school administration for the nonrenewal of teacher term contracts, excepting only the general superintendent of schools.

"Sec. 21.204. Notice

"(a) In the event the board of trustees receives a recommendation for nonrenewal, the board, after consideration of the written evaluations required by Section 21.202 of this subchapter and the reasons for the rec-

63. V.T.C.A. Education Code, § 21.201 note.    64. V.T.C.A. Education Code, §§ 21.201 to 21.211.

ommendation, shall, in its sole discretion, either reject the recommendation or shall give the teacher written notice of the proposed nonrenewal on or before April 1 preceding the end of the employment term fixed in the contract.

"(b) In the event of failure to give such notice of proposed nonrenewal within the time herein specified, the board of trustees shall thereby elect to employ such employee in the same professional capacity for the succeeding school year.

"(c) The notice of proposed nonrenewal required in this section shall contain a statement of all the reasons for such proposed action.

"Sec. 21.205.   Hearing

"(a) If the teacher desires a hearing after receiving notice of the proposed nonrenewal, the teacher shall notify the board of trustees in writing within 10 days after receiving the notice of nonrenewal.  The board shall provide for a hearing to be held within 15 days after receiving written notice from the teacher requesting a hearing.  Such hearing shall be closed unless an open hearing is requested by the employee.

"(b) The hearing shall be conducted in accordance with rules promulgated by the district.

"Sec. 21.206.   Decision of Board

"(a) If the teacher fails to request a hearing, the board shall take such action as it deems lawful and appropriate and shall notify the employee in writing of that action within 15 days of the expiration of the 10-day period for requesting a hearing.

"(b) If the teacher requests a hearing, the board shall take such action as it deems lawful and appropriate and shall notify the teacher in writing of that action within 15 days following the conclusion of the hearing.

"Sec. 21.207.   Appeal

"(a) If the teacher is aggrieved by the decision of the board of trustees, he may appeal to the State Commissioner of Education pursuant to Section 11.13 of this code.  The commissioner may not substitute his judgment for that of the board of trustees, unless the decision below was arbitrary, capricious, unlawful, or not supported by substantial evidence.

"(b) The State Board of Education shall have jurisdiction to hear appeals from such decisions of the State Commissioner of Education.

"Sec. 21.208.   Superintendents

"If a majority of the board of trustees of any school district shall determine that the term contract of the general superintendent of schools should be considered for nonrenewal, the provisions of this subchapter shall apply, except that there need not be a recommendation from the designated school administration.

"Sec. 21.209.   Probation

"The board of trustees of any school district may provide by written policy for a probationary period not to exceed the first two years of continuous employment in the district, in which case the provisions of this subchapter shall not apply during such probationary period.

"Sec. 21.210.   Discharge for Cause

"Nothing in this subchapter shall prohibit a board of trustees from discharging a teacher for cause during the term of the contract.

"Sec. 21.211.   Exemptions

"This subchapter does not apply to teachers who are employed under the provisions of the probationary or continuing contract law as set out in Subchapter C of Chapter 13 of this code."

Sec. 3. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

Passed the Senate on May 12, 1981: Yeas 30, Nays 1; Senate concurred in House amendments on May 26, 1981, by a viva-voce vote; passed the House, with amendments, on May 25, 198), by a non-record vote.

Approved June 17, 1981.

Effective Aug. 31, 1981, 90 days after date of adjournment.

---

# PSYCHOLOGISTS—LICENSURE, CERTIFICATION, AND REGULATION

## CHAPTER 766

### S. B. No. 359

An Act relating to the continuation of the Texas State Board of Examiners of Psychologists, its organization, powers, and duties, and the regulation of providers of psychological services; amending Sections 4, 4a, 5, 6, 8, 11, 12, 14, 15, 16, 17, 20, 21, 22, and 23, Psychologists' Certification and Licensing Act, as amended (Article 4512c, Vernon's Texas Civil Statutes).

*Be it enacted by the Legislature of the State of Texas:*

Section 1. Sections 4, 4a, 5, 6, 8, 11, 12, 14, 15, 16, 17, 20, 21, 22, and 23, Psychologists' Certification and Licensing Act, as amended (Article 4512c, Vernon's Texas Civil Statutes), are amended [65] to read as follows:

#### State Board of Examiners; members; appointment and terms; oath

"Sec. 4. (a) The Texas State Board of Examiners of Psychologists shall consist of nine qualified persons appointed by the governor with the advice and consent of the senate, for regular terms of six years.

"(b) Before entering upon the duties of his office, each member of the Board shall take the constitutional oath of office and file it with the secretary of state.

"(c) Appointments to the Board shall be made without regard to the race, creed, sex, religion, or national origin of the appointees.

#### Application of Sunset Act

"Sec. 4a. The Texas State Board of Examiners of Psychologists is subject to the Texas Sunset Act, as amended (Article 5429k, Vernon's Texas Civil Statutes); and unless continued in existence as provided by that Act the Board is abolished, and this Act expires effective September 1, 1993.

65. Vernon's Ann.Civ.St. art. 4512c, §§ 4 to
6, 8, 11, 12, 14 to 17, 20 to 23.

2.

*(B) the woman's 21st birthday.*

## ARTICLE 16. IMPLEMENTATION; EFFECTIVE DATE

SECTION 16.01. It is the intent of the legislature that the Health and Human Services Commission take any action the commission determines is necessary and appropriate, including expedited and emergency action, to ensure the timely implementation of the relevant provisions of this bill and the corresponding assumptions reflected in H.B. No. 1, 82nd Legislature, Regular Session, 2011 (General Appropriations Act), by September 1, 2011, or the effective date of this Act, whichever is later, including the adoption of administrative rules, the preparation and submission of any required waivers or state plan amendments, and the preparation and execution of any necessary contract changes or amendments.

SECTION 16.02. Except as otherwise provided by this Act, this Act takes effect on the 91st day after the last day of the legislative session.

Passed the Senate on June 3, 2011: Yeas 31, Nays 0; June 13, 2011, Senate refused to concur in House amendments and requested appointment of Conference Committee; June 15, 2011, House granted request of the Senate; June 27, 2011, Senate adopted Conference Committee Report by the following vote: Yeas 22, Nays 8; passed the House, with amendments, on June 9, 2011: Yeas 89, Nays 41, one present not voting; June 15, 2011, House granted request of the Senate for appointment of Conference Committee; June 27, 2011, House adopted Conference Committee Report by the following vote: Yeas 96, Nays 48, one present not voting.

Approved July 19, 2011.

Effective as shown in § 16.02

---

## CHAPTER 8

### S.B. No. 8

#### AN ACT

relating to the flexibility of the board of trustees of a school district in the management and operation of public schools in the district.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 21.0031, Education Code, is amended by amending Subsections (a) and (b) and adding Subsection (b–1) to read as follows:

(a) An employee's probationary, continuing, or term contract under this chapter is void if the employee:

(1) does not hold a *valid* certificate or permit issued by the State Board for Educator Certification; [or]

(2) fails to fulfill the requirements necessary to *renew or* extend the employee's temporary, *probationary,* or emergency certificate or *any other certificate or* permit *issued under Subchapter B; or*

*(3) fails to comply with any requirement under Subchapter C, Chapter 22, if the failure results in suspension or revocation of the employee's certificate under Section 22.0831(f)(2).*

(b) *If a school district has knowledge that an* [After an employee receives notice that the] employee's contract is void under Subsection (a):

(1) *the* [a school] district may, *except as provided by Subsection (b–1)*:

(A) terminate the employee;

(B) suspend the employee with or without pay; or

(C) retain the employee for the remainder of the school year on an at-will employment basis in a position other than *a position required to be held by an employee under a*

*contract under Section 21.002* [classroom teacher] *at the employee's existing rate of pay or at a reduced rate;* and

(2) the employee is not entitled to the minimum salary prescribed by Section 21.402.

*(b–1) A school district may not terminate or suspend under Subsection (b) an employee whose contract is void under Subsection (a)(1) or (2) because the employee failed to renew or extend the employee's certificate or permit if the employee:*

*(1) requests an extension from the State Board for Educator Certification to renew, extend, or otherwise validate the employee's certificate or permit;* and

*(2) not later than the 10th day after the date the contract is void, takes necessary measures to renew, extend, or otherwise validate the employee's certificate or permit, as determined by the State Board for Educator Certification.*

SECTION 2.    Section 21.051, Education Code, is amended to read as follows:

Sec. 21.051.    *RULES REGARDING FIELD–BASED EXPERIENCE AND* OPTIONS FOR FIELD EXPERIENCE AND INTERNSHIPS.    *(a) In this section, "teacher of record" means a person employed by a school district who teaches the majority of the instructional day in an academic instructional setting and is responsible for evaluating student achievement and assigning grades.*

*(b) Before a school district may employ a candidate for certification as a teacher of record, the candidate must complete at least 15 hours of field-based experience in which the candidate is actively engaged in instructional or educational activities under supervision at:*

*(1) a public school campus accredited or approved for the purpose by the agency;* or

*(2) a private school recognized or approved for the purpose by the agency.*

*(c) Subsection (b) applies only to an initial certification issued on or after September 1, 2012. Subsection (b) does not affect:*

*(1) the validity of a certification issued before September 1, 2012;* or

*(2) the eligibility of a person who holds a certification issued before September 1, 2012, to obtain a subsequent renewal of the certification in accordance with board rule.*

*(d) Subsection (b) does not affect the period within which an individual must complete field-based experience hours as determined by board rule if the individual is not accepted into an educator preparation program before the deadline prescribed by board rule and is hired for a teaching assignment by a school district after the deadline prescribed by board rule.*

*(e) The board shall propose rules relating to the field-based experience required by Subsection (b).    The commissioner by rule shall adopt procedures and standards for recognizing a private school under Subsection (b)(2).*

*(f)* The board shall propose rules providing flexible options for persons for any *field-based* [field] experience or internship required for certification.

SECTION 3.    Subsection (a), Section 21.103, Education Code, is amended to read as follows:

(a) The board of trustees of a school district may terminate the employment of a teacher employed under a probationary contract at the end of the contract period if in the board's judgment the best interests of the district will be served by terminating the employment. The board of trustees must give notice of its decision to terminate the employment to the teacher not later than the *10th* [45th] day before the last day of instruction required under the contract.    *The notice must be delivered personally by hand delivery to the teacher on the campus at which the teacher is employed, except that if the teacher is not present on the campus on the date that hand delivery is attempted, the notice must be mailed by prepaid certified mail or delivered by express delivery service to the teacher's address of record with the district.    Notice that is postmarked on or before the 10th day before the last day of instruction is considered timely given under this subsection.*    The board's decision is final and may not be appealed.

SECTION 4.    Subsection (b), Section 21.104, Education Code, is amended to read as follows:

(b) In lieu of discharge *or pending discharge,* a school district may suspend a teacher without pay for good cause as specified by Subsection (a) for a period not to extend beyond the end of the current school year.

SECTION 5. Subchapter C, Chapter 21, Education Code, is amended by adding Section 21.1041 to read as follows:

*Sec. 21.1041. HEARING UNDER PROBATIONARY CONTRACT. A teacher is entitled to:*

*(1) a hearing as provided by Subchapter F, if the teacher is protesting proposed action under Section 21.104;* or

*(2) a hearing in a manner provided under Section 21.207 for nonrenewal of a term contract or a hearing provided by Subchapter F, as determined by the board of trustees of the district, if the teacher is protesting proposed action to terminate a probationary contract before the end of the contract period on the basis of a financial exigency declared under Section 44.011 that requires a reduction in personnel.*

SECTION 6. Subsection (b), Section 21.156, Education Code, is amended to read as follows:

(b) In lieu of discharge *or pending discharge,* a school district may suspend a teacher without pay for good cause as specified by Subsection (a) for a period not to extend beyond the end of the current school year.

SECTION 7. Section 21.157, Education Code, is amended to read as follows:

Sec. 21.157. NECESSARY REDUCTION OF PERSONNEL. A teacher employed under a continuing contract may be released at the end of a school year and the teacher's employment with the school district terminated at that time because of a necessary reduction of personnel by the school district, with those reductions made *primarily based upon teacher appraisals administered under Section 21.352* [in the reverse order of seniority] in the specific teaching fields *and other criteria as determined by the board.*

SECTION 8. Subsection (b), Section 21.159, Education Code, is amended to read as follows:

(b) A teacher who notifies the board of trustees within the time prescribed by Subsection (a) is entitled to:

*(1)* a hearing as provided by Subchapter F, *if the teacher is protesting proposed action under Section 21.156;* or

*(2) a hearing in a manner provided under Section 21.207 for nonrenewal of a term contract or a hearing provided by Subchapter F, as determined by the board, if the teacher is protesting proposed action under Section 21.157 or proposed action to terminate a term contract at any time on the basis of a financial exigency declared under Section 44.011 that requires a reduction in personnel.*

SECTION 9. Subsection (a), Section 21.206, Education Code, is amended to read as follows:

(a) Not later than the *10th* [45th] day before the last day of instruction in a school year, the board of trustees shall notify in writing each teacher whose contract is about to expire whether the board proposes to renew or not renew the contract. *The notice must be delivered personally by hand delivery to the teacher on the campus at which the teacher is employed, except that if the teacher is not present on the campus on the date that hand delivery is attempted, the notice must be mailed by prepaid certified mail or delivered by express delivery service to the teacher's address of record with the district. Notice that is postmarked on or before the 10th day before the last day of instruction is considered timely given under this subsection.*

SECTION 10. Section 21.207, Education Code, is amended by amending Subsections (a) and (c) and adding Subsection (b–1) to read as follows:

(a) If the teacher desires a hearing after receiving notice of the proposed nonrenewal, the teacher shall notify the board of trustees in writing not later than the 15th day after the date the teacher receives *hand delivery of* the notice of the proposed action, *or if the notice is mailed by prepaid certified mail or delivered by express delivery service, not later than the*

*15th day after the date the notice is delivered to the teacher's address of record with the district.* The board shall provide for a hearing to be held not later than the 15th day after the date the board receives the request for a hearing unless the parties agree in writing to a different date. The hearing must be closed unless the teacher requests an open hearing.

*(b–1) Notwithstanding any other provision of this code, this subsection applies only to a school district with an enrollment of at least 5,000 students. The board of trustees may designate an attorney licensed to practice law in this state to hold the hearing on behalf of the board, to create a hearing record for the board's consideration and action, and to recommend an action to the board. The attorney serving as the board's designee may not be employed by a school district and neither the designee nor a law firm with which the designee is associated may be serving as an agent or representative of a school district, of a teacher in a dispute between a district and a teacher, or of an organization of school employees, school administrators, or school boards of trustees. Not later than the 15th day after the completion of the hearing under this subsection, the board's designee shall provide to the board a record of the hearing and the designee's recommendation of whether the contract should be renewed or not renewed. The board shall consider the record of the hearing and the designee's recommendation at the first board meeting for which notice can be posted in compliance with Chapter 551, Government Code, following the receipt of the record and recommendation from the board's designee, unless the parties agree in writing to a different date. At the meeting, the board shall consider the hearing record and the designee's recommendation and allow each party to present an oral argument to the board. The board by written policy may limit the amount of time for oral argument. The policy must provide equal time for each party. The board may obtain advice concerning legal matters from an attorney who has not been involved in the proceedings. The board may accept, reject, or modify the designee's recommendation. The board shall notify the teacher in writing of the board's decision not later than the 15th day after the date of the meeting.*

(c) At the hearing *before the board or the board's designee,* the teacher may:

(1) be represented by a representative of the teacher's choice;

(2) hear the evidence supporting the reason for nonrenewal;

(3) cross-examine adverse witnesses; and

(4) present evidence.

SECTION 11. Section 21.212, Education Code, is amended by adding Subsection (f) to read as follows:

*(f) On the basis of a financial exigency declared under Section 44.011 that requires a reduction in personnel, the board of trustees of a school district may choose to amend the terms of the contract of a superintendent employed under a term contract. A superintendent whose contract is amended under this subsection may resign without penalty by providing reasonable notice to the board and may continue employment for that notice period under the prior contract.*

SECTION 12. Section 21.251, Education Code, is amended to read as follows:

Sec. 21.251. APPLICABILITY. (a) This subchapter applies if a teacher requests a hearing after receiving notice of the proposed decision to:

(1) terminate the teacher's continuing contract at any time, *except as provided by Subsection (b)(3)*;

(2) terminate the teacher's probationary or term contract before the end of the contract period, *except as provided by Subsection (b)(3)*; or

(3) suspend the teacher without pay.

(b) This subchapter does not apply to:

(1) a decision to terminate a teacher's employment at the end of a probationary contract; [or]

(2) a decision not to renew a teacher's term contract, unless the board of trustees of the employing district has decided to use the process prescribed by this subchapter for that purpose; *or*

*(3) a decision, on the basis of a financial exigency declared under Section 44.011 that requires a reduction in personnel, to terminate a probationary or term contract before the end of the contract period or to terminate a continuing contract at any time, unless the board of trustees has decided to use the process prescribed by this subchapter for that purpose.*

SECTION 13.   Section 21.257, Education Code, is amended by adding Subsection (a–1) to read as follows:

*(a–1) A determination by the hearing examiner regarding good cause for the suspension of a teacher without pay or the termination of a probationary, continuing, or term contract is a conclusion of law and may be adopted, rejected, or changed by the board of trustees or board subcommittee as provided by Section 21.259(b).*

SECTION 14.   Subsection (b), Section 21.259, Education Code, is amended to read as follows:

(b) The board of trustees or board subcommittee may adopt, reject, or change the hearing examiner's:

(1) conclusions of law, *including a determination regarding good cause for suspension without pay or termination*; or

(2) proposal for granting relief.

SECTION 15.   Subsection (a), Section 21.402, Education Code, is amended to read as follows:

(a) Except as provided by Subsection [(d),] (e)[,] or (f), a school district must pay each classroom teacher, full-time librarian, full-time counselor certified under Subchapter B, or full-time school nurse not less than the minimum monthly salary, based on the employee's level of experience in addition to other factors, as determined by commissioner rule, determined by the following formula:

$$MS = SF \times FS$$

where:

"MS" is the minimum monthly salary;

"SF" is the applicable salary factor specified by Subsection (c); and

"FS" is the amount, as determined by the commissioner under Subsection (b), of state and local funds per weighted student, including funds provided under Section 42.2516, available to a district eligible to receive state assistance under Section 42.302 with a maintenance and operations tax rate per $100 of taxable value equal to the product of the state compression percentage, as determined under Section 42.2516, multiplied by $1.50, except that the amount of state and local funds per weighted student does not include the amount attributable to the increase in the guaranteed level made by Chapter 1187, Acts of the 77th Legislature, Regular Session, 2001.

SECTION 16.   Subchapter I, Chapter 21, Education Code, is amended by adding Sections 21.4021, 21.4022, and 21.4032 to read as follows:

*Sec. 21.4021.   FURLOUGHS.   (a) Notwithstanding Section 21.401 and subject to Section 21.4022, the board of trustees of a school district may, in accordance with district policy, implement a furlough program and reduce the number of days of service otherwise required under Section 21.401 by not more than six days of service during a school year if the commissioner certifies in accordance with Section 42.009 that the district will be provided with less state and local funding for that year than was provided to the district for the 2010–2011 school year.*

*(b) Notwithstanding Section 21.402, the board of trustees may reduce the salary of an employee who is furloughed in proportion to the number of days by which service is reduced, provided that the furlough program is implemented in compliance with this section.*

*(b–1) A furlough program must subject all contract personnel to the same number of furlough days.*

*(c) An educator may not be furloughed on a day that is included in the number of days of instruction required under Section 25.081.*

*(d) An educator may not use personal, sick, or any other paid leave while the educator is on a furlough.*

*(e) A furlough imposed under this section does not constitute a break in service for purposes of the Teacher Retirement System of Texas. A furlough day does not constitute a day of service for purposes of the Teacher Retirement System of Texas.*

*(f) Implementation of a furlough program may not result in an increase in the number of required teacher workdays.*

*(g) If a board of trustees adopts a furlough program after the date by which a teacher must give notice of resignation under Section 21.105, 21.160, or 21.210, as applicable, a teacher who subsequently resigns is not subject to sanctions imposed by the State Board for Educator Certification as otherwise authorized by those sections.*

*(h) A decision by the board of trustees to implement a furlough program:*

*(1) is final and may not be appealed; and*

*(2) does not create a cause of action or require collective bargaining.*

*(i) Any reduction under this section in the amount of the annual salary paid to an employee must be equally distributed over the course of the employee's current contract with the school district.*

*Sec. 21.4022. REQUIRED PROCESS FOR DEVELOPMENT OF FURLOUGH PROGRAM OR OTHER SALARY REDUCTION PROPOSAL. (a) The board of trustees of a school district may not implement a furlough program under Section 21.4021 or reduce salaries until the district has complied with this section.*

*(b) A school district must use a process to develop a furlough program or other salary reduction proposal, as applicable, that:*

*(1) includes the involvement of the district's professional staff; and*

*(2) provides district employees with the opportunity to express opinions regarding the furlough program or salary reduction proposal, as applicable, at the public meeting required by Subsection (c).*

*(c) The board of trustees must hold a public meeting at which the board and school district administration present:*

*(1) information regarding the options considered for managing the district's available resources, including consideration of a tax rate increase and use of the district's available fund balance;*

*(2) an explanation of how the district intends, through implementation of a furlough program under Section 21.4021 or through other salary reductions, as applicable, to limit the number of district employees who will be discharged or whose contracts will not be renewed; and*

*(3) information regarding the local option residence homestead exemption.*

*(d) Any explanation of a furlough program under Subsection (c)(2) must state the specific number of furlough days proposed to be required.*

*(e) The public and school district employees must be provided with an opportunity to comment at the public meeting required under Subsection (c).*

*Sec. 21.4032. REDUCTIONS IN SALARIES OF CLASSROOM TEACHERS AND ADMINISTRATORS. (a) This section applies only to a widespread reduction in the amount of the annual salaries paid to school district classroom teachers based primarily on district financial conditions rather than on teacher performance.*

*(b) For any school year in which a school district has reduced the amount of the annual salaries paid to district classroom teachers from the amount paid for the preceding school year, the district shall reduce the amount of the annual salary paid to each district administrator or other professional employee by a percent or fraction of a percent that is equal to the average percent or fraction of a percent by which teacher salaries have been reduced.*

SECTION 17. Subsection (a), Section 38.101, Education Code, is amended to read as follows:

(a) Except as provided by Subsection (b), a school district annually shall assess the physical fitness of students enrolled in *grade three or higher in a course that satisfies the curriculum requirements for physical education under Section 28.002(a)(2)(C)* [grades 3 through 12].

SECTION 18. Subchapter A, Chapter 42, Education Code, is amended by adding Section 42.009 to read as follows:

*Sec. 42.009. DETERMINATION OF FUNDING LEVELS. (a) Not later than July 1 of each year, the commissioner shall determine for each school district whether the estimated amount of state and local funding per student in weighted average daily attendance to be provided to the district under the Foundation School Program for maintenance and operations for the following school year is less than the amount provided to the district for the 2010–2011 school year. If the amount estimated to be provided is less, the commissioner shall certify the percentage decrease in funding to be provided to the district.*

*(b) In making the determinations regarding funding levels required by Subsection (a), the commissioner shall:*

*(1) make adjustments as necessary to reflect changes in a school district's maintenance and operations tax rate;*

*(2) for a district required to take action under Chapter 41 to reduce its wealth per student to the equalized wealth level, base the determinations on the district's net funding levels after deducting any amounts required to be expended by the district to comply with Chapter 41; and*

*(3) determine a district's weighted average daily attendance in accordance with this chapter as it existed on January 1, 2011.*

SECTION 19. Subchapter A, Chapter 44, Education Code, is amended by adding Section 44.011 to read as follows:

*Sec. 44.011. FINANCIAL EXIGENCY. (a) The board of trustees of a school district may adopt a resolution declaring a financial exigency for the district. The declaration expires at the end of the fiscal year during which the declaration is made unless the board adopts a resolution before the end of the fiscal year declaring continuation of the financial exigency for the following fiscal year.*

*(b) The board is not limited in the number of times the board may adopt a resolution declaring continuation of the financial exigency.*

*(c) A board may terminate a financial exigency declaration at any time if the board considers it appropriate.*

*(d) Each time the board adopts a resolution under this section, the board must notify the commissioner. The commissioner by rule shall prescribe the time and manner in which notice must be given to the commissioner under this subsection.*

*(e) The commissioner by rule shall adopt minimum standards concerning school district financial conditions that must exist for declaration of a financial exigency by the board of trustees of the district.*

*(f) The commissioner may use emergency rulemaking procedures to adopt rules under Subsection (e). This subsection expires September 1, 2013.*

SECTION 20. Subchapter F, Chapter 552, Government Code, is amended by adding Section 552.2661 to read as follows:

*Sec. 552.2661. CHARGE FOR COPY OF PUBLIC INFORMATION PROVIDED BY SCHOOL DISTRICT. A school district that receives a request to produce public information for inspection or publication or to produce copies of public information in response to a requestor who, within the preceding 180 days, has accepted but failed to pay written itemized statements of estimated charges from the district as provided under Section 552.261(b) may require the requestor to pay the estimated charges for the request before the request is fulfilled.*

SECTION 21. The following provisions of the Education Code are repealed:

(1) Section 12.1331;

(2) Subsection (d), Section 21.402; and

(3) Subsections (b) and (c), Section 33.902.

SECTION 22.   On or before January 1, 2012, the State Board for Educator Certification shall propose rules relating to educator certification as prescribed by Section 21.051, Education Code, as amended by this Act.

SECTION 23.   The changes in law made by this Act apply only to a hearing examiner's determination regarding good cause that is contained in a written recommendation under Section 21.257, Education Code, issued on or after the effective date of this Act.

SECTION 24.   This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect on the 91st day after the last day of the legislative session.

Passed the Senate on June 6, 2011: Yeas 18, Nays 12; June 20, 2011, Senate refused to concur in House amendments and requested appointment of Conference Committee; June 21, 2011, House granted request of the Senate; June 27, 2011, Senate adopted Conference Committee Report by the following vote: Yeas 19, Nays 11; passed the House, with amendments, on June 16, 2011: Yeas 88, Nays 55, one present not voting; June 21, 2011, House granted request of the Senate for appointment of Conference Committee; June 27, 2011, House adopted Conference Committee Report by the following vote: Yeas 80, Nays 63, one present not voting.

Approved July 19, 2011.

Effective September 28, 2011.

3.

# Journal of the House of Representatives of the Regular Session of the Sixty-Seventh Legislature of the State of Texas, Volume 2

**CSSB 341** was read second time.

Representative Atkinson offered the following amendment to **CSSB 341**:

Amend **CSSB 341**, SECTION 2, by amending Section 21.204(b) on page 2 to read as follows:

(b)   In the event of failure to give such notice of proposed nonrenewal within the time herein specified, the board of trustees shall thereby elect to employ such employee in the same professional capacity for the succeeding school year.

The amendment was adopted without objection.

Representative Atkinson offered the following amendment to **CSSB 341**:

Amend **CSSB 341**, SECTION 2, by amending Section 21.205(a) on page 3 to read as follows:

(a)  If the teacher desires a hearing after receiving notice of the proposed nonrenewal, the teacher shall notify the board of trustees in writing within 10 days after receiving the notice of nonrenewal. The board shall provide for a hearing to be held within 15 days after receiving written notice from the teacher requesting a hearing. Such hearing shall be closed unless an open hearing is requested by the employee.

The amendment was adopted without objection.

Representative Atkinson offered the following amendment to **CSSB 341**:

Amend **CSSB 341**, SECTION 2, by amending Section 21.206 on page 3 to read as follows:

Sec. 21.206.  Decision of Board
(a)  If the teacher fails to request a hearing, the board shall take such action as it deems lawful and appropriate, and shall notify the employee in writing of that action within 15 days of the expiration of the 10-day period for requesting a hearing.
(b)   If the teacher requests a hearing, the board shall take such action as it deems lawful and appropriate, and shall notify the teacher in writing of that action within 15 days following the conclusion of the hearing.

The amendment was adopted without objection.

Representative Atkinson offered the following amendment to **CSSB 341**:

Amend **CSSB 341**, SECTION 2, by amending Section 21.209 on page 4 to read as follows:

Sec. 21.209.  Probation
The board of trustees of any school district may provide by written policy for a probationary period not to exceed the first 2 years of continuous employment in the district, in which case the provisions of this subchapter shall not apply during such probationary period.

The amendment was adopted without objection.

Representative Atkinson offered the following amendment to **CSSB 341**:

Texas. Legislature. House of Representatives.. Journal of the House of Representatives of the Regular Session of the Sixty-Seventh Legislature of the State of Texas, Volume 2, Legislative Document, [1981]; digital images, (http://texashistory.unt.edu/ark:/67531/metapth123828/ : accessed September 03, 2014), University of North Texas Libraries, The Portal to Texas History, http://texashistory.unt.edu; crediting UNT Libraries Government Documents Department, Denton, Texas.

4.

F

By Caperton, et al. (Atkinson)                    S.B. No. 341

Substitute the following for S.B. No. 341:

By Atkinson                                   C.S.S.B. No. 341


A BILL TO BE ENTITLED

AN ACT

relating to the standards and procedures for the nonrenewal of contracts for teachers under term contracts in the public schools of this state; adding Section(s) 21.201-21.211 to Subchapter G in Chapter 21 of the Texas Education Code, as amended.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1. This Act shall be known as "The Term Contract Nonrenewal Act."

SECTION 2. Chapter 21, Subchapter G, Texas Education Code, as amended, is amended by adding Section(s) 21.201-21.211 to read as follows:

Sec. 21.201 Definitions

As used in this Subchapter, the following terms shall have the meaning ascribed to them in this section.

(1) "Teacher" means a superintendent, principal, supervisor, classroom teacher, counselor, or other full-time professional employee, except paraprofessional personnel, who is required to hold a valid certificate or teaching permit.

(2) "Board" and "Board of Trustees" means the governing board of a public school district.

(3) "School district" means any public school district in this state.

(4) "Term contract" means any contract of employment for a fixed term between the school district and a teacher.

1

Sec. 21.202  Teacher Evaluations

The board of trustees of each school district shall provide by written policy for the periodic written evaluation of each teacher in its employ at annual or more frequent intervals. Such evaluation shall be considered by the board of trustees prior to any decision by the board not to renew the term contract of any teacher.

Sec. 21.203  Nonrenewal of Term Contracts

(a) The board of trustees of each school district may choose not to renew the employment of any teacher employed under a term contract effective at the end of the contract period.

(b) The board of trustees of each school district shall establish policies consistent with this Subchapter which shall establish reasons for nonrenewal.

(c) The board of trustees of each school district shall establish policies and procedures for receiving recommendations from its school administration for the nonrenewal of teacher term contracts, excepting only the general superintendent of schools.

Sec. 21.204  Notice

(a) In the event the board of trustees receives a recommendation for nonrenewal, the board, after consideration of the written evaluations required by Section 21.202 of this Subchapter and the reasons for the recommendation, shall, in its sole discretion, either reject the recommendation or shall give the teacher written notice of the proposed nonrenewal on or before April 1, preceding the end of the employment term fixed in the contract.

(b) In the event of failure to give such notice of proposed nonrenewal within the time herein specified, the board of trustees shall thereby elect to employ such employee in the same capacity for the succeeding school year.

(c) The notice of proposed non-renewal required in this Section shall contain a statement of all the reasons for such proposed action.

Sec. 21.205  Hearing

(a) If, after receipt of the notice of the proposed nonrenewal the teacher desires a hearing on the same, he shall notify in writing the board of trustees within 10 days of the receipt of the notice of his desire to be heard, and the board shall provide a hearing within 15 days, which may be closed unless otherwise requested by the employee.

(b) The hearing shall be conducted in accordance with rules promulgated by the district.

Sec. 21.206  Decision of Board

(a) If the teacher fails to request a hearing within the 10 days as hereinabove provided, or after a hearing, the board of trustees shall take such action and shall enter a written decision, if adverse to the teacher, as it deems lawful and appropriate.

(b) The decision of the board of trustees not to renew the teacher's term contract shall be communicated in writing to the teacher within 15 days following the conclusion of the hearing.

Sec. 21.207  Appeal

(a) If the teacher is aggrieved by the decision of the board of trustees, he may appeal to the State Commissioner of Education

pursuant to Section 11.13 of this Code. The Commissioner may not substitute his judgment for that of the board of trustees, unless the decision below was arbitrary, capricious, unlawful, or not supported by substantial evidence.

(b) The State Board of Education shall have jurisdiction to hear appeals from such decisions of the State Commissioner of Education.

Sec. 21.208  Superintendents

If a majority of the board of trustees of any school district shall determine that the term contract of the general superintendent of schools should be considered for nonrenewal, the provisions of this Subchapter shall apply except that there need not be a recommendation from designated school administration.

Sec. 21.209  Probation

The board of trustees of any school district may provide by written policy for a probationary period not to exceed 2 years of continuous employment, in which case the provisions of this Subchapter shall not apply during such probationary period.

Sec. 21.210  Discharge for Cause

Nothing in this Subchapter shall prohibit a board of trustees from discharging a teacher for cause, as determined by board policies, during the term of the contract.

Sec. 21.211  Exemptions

This Subchapter does not apply to teachers who are employed under the provisions of the probationary or continuing contract law as set out in Subchapter C, Chapter 13 of this Code.

SECTION 3. The importance of this legislation and the

crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in full force from and after its passage, and it is so enacted.

**COMMITTEE REPORT**     5/20/81
(date)

The Honorable Bill Clayton
Speaker of the House of Representatives

Sir:

We, your COMMITTEE ON PUBLIC EDUCATION, to whom was referred ___S. B. 341___ have had the same under
consideration and beg to report back with the recommendation that it ___(measure)___

( ) do pass, without amendment.
( ) do pass, with amendment(s).
(✓) do pass and be not printed; a Complete Committee Substitute is recommended in lieu of the original measure.

A fiscal note was requested.     (✓) yes     ( ) no

An author's fiscal statement was requested.     ( ) yes     (✓) no

An actuarial analysis was requested.     ( ) yes     (✓) no

The Committee recommends that this measure be placed on the ~~(Local)~~ or ~~(Consent)~~ Calendar.

This measure     (✓) proposes new law.
                 ( ) amends existing law.

House Sponsor of Senate Measure ___Atkinson___ .

The measure was reported from Committee by the following vote:

| | AYE | NAY | PNV | ABSENT |
|---|---|---|---|---|
| Atkinson, Ch. | ✓ | | | |
| Blanton, V.C. | ✓ | | | |
| Haley, C.B.O. | ✓ | | | |
| Barton | ✓ | | | |
| Bryant | ✓ | | | |
| Evans | ✓ | | | |
| Fox | ✓ | | | |
| Glossbrenner | ✓ | | | |
| Hall, L. | ✓ | | | |
| Hanna | ✓ | | | |
| Peveto | ✓ | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Total
__11__ aye
__0__ nay
__0__ present, not voting
__0__ absent

___Hamp Atkinson___
CHAIRMAN

___Rynolds___
COMMITTEE COORDINATOR

5.

By Coput
Santisteban

S.B. No. 341

A BILL TO BE ENTITLED

AN ACT

relating to standards for the employment of public school professional personnel.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Chapter 13, Texas Education Code, as amended, is amended by adding Subchapter E to read as follows:

SUBCHAPTER E.  PROFESSIONAL EMPLOYMENT STANDARDS

Sec. 13.251.  POLICY.  In order to maintain an effective system of public education, highly qualified professional educators must be attracted, retained, and stimulated to optimum performance. These objectives can be accomplished only if the employees are evaluated and retained on the basis of their performance of assigned teaching duties, afforded due process prior to termination, and protected against unjustifiable actions by the boards that employ them.  It is the purpose of this subchapter to provide that evaluation of and protection for professional educators employed in the public schools in the State of Texas by providing for evaluation and guaranteeing due process.  This subchapter does not establish or grant tenure to any teacher.

Sec. 13.252.  DEFINITIONS.  In this subchapter:

(1) "Board" means the board of trustees of a school district.

(2) "Teacher" means a person employed in a professional capacity by a board to instruct, supervise,

67R2409 SRC-F                            1

administer, or direct an educational program, but does not include a superintendent, an assistant superintendent, an associate superintendent, or another executive officer of equivalent rank.

(3) "Teacher organization" means an organization, agency, committee, council, or group of any kind in which teachers participate and which exists for the purpose, in whole or in part, of conferring, discussing, and consulting with a board over the terms and conditions of professional service and other matters of mutual concern.

(4) "Dismissal" means an involuntary termination or interruption of the employment relationship between a teacher and the employing board during the teacher's professional or probationary status.

(5) "Professional status" means the employment status granted teachers after probationary service rendered in accordance with the terms of this subchapter.

(6) "Nonrenewal" means a failure to reemploy a teacher after the expiration of probationary status.

(7) "Termination" means a dismissal or a nonrenewal.

(8) "Demotion" means an involuntary reduction of a teacher to a position of lesser rank, responsibility, or compensation, or reassignment of a teacher to a position outside the scope of the teacher's teaching certificate or major or minor field of study.

(9) "Seniority" means length of service as a teacher in a particular school district computed from the most recent date of hire.

Sec. 13.253. PROBATIONARY STATUS AND PROFESSIONAL STATUS. On initial employment by a board, a teacher has probationary status and retains that status until he or she has been employed by the board as a teacher for 210 days in each of two consecutive school years. Beginning on the 211th day of employment in the second school year, a teacher acquires professional status unless the board previously notified the teacher in accordance with Section 13.258 of this code of its intention to dismiss the teacher at or prior to the conclusion of the school year.

Sec. 13.254. EVALUATION PROCEDURE. (a) Each board by resolution or directive, after availing itself of the advice of its practicing classroom teachers, shall adopt a procedure for evaluating the performance of its teachers. The board may include the procedure in a written agreement with a recognized teacher organization. At a minimum, the procedure shall:

(1) provide for the preparation of periodic written evaluation reports by appropriate supervisors;

(2) afford the teacher an opportunity to review each evaluation report and submit a written response to it, which response shall be attached to the report; and

(3) include the criteria and guidelines to be used in determining whether or not to continue probationary status or to grant or continue professional status.

(b) The procedures adopted under this section must comply with Section 13.256 of this code. The board shall provide a copy of the procedures to the Central Education Agency and to each teacher at the time of initial employment.

Sec. 13.255. PROFESSIONAL STATUS IN ANOTHER SCHOOL DISTRICT. Notwithstanding the provisions of Section 13.253 of this code, a board may grant professional status as of the date of employment to any teacher who previously acquired professional status in another school district in the State of Texas or another jurisdiction.

Sec. 13.256. BASES FOR TERMINATION OR DEMOTION. (a) A professional teacher may not be dismissed or demoted, and a probationary teacher may not be dismissed, other than for just cause. "Just cause" must be established on the basis of factors that: (1) relate to the performance of assigned teaching duties or the effective operation of the school system; or (2) require a reduction or realignment of the teaching staff. The exercise of a legally protected right does not constitute an element of just cause.

(b) A probationary teacher may not be nonrenewed or demoted arbitrarily, discriminatorily, or because of the exercise of a legally protected right.

(c) Except as provided by Subsection (d) of this section, if one or more teachers are to be terminated or demoted because of a substantial change in the size and nature of the student population or unavoidable budgetary limitations in funding existing educational programs, those teachers in the affected job categories who have the least seniority shall be terminated or demoted first. For three years from the effective date of termination or demotion, a teacher terminated or demoted pursuant to this subsection is entitled to be recalled to the job category that the teacher was in immediately prior to the termination or demotion. Teachers shall

be recalled to available positions in each job category in reverse order to termination or demotion. During the three-year period, a board shall offer the teacher any available position for which the teacher is qualified in another job category before the position is offered to a teacher with less seniority who does not have recall rights to that job category.

(d) A teacher may be terminated, demoted, or recalled in a manner inconsistent with Subsection (c) of this section in order to implement the provisions of a board-approved or court-ordered affirmative action program designed to provide employment opportunities for women or for members of an ethnic minority group or to eliminate the effects of past discrimination against those persons.

Sec. 13.257. NOTIFICATION OF DEFICIENCIES. A board may not terminate or demote a teacher for ineffective performance of assigned teaching duties or ineffective operation of the school system unless the teacher was previously notified in writing of the specific deficiencies and given assistance and a reasonable period of time to correct the specified deficiencies and to show adequate improvement. If the teacher fails to correct the deficiencies within the time allotted, the board shall notify the teacher in writing.

Sec. 13.258. NOTICE OF TERMINATION OR DEMOTION; RIGHT TO HEARING. (a) The board, by certified mail, return receipt requested, shall send a written notice, signed by the president of the board, of its intention to terminate or demote the teacher. The notice shall:

(1) advise the teacher of the proposed action and the date on which it is to become effective;

(2) contain a clear and detailed statement of the reasons for the proposed action, including the time and place of any particular incidents or acts alleged;

(3) indicate the portion or portions of any rules of the school system alleged to have been violated;

(4) inform the teacher of rights under this subchapter, including the right to a hearing; and

(5) set forth the name, address, and telephone number of a representative of the board to notify if a hearing is requested.

(b) If a teacher wishes to challenge the proposed action of the board, the teacher shall file with the board a written request for a hearing. The request must be filed not later than the 10th day after the day on which the teacher received notice. Not later than the fifth day after the day on which the board receives the request, the parties shall select a person to serve as a hearing officer and shall obtain a commitment from the person to serve. If the parties are unable to agree on a hearing officer or to obtain a commitment within that time, either party may request the Central Education Agency to submit a list of hearing officers in accordance with Section 13.263 of this code.

Sec. 13.259. STATUS OF TEACHER AFTER NOTICE. (a) Except as provided by Subsection (b) of this section, if a teacher requests a hearing under Section 13.258 of this code, the board shall keep the teacher in his or her teaching assignment until the assignment ends

or until the hearing officer renders a decision, whichever occurs first.

(b) A board may remove a teacher from an assignment if the removal is necessary for the effective operation of the school system. A disagreement over whether removal is justified may be submitted by either party to the hearing officer selected to hear the underlying dispute.

(c) If a teacher does not request a hearing under Section 13.258 of this code, the board shall:

(1) keep the teacher in his or her teaching assignment until the assignment ends or for 10 days after the last date for filing a request for a hearing, whichever occurs first; or

(2) remove the teacher and grant pay for the time that the teacher would have worked.

Sec. 13.260. HEARINGS. (a) The hearing officer shall fix a mutually agreeable time and place for the hearing, which shall be not later than the 30th day after the day on which the board receives the request. If a stenographic record of the hearing is requested by one or more parties, the hearing officer shall arrange for a stenographer to make an official transcript of the hearing.

(b) The hearing officer shall inquire fully into the facts as they relate to the matter of the hearing and may:

(1) administer oaths;

(2) issue subpoenas for the attendance and testimony of witnesses and the production of books, papers, and documents relating to any matter under investigation;

(3) authorize depositions to be taken whenever the

ends of justice would be served thereby;

(4) receive evidence and limit lines of questioning or testimony which are repetitive, cumulative, or irrelevant;

(5) call, examine, and cross-examine witnesses and introduce into the record documentary or other evidence; and

(6) regulate the course of the hearing and dispose of procedural requests, motions and similar matters.

(c) A subpoena issued under Subsection (b) of this section must be signed by the hearing officer. On request of the hearing officer, a peace officer shall serve the subpoena in the same manner in which a subpoena issued by a district court is served. If the person to whom a subpoena is directed fails to comply, the hearing officer may sue in district court to enforce the subpoena. The court shall order compliance if it determines that good cause exists for the subpoena. The court may modify the requirements of a subpoena that the court determines are unreasonable. Failure to comply with the order of the court is punishable as contempt. The hearing officer may provide for the compensation of subpoenaed witnesses in an amount not to exceed the amount paid to a witness subpoenaed by a district court in a civil proceeding.

(d) The hearing shall be closed to the public unless the teacher requests a public hearing, and the hearing shall be confined to the reasons given in the notice for termination or demotion.

(e) Each party is entitled to appear at the hearing in person, by counsel, or by other representative; to call, examine, and cross-examine relevant witnesses; and to introduce into the

67R2409 SRC-F                    8

record relevant documentary or other evidence. The hearing officer shall issue a subpoena on application by either party and a showing of general relevance and reasonable scope.

(f) The parties are not bound by rules of evidence, whether statutory, common law, or adopted by the rules of court. Prior to the hearing, within a mutually agreeable time, the board shall provide the teacher or teacher's counsel with a list of witnesses and a statement of the testimony that the witnesses are expected to present at the hearing, a list of documents to be presented as evidence with copies of same, and a statement of all other evidence to be used by the board to support the allegations set forth in the notice from the board to the teacher. After the teacher or counsel receives from the board the list of witnesses and a statement of the testimony that the board's witnesses are expected to present, the teacher or counsel shall, within a mutually agreeable time, notify the board of the witnesses to be called to oppose the board's evidence and a statement of the testimony that the witnesses are expected to present. Except for newly discovered evidence that by due diligence could not have been discovered in time, neither party may introduce evidence that has not been given to the opposing party or counsel in compliance with the requirements of this section. Testimony may not be given or evidence introduced relating to the ineffectiveness of the teacher if it is not relevant or material to the allegations set forth in the notice or if it is based on procedures not in compliance with Sections 13.253-13.257 of this code.

(g) Evidence detrimental to a teacher's conduct, service,

67R2409 SRC-F                    9

character, or personality may not be introduced as a basis for termination or demotion unless the evidence was called to the attention of the teacher promptly after the board knew or reasonably should have known of its existence and unless the teacher was given an opportunity to respond to or rebut it.

(h) The hearing officer shall give effect to the rules of privilege required by law.

(i) Each party is entitled, on request, to a reasonable period for oral argument prior to the close of the hearing.

(j) Each party is entitled, on request made before the conclusion of the hearing, to file a written brief. The hearing officer shall fix a reasonable time for that filing not later than the 20th day after the last day of the hearing unless otherwise agreed to by the parties.

(k) The hearing officer shall promptly render a decision. Unless otherwise agreed by the parties, the hearing officer shall render the decision not later than the 30th day after the last day of the hearing or, if an oral hearing has been waived, after the date of transmitting the final statements and proofs to the hearing officer.

(l) The decision of the hearing officer must be in writing, be based on the record of the hearing, and set forth findings of fact, reasoning, and conclusions on the issues submitted. The hearing officer shall require the board to take remedial action appropriate to effect the purposes of this subchapter, including:

(1) reinstatement of a teacher;

(2) payment of lost salary, benefits, or other

compensatory damages; or

(3) if the officer finds that the board acted in bad faith in rendering an arbitrary or capricious decision not supported by the record, payment of punitive damages.

(m) A hearing officer may not require the commission of an act prohibited by law. The decision of the hearing officer shall be submitted to the board, the teacher, and the Central Education Agency and is final and binding on the parties unless appealed to a court in the manner provided for appeal of contested cases under the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes).

Sec. 13.261. COST OF HEARING. The cost for the services of the hearing officer, including actual and necessary travel and subsistence expenses, and any other mutually incurred costs shall be borne equally by the parties. Any other costs incurred shall be borne by the party incurring them, except that if the hearing officer fails to sustain the position taken by the board, the entire cost of the hearing, including reasonable attorney's fees incurred by the teacher, shall be borne by the board.

Sec. 13.262. APPLICABILITY OF HEARING PROCEDURE. (a) Except as provided by this section, the procedure set forth in Sections 13.258-13.261 of this code is the exclusive method for resolving disputes between a board and a teacher in regard to termination or demotion.

(b) If a board enters into a written agreement with a recognized teacher organization containing a procedure for resolving disputes that is inconsistent with the procedure set

67R2409 SRC-F                    11

forth in Sections 13.258-13.261 of this code, the board may apply to the Central Education Agency for an exemption from those sections. If the agency determines that the procedure established by the agreement is substantially equivalent to the procedure established in those sections, it shall grant the requested exemption for the teachers covered by the agreement. The exemption takes effect on a date fixed by the agency. A person aggrieved by a decision of the agency granting or denying the request for an exemption may obtain a review of the decision by filing a request for a hearing with the agency not later than the 10th day after the day on which the decision is rendered. If a hearing is requested, the hearing officer shall be appointed and the hearing conducted in the manner provided by this subchapter for hearings relating to an action of a board.

Sec. 13.263. SELECTION OF A HEARING OFFICER. For the purpose of the hearings required by this subchapter, the Central Education Agency shall maintain a list of members of the American Arbitration Association. If either party requests the agency to submit a list of hearing officers, the agency shall submit a list of not less than nine names drawn by lot or rotation from the entire membership list maintained. The list must be submitted not later than the fifth day after the day the agency receives the request. Not later than the fifth day after the day on which the list is received, the parties shall select a hearing officer by alternately striking names from the list until one name remains. That individual shall be the hearing officer. A hearing officer may not be a member of or an employee of any board or related by

consanguinity or marriage to any of the parties. A person may not be appointed to hear more than two employment termination or demotion cases in the same school district in any school year.

SECTION 2. Subchapter C, Chapter 13, Texas Education Code, is repealed.

SECTION 3. (a) A teacher employed on a continuing contract on the effective date of this Act is entitled to professional status.

(b) A teacher who is employed on a probationary contract on the effective date of this Act and will be eligible for a continuing contract under prior law is entitled to reemployment on professional status unless there is just cause for termination or demotion as provided by Section 13.256, Texas Education Code, as added by this Act.

(c) A teacher who is designated as a probationary teacher by the employing board of education on the effective date of this Act and who will have completed a probationary teaching period under the provisions of a local agreement in effect prior to the effective date of this Act is entitled to reemployment on professional status at the end of the probationary period unless there is just cause for termination or demotion as provided by Section 13.256, Texas Education Code, as added by this Act.

SECTION 4. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended,

and that this Act take effect and be in force from and after its passage, and it is so enacted.

6.

# TEXAS SESSION LAWS 1990

## GENERAL AND SPECIAL

### Seventy-First Legislature, Sixth Called Session

---

## CHAPTER 1

### S.B. No. 1

#### AN ACT

relating to public education.

*Be it enacted by the Legislature of the State of Texas:*

#### ARTICLE I. FINANCE

SECTION 1.01. Section 16.001, Education Code, is amended to read as follows:

Sec. 16.001. STATE POLICY. *(a)* It is the policy of the State of Texas that the provision of public education is a state responsibility and that a thorough and efficient system be provided and substantially financed through state revenue sources so that each student enrolled in the public school system shall have access to programs and services that are appropriate to his or her educational needs and that are substantially equal to those available to any similar student, notwithstanding varying local economic factors.

*(b) The public school finance system of the State of Texas shall adhere to a standard of fiscal neutrality which provides for substantially equal access to similar revenue per student at similar tax effort.*

*(c) The program of state financial support designed and implemented to achieve these policies shall include adherence to the following principles:*

*(1) the yield of state and local educational program revenue per pupil per cent of effective tax effort shall not be statistically significantly related to local taxable wealth per student for at least those districts in which 95 percent of students attend school; and*

*(2) the level of state and local revenues for which equalization is established shall include funds necessary for the efficient operation and administration of appropriate educational programs and the provision of financing for adequate facilities and equipment.*

*(d) Future legislatures are free to use other methods to achieve substantially equal access to similar revenues per student at similar tax effort. These methods may involve minimum tax efforts, redefining the tax base, and other ways to equalize. However, adherence to the state policy described in this section shall be maintained.*

SECTION 1.02. Section 16.004, Education Code, is amended to read as follows:

Sec. 16.004. SCOPE OF PROGRAM. Under the Foundation School Program, a school district may receive state financial aid for *programs, services, facilities, and equipment, including* personnel salaries, current operating expenses, categorical programs, and transportation services. The amount of state aid to each school district shall be based on the district's ability to support its public schools.

SECTION 1.03. Section 16.006, Education Code, is amended to read as follows:

Sec. 16.006. AVERAGE DAILY ATTENDANCE. *(a)* In this chapter, average daily attendance is determined by the *daily attendance as averaged each month of the minimum school year as described under Section 16.052(a) of this code* [best four weeks of eight weeks of attendance. The State Board of Education by rule shall

1

~~prescribe the eight weeks for which attendance records must be maintained by all districts for this purpose, except that the records must be kept for four weeks of each regular semester~~].

*(b) For the school year 1990–1991 only, the number of students in average daily attendance under the definition described in Subsection (a) of this section shall not be less than 98 percent of the number of students that would be obtained under the definition used for the 1989–1990 school year.*

*(c) A school district that experiences a decline of two percent or more in average daily attendance as a result of the closing or reduction in personnel of a military base shall be funded on the basis of the actual average daily attendance of the immediately preceding school year.*

SECTION 1.04. Subchapter A, Chapter 16, Education Code, is amended by adding Section 16.008 to read as follows:

*Sec. 16.008. EQUALIZED FUNDING ELEMENTS. (a) The Legislative Education Board shall adopt rules, subject to appropriate notice and opportunity for public comment, for the calculation for each year of a biennium of the qualified funding elements necessary to achieve the state funding policy under Section 16.001 of this code not later than the 1994–1995 school year and for each school year thereafter.*

*(b) The funding elements shall include:*

*(1) a basic allotment for the purposes of Section 16.101 of this code that represents the cost per student of a regular education program that meets the basic criteria for an accredited program including all mandates of law and regulation;*

*(2) the formula or other provision for the cost of education index designed to reflect the geographic variation in known resource costs and costs of education beyond the control of school districts for the purposes of Sections 16.102 and 16.103 of this code;*

*(3) appropriate program cost differentials and other funding elements for the programs authorized under Subchapter D of this chapter, with the program funding level expressed as dollar amounts and as weights applied to the adjusted basic allotment for the appropriate year;*

*(4) the maximum guaranteed level of qualified state and local funds per student for the purposes of Subchapter H of this chapter that represents the costs as determined and limited under Subchapter F of this chapter for exemplary programs including the cost of facilities and equipment until such time as a funding formula for capital outlay and debt service is adopted under Subchapter I of this chapter;*

*(5) the total tax rates for the local funding requirements of Section 16.252 of this code and Subchapter H of this chapter, including tax rates for capital outlay and debt service until such time as a funding formula for capital outlay and debt service is adopted under Subchapter I of this chapter; and*

*(6) the formula elements for the funding formulas for capital outlay and debt service under the provisions of Subchapter I of this chapter.*

*(c) Beginning in 1992, not later than October 1 preceding each regular session of the legislature, the board by rule shall report the equalized funding elements calculated under Subsection (b) of this section to the foundation school fund budget committee, the commissioner of education, and the legislature.*

*(d) Notwithstanding other provisions of this section, the report and recommendations of the Legislative Education Board for the 1993–1994 school year and the 1994–1995 school year shall provide for appropriate transition from the program in effect for the 1992–1993 school year.*

SECTION 1.05. Section 16.101, Education Code, is amended to read as follows:

Sec. 16.101. BASIC ALLOTMENT. For each student in average daily attendance, not including the time students spend each day in special education or vocational education programs for which an additional allotment is made under Subchapter D of this chapter, a district is entitled to an allotment of *$1,910* [$~~1,477~~] for the *1990–1991* [~~1989–1990~~] school

*year, $2,128 for the 1991-1992 and 1992-1993 school years,* and *$2,128 or an amount adopted by the foundation school fund budget committee under Section 16.256 of this code for the 1993-1994 school year and* [$1,500 for] each school year thereafter. *A*[, or a] greater amount *for any school year may be* provided by appropriation.

SECTION 1.06. Subsection (a), Section 16.151, Education Code, is amended to read as follows:

(a) For each full-time equivalent student in average daily attendance in a special education program under Subchapter N, Chapter 21, of this code, a district is entitled to an annual allotment equal to the adjusted basic allotment multiplied by a weight determined according to instructional arrangement, which for the 1989-1990 and 1990-1991 school years is as follows:

```
Homebound ................................................................ 5.0
Hospital class .............................................................. 5.0
Speech therapy ............................................................ 7.11
Resource room ............................................................. 2.7
Self-contained, mild and moderate, regular campus ...................... 2.3
Self-contained, severe, regular campus ................................. 3.5
Self-contained, separate campus ........................................ 2.7
Multidistrict class ...................................................... 3.5
Nonpublic day school ..................................................... 3.5
Vocational adjustment class ............................................. 2.3
Community class .......................................................... 3.5
[Self-contained, pregnant ............................................... 2.0]
Mainstream .............................................................. 0.25
```

SECTION 1.07. Subsection (a), Section 16.152, Education Code, is amended to read as follows:

(a) For each student who is educationally disadvantaged or who is a nonhandicapped student residing in a residential placement facility in a district in which the student's parent or legal guardian does not reside, a district is entitled to an annual allotment equal to the adjusted basic allotment multiplied by 0.2 *and 2.41 for each full-time equivalent student who is in a remedial and support program under Section 21.557 of this code because the student is pregnant*[, subject to Subsection (e) of this section].

SECTION 1.08. Subsection (c), Section 16.152, Education Code, is amended to read as follows:

(c) Funds allocated under this section, other than an indirect cost allotment established under State Board of Education rule, *which shall not exceed 15 percent,* must be used in providing remedial and compensatory education programs under Section 21.557 of this code, and the district must account for the expenditure of state funds by program and by campus. *Funds allocated under this section, other than the indirect cost allotment, shall only be expended for supplemental purposes in addition to those programs and services funded under the regular education program of the district from all funding sources.*

SECTION 1.09. Section 16.252, Education Code, is amended to read as follows:

Sec. 16.252. LOCAL SHARE OF PROGRAM COST. (a) Each school district's share of its Foundation School Program shall be an amount determined by the following formula:

$$LFA = TR \times DPV$$

where:

"LFA" is the district's local share;

"TR" is a tax rate *which for the 1990-1991 school year shall be* computed by the commissioner of education before *the 1990-1991* [each] school year *as the rate* that will raise a total local share, prior to adjustments, equal to *41* [93.3] percent of the current year Foundation School Program estimated costs under Subchapters C and D of this chapter other than the adjustments made under Sections 16.102(d) and 16.103(d) of this

code, *and which shall be $0.70 per hundred dollars of valuation for each year thereafter, or a rate as adopted by the foundation school fund budget committee for the 1993-1994 and 1994-1995 school years under authority granted in Section 16.256(d) of this code;* and

"DPV" is the taxable value of property in the district for the prior tax year determined under Section 11.86 of this code.

(b) The commissioner of education shall adjust the values reported in the official report of the State Property Tax Board to reflect reductions in taxable value of property resulting from natural or economic disaster after January 1 in the year in which the valuations are determined. The decision of the commissioner of education shall be final. An adjustment does not affect the local fund assignment of any other district.

(c) Appeals of district values shall be held pursuant to Subsection (e) of Section 11.86 of this code.

(d) A district shall raise its total local share of its program cost in order to qualify for aid from the foundation school fund.

(e) The commissioner of education shall hear appeals from local school districts which have experienced a rapid decline in tax base used in calculating the local fund assignment, exceeding eight percent of prior year, that is beyond the control of the local board of trustees. The commissioner of education may adjust the local school district's taxable values for local fund assignment purposes for such losses in value exceeding eight percent and thereby adjust the local fund assignment to reflect the local current year taxable value. The decision of the commissioner of education shall be final. An adjustment does not affect the local fund assignment of any other district.

SECTION 1.10. Section 16.256, Education Code, is amended by adding Subsections (d), (e), (f), and (g) to read as follows:

*(d) The foundation school fund budget committee shall adopt rules for the calculation for each year of a biennium of the qualified funding elements necessary to achieve the state funding policy under Section 16.001 of this code not later than the 1994-1995 school year and for each year thereafter. In the calculation of these funding elements, the committee shall consider the report of the Legislative Education Board prescribed under Section 16.008 of this code.*

*(e) The funding elements shall include:*

*(1) a basic allotment for the purposes of Section 16.101 of this code that represents the cost per student of a regular education program that meets the basic criteria for an accredited program including all mandates of law and regulation;*

*(2) the formula or other provision for the cost of education index designed to reflect the geographic variation in known resource costs and costs of education beyond the control of school districts for the purposes of Sections 16.102 and 16.103 of this code;*

*(3) appropriate program cost differentials and other funding elements for the programs authorized under Subchapter D of this chapter, with the program funding level expressed as dollar amounts and as weights applied to the adjusted basic allotment for the appropriate year;*

*(4) the maximum guaranteed level of qualified state and local funds per student for the purposes of Subchapter H of this chapter that represents the costs as determined and limited under Subchapter F of this chapter for exemplary programs including the cost of facilities and equipment until such time as a funding formula for capital outlay and debt service is adopted under Subchapter I of this chapter;*

*(5) the total tax rates for the local funding requirements of Section 16.252 of this code and Subchapter H of this chapter, including tax rates for capital outlay and debt service until such time as a funding formula for capital outlay and debt service is adopted under Subchapter I of this chapter; and*

*(6) the formula elements for the funding formulas for capital outlay and debt service under the provision of Subchapter I of this chapter.*

4

*(f) Beginning in 1992, not later than November 1 preceding each regular session of the legislature, the foundation school fund budget committee by rule shall adopt and report the equalized funding elements calculated under this section to the commissioner of education and the legislature. Before the committee adopts the elements, the committee or the committee's designees shall hold a public hearing on the recommendations of the Legislative Education Board.*

*(g) Notwithstanding other provisions of this section, the funding elements adopted by the foundation school fund budget committee for the 1993–1994 school year and the 1994–1995 school year shall provide for appropriate transition from the program in effect for the 1992–1993 school year.*

SECTION 1.11. Subchapter H, Chapter 16, Education Code, is amended by amending Sections 16.302 and 16.303 and adding Section 16.304 to read as follows:

Sec. 16.302. ALLOTMENT. *(a)* Each district is guaranteed a specified amount per weighted student in state and local funds for each cent of tax effort over that required for the local fund assignment up to the maximum level specified in this subchapter. The amount of state support, subject *only* to *the maximum amount under* Section 16.303 of this code, is determined by the formula:

$$GYA = (GL \times WADA \times DTR \times 100) - LR$$

where:

"GYA" is the guaranteed yield amount of state funds to be allocated to the district;

"GL" is the dollar amount guaranteed level of state and local funds per weighted student per cent of tax effort, which is *$17.90 for the 1990–1991 school year and $26.05 for each school year thereafter,* [$18.25] or a greater amount *for any year* provided by appropriation, *or an amount adopted by the foundation school fund budget committee under Section 16.256(d) of this code for the 1993–1994 or 1994–1995 school year or thereafter;*

"WADA" is the number of weighted students in average daily attendance, which is calculated by dividing the sum of the district's allotments under Subchapters C and D of this chapter, less any allotments to the district for transportation or for career ladder supplements and 50 percent of the *adjustment* [adjustments] under *Section* [Sections] 16.102 [and 16.103] of this code, by the basic allotment for the applicable year;

"DTR" is the district enrichment tax rate of the district, which is determined by subtracting the local fund assignment of the district from the amount of taxes collected by the district for the applicable school year and dividing the result by the quotient of the district's taxable value of property (DPV) under Section 16.252 of this code divided by 100; and

"LR" is the local revenue, which is determined by multiplying "DTR" by the quotient of the district's taxable value of property (DPV) under Section 16.252 of this code divided by 100.

*(b) Beginning with the 1992–1993 school year, if the cost of education index and program cost differentials developed jointly by the Legislative Education Board and the Legislative Budget Board under Section 16.203 of this code are not adopted by the foundation school fund budget committee or the commissioner of education, the amount guaranteed under this section is an amount per student rather than per weighted student and a district's average daily attendance ("ADA") under Section 16.006 of this code is substituted for "WADA" in the formula under Subsection (a) of this section.*

*(c) Beginning with the 1991–1992 school year, the Legislative Education Board under Section 16.008 of this code and the foundation school fund budget committee under Section 16.256 of this code may calculate rates for "GL" and for the limitation on "DTR" under Section 16.303 of this code using a percentile of property wealth per weighted student that is not less than the 90th percentile. The rates calculated will replace the rates stated in Subsection (a) of this section and Section 16.303 of this code.*

5

Sec. 16.303. LIMITATION ON ENRICHMENT TAX RATE. (a) The district enrichment tax rate ("DTR") under Section 16.302 of this code may not exceed *$0.37 in the 1990–1991 school year, $0.48 in each year thereafter, or an amount for 1993–1994 and 1994–1995 school years or thereafter as adopted by the foundation school fund budget committee under Section 16.256(d) of this code* [$0.36 or a greater amount for any of those school years provided by appropriation].

(b) *For districts that have a district enrichment tax rate in 1990–1991 of less than the maximum "DTR" as specified in Subsection (a) of this section, for years subsequent to 1990–1991, the annual maximum "DTR" for the school years 1991–1992 through 1993–1994 shall be limited to the 1990–1991 district enrichment tax rate plus:*

*(1) an amount equal to 25 percent of the difference between the maximum rate and the 1990–1991 district rate for the 1991–1992 school year;*

*(2) an amount equal to 50 percent of the difference between the maximum rate and the 1990–1991 district rate for the 1992–1993 school year; and*

*(3) an amount equal to 75 percent of the difference between the maximum rate and the 1990–1991 district rate for the 1993–1994 school year* [the 1989–1990 school year, a district may not receive less per student in guaranteed yield state funds than the amount of state funds received under the enrichment equalization allotment in the 1988–1989 school year].

*Sec. 16.304. COMPUTATION OF AID FOR DISTRICT ON MILITARY RESERVATION OR AT STATE SCHOOL. State assistance under this subchapter for a school district located on a federal military installation or at Moody State School is computed using the average tax rate and property value per student of school districts in the county, as determined by the commissioner of education.*

SECTION 1.12. Section 16.155, Education Code, is amended by amending Subsections (a) and (e) and adding Subsection (g) to read as follows:

(a) For each full-time equivalent student in average daily attendance in an approved vocational education program *in grades nine through 12 or in vocational education for the handicapped programs in grades seven through 12*, a district is entitled to an annual allotment [for the 1989–1990 and 1990–1991 school years] equal to the adjusted basic allotment multiplied by a weight of *1.37* [1.45].

(e) Funds allocated under this section, other than an indirect cost allotment established under State Board of Education rule, must be used in providing vocational education programs *in grades nine through 12 or vocational education for the handicapped programs in grades seven through 12* under the provisions of Sections 21.111, 21.1111, and 21.112 of this code.

*(g) The commissioner shall conduct a cost-benefit comparison between vocational education programs and mathematics and science programs.*

SECTION 1.13. Subchapter F, Chapter 16, Education Code, is amended to read as follows:

## SUBCHAPTER F. [PROGRAM] ACCOUNTABLE COSTS *OF EDUCATION*

Sec. 16.201. *PURPOSE. The accountable costs of education studies are designed to support the development of the equalized funding elements necessary to provide an efficient state and local public school finance system which meets the state policy established in Section 16.001 of this code and provides the research basis for the equalized funding elements under the provisions of Section 16.003 of this code. In determining accountable costs, the boards may not include costs of cocurricular and extracurricular programs and shall consider the results of the efficiency in administration report under Section 16.205 of this code* [REPORT. The State Board of Education shall report what it determines to be:

[(1) the minimum basic accountable costs per student to school districts of providing education programs, personnel, and other operating costs that meet the accreditation standards prescribed by law and rule, for each year of the next biennium;

[(2) the estimated costs per student to school districts of providing exemplary education programs, personnel, and other operating costs that exceed basic accreditation levels;

[(3) the costs of implementing the long-range plan for public school education authorized by Section 11.26(b) of this code;

[(4) facility and debt service costs necessary to provide for both current and projected facilities for public schools according to the standards adopted under Subchapter I of this chapter;

[(5) the basic accountable costs per student for each programmatic area that is recognized by the Foundation School Program; and

[(6) the basic accountable costs of transportation].

Sec. 16.202. *STUDIES. (a) On a biennial basis, the Legislative Education Board and the Legislative Budget Board, with the assistance of the Educational Economic Policy Center and the Central Education Agency, shall complete each of the following studies and develop recommended amounts where appropriate for each year of the next biennium:*

*(1) a study of the fiscal neutrality of the system to determine the status of the state and local finance system with regard to the policies established under the provisions of Section 16.001 of this code, including recommendations for adjustments necessary to maintain fiscal neutrality;*

*(2) the accountable costs per student to school districts of providing educational programs, personnel, and other operating costs that meet accreditation criteria and the provisions of law and regulation;*

*(3) a cost of education index designed to reflect the geographic variation in known resource costs and costs of education due to factors beyond the control of school districts;*

*(4) program cost differentials designed by program to provide support for the added expense of high-cost courses or programs for students participating in such courses or programs, with the program funding level expressed as dollar amounts and as weights applied to the adjusted basic allotment for the appropriate year;*

*(5) transportation and career ladder allotments;*

*(6) the accountable costs per student to districts rated as exemplary under the provisions of Subchapter T of Chapter 21 of this code for the provision of personnel, programs, and other operating expenses, with the limitation that for the 1993-1994 and the 1994-1995 school years this level may not be less than 95 percent nor more than 100 percent of the 95th percentile of state and local revenue per pupil;*

*(7) the levels of tax effort necessary for each tier of the Foundation School Program necessary to fulfill the requirements of Sections 16.001 and 16.008 of this code; and*

*(8) capital outlay and debt service requirements and formula elements for the requirements of Subchapter I of this chapter or other provisions of this chapter.*

*(b) In the determination of costs and revenues under this chapter, the boards shall consider those costs and revenues necessary for operation, maintenance, and administration and those costs necessary for adequate facilities and equipment and shall exclude all other costs* [ADVISORY COMMITTEE. (a) The State Board of Education shall appoint an advisory committee to assist the board in determining the minimum basic accountable costs. The committee must be composed of 15 members, a majority of whom may not be employees or officials of a local school district.

[(b) In making appointments to the committee, the board shall give representation to different geographic areas and different sizes of schools and districts.

[(c) Members of the committee serve without compensation but are entitled to reimbursement for actual and necessary expenses incurred in performing their duties. Reimbursement is from funds appropriated to the Central Education Agency and available for that purpose].

Sec. 16.203. *PROCEDURES.* *(a) In the determination of the statistical measures used for the calculation of fiscal neutrality, the boards shall use only those measures recommended by an impartial panel of persons expert in the use of statistics appointed by the boards.*

*(b) The cost of education index shall be based on one or more models that consider the effect of school district or other characteristics on the cost of public education in the various school districts of the state. The districts may be divided into a variety of categories that may include region, size, area, density, educational characteristics, and economic conditions. The index shall adjust only for specific resource cost variations caused by factors beyond the control of school districts, to include personnel, variations from optimal district size, and other cost factors. Factors that are addressed by other formula adjustments in the Foundation School Program are not to be considered. Variations should be based on the most efficient service delivery systems. An impartial panel of persons expert in econometric modeling, statistics, and related fields shall be consulted in the development of the index, examination of cost factors, and development of models. The commissioner of education shall collect data necessary to the development of the models and index. The boards shall develop a formula for applying the index to the basic allotment in a manner that appropriately reflects the relative significance of the costs adjusted by the index to the overall cost of a minimum accredited regular education program represented by the basic allotment.*

*(c) The cost of education index developed jointly by the Legislative Education Board and the Legislative Budget Board shall be submitted to the foundation school fund budget committee for adoption. The cost of education index adopted by the committee shall be effective beginning with the 1991-1992 school year.*

*(d) The program cost differentials developed jointly by the Legislative Education Board and the Legislative Budget Board shall be submitted to the foundation school fund budget committee for adoption beginning with the 1992-1993 school year. If the foundation school fund budget committee fails to adopt by April 1 the program cost differentials for the following school year, the commissioner of education, after considering the recommendations developed by those boards, shall adopt program cost differentials.*

*(e) The commissioner of education shall provide appropriate assistance to the boards for the calculation of the various funding elements. Subject to review by the Legislative Education Board, the commissioner of education shall retain from the allotments under Sections 16.102 and 16.103 of this code and Subchapter D of this chapter amounts appropriate to finance necessary additional costs for the studies required under this subchapter.*

*(f) The boards may appoint advisory committees to assist in the development of the various funding elements and studies required under this subchapter. Advisory committee members serve without compensation but are entitled to reimbursement for actual and necessary expenses incurred in the performance of their duties. Reimbursement shall be from funds available under Subsection (e) of this section or from other funds available to the boards.*

*(g) In the studies relating to program cost differentials the boards shall give special consideration to cost factors associated with class size, laboratory expenses, materials, equipment, teacher training, necessary salary supplementation, and special services related to individual courses or groups of courses* [LEGISLATIVE CONSIDERATION. In adopting the amount of basic, special, and transportation allotments under this chapter, the legislature shall consider the recommendations and report of the State Board of Education as to the minimum basic accountable costs of a program that meets accreditation standards. The board shall file the report with the governor, the Legislative Budget Board, and the Legislative Education Board].

Sec. 16.204. *NAVAL MILITARY FACILITY IMPACT. (a) The model on which a cost of education index is based must specifically consider the impact of a significant new naval military facility on each district in an impacted region.*

*(b) If the construction or operation of a significant new naval military facility begins during a school year, the Legislative Education Board and the Legislative Budget Board shall recommend the adjustment of the basic allotment during that school year to consider any impact of the facility on the cost of education index of the districts in the impacted region.*

*(c) In this section, "significant new naval military facility" and "impacted region" have the meanings assigned by Section 4, Article 1, National Defense Impacted Region Assistance Act of 1985 (Article 689a-4d, Vernon's Texas Civil Statutes).*

*Sec. 16.205. EFFICIENCY IN ADMINISTRATION REPORT. (a) The commissioner of education shall conduct a study to determine the most appropriate and efficient method for reporting and monitoring the allocation of resources by school districts.*

*(b) The study shall identify the most effective means for calculating, monitoring, and reporting the proportion of resources that school districts allocate for their administrative costs and shall include administrator-teacher ratios.*

*(c) The study shall include a description of average efficient administrative expenditures by districts with consideration of district size and demographics.*

*(d) Prior to the beginning of each regular session of the legislature, the agency shall provide a report with recommendations to the Legislative Education Board and the legislature.*

*(e) The study is an element of the study of accountable costs of education under this subchapter.*

SECTION 1.14. (a) In the development of the accountable cost of education studies during the 1989–1990 and 1990–1991 school years, the Legislative Education Board and Legislative Budget Board shall give special consideration to the studies required for the development of program cost differentials, the cost of education index, and a comprehensive set of recommendations for the provision of state assistance to school districts for school facilities and debt service beginning in the 1991–1992 school year. These studies shall be completed not later than January 1, 1991.

(b) In addition, specific studies of the impact of year-round average daily attendance, appropriate mechanisms for the funding of vocational education, and the cost of serving at-risk students shall be included in the studies completed by the boards prior to January 1, 1991.

SECTION 1.15. Section 13.353, Education Code, is amended by adding Subsection (e) to read as follows:

*(e) From funds appropriated for that purpose, the Central Education Agency shall allocate an amount each year for the identification, adaptation, development, and evaluation of professional development programs and materials; training of trainers; and technical assistance in the development of general management and leadership development skills, including skills necessary to implement Sections 21.7532 and 21.930 of this code. The State Board of Education may designate special projects and development activities to be carried out with such funds. The manner in which such funds are utilized shall be reported annually to the commissioner of education.*

SECTION 1.16. Section 29.05, Education Code, is amended to read as follows:

Sec. 29.05. ALLOCATION OF COSTS. A formula for the allocation of professional units and other operating expenses shall be developed by the Central Education Agency and approved by the State Board of Education. *For the fiscal year ending August 31, 1991, the amount approved by the State Board of Education may not exceed $29 million. Not later than February 1, 1991, the Central Education Agency and the Texas Department of Criminal Justice shall propose to the 72nd Legislature a formula for funding the schools authorized by Section 29.01 of this code, using the fund required by Section 29.04 of this code.*

SECTION 1.17. Chapter 1, Title 22, Revised Statutes, is amended by adding Article 717t-1 to read as follows:

*Art. 717t-1. PUBLIC SCHOOL FACILITIES DEVELOPMENT GRANTS. (a) From funds appropriated for the purpose, in the 1991–1992 school year, the board*

*shall make grants to school districts to alleviate emergency needs for acquiring, constructing, renovating, or improving capital assets and instructional facilities. A portion of these funds may be used to alleviate the debt service obligations of school districts incurring debt since September 1, 1984, and prior to the effective date of this article.*

*(b) The board by rule shall establish procedures and qualifications for obtaining a grant under this article. Under the rules, a priority shall be given to school districts with a property-wealth per student ratio inadequate to meet the demands for adequate funds for its education program and for its debt service obligations. The board may consider, in adopting rules and awarding grants, the conditions listed in Subsection (a), Section 10, Public School Facilities Funding Act (Article 717t, Vernon's Texas Civil Statutes).*

*(c) Except to the extent directly related to the acquisition, construction, renovation, or improvement of capital assets and instructional facilities, a grant may not be used to pay the general administrative expenses of any school district or to pay any part of the salary or benefits of an official or employee of any school district receiving a grant under this article.*

*(d) In this article:*

*(1) "Board" has the meaning assigned by Section 2, Public School Facilities Funding Act (Article 717t, Vernon's Texas Civil Statutes).*

*(2) "Capital assets" means permanent fixtures, mechanical or electrical equipment, or other tangible property that becomes a permanent improvement to an instructional facility or furnishings, other than computers, for an instructional facility that have a life of not less than 10 years.*

*(3) "Instructional facility" has the meaning assigned by Section 2, Public School Facilities Funding Act (Article 717t, Vernon's Texas Civil Statutes).*

*(e) This article expires August 31, 1992.*

SECTION 1.18.  Chapter 314, Government Code, is amended by adding Section 314.004 to read as follows:

*Sec. 314.004.  EQUALIZED EDUCATION FUNDING IMPACT STATEMENT.  (a) The board shall prepare for each bill or resolution that affects public education an equalized education funding impact statement.*

*(b) The impact statement must evaluate the effect of the bill or resolution on all state equalized funding requirements and policies.*

*(c) The impact statement must be attached to the bill or resolution immediately following the fiscal note attached under Section 314.003.*

SECTION 1.19.  Section 322.008, Government Code, is amended to read as follows:

Sec. 322.008.  APPROPRIATIONS BILL.  (a) The director, under the direction of the board, shall prepare the general appropriations bill for introduction at each regular legislative session.

*(b) Not later than the 1994–1995 school year, the general appropriations bill shall include for purposes of information the funding elements adopted by the foundation school fund budget committee under Section 16.256(e), Education Code, excluding the values for each school district calculated under Subdivision (2) of that subsection. The funding elements under Section 16.256(e)(3), Education Code, shall be reported in dollar amounts per pupil.*

*(c)* Not later than the fifth day after a regular legislative session convenes, the director shall transmit a copy of the budget of estimated appropriations prepared by the director to the governor and each member of the legislature.

*(d)* [(e)] Not later than the seventh day after a regular legislative session convenes, the director shall transmit a copy of the general appropriations bill to the governor and each member of the legislature.

SECTION 1.20.  (a) Notwithstanding any other provision of this Act, a district's increase or decrease in state aid per student due to changes made by this Act to the

Education Code at the time of its enactment shall be limited to the following levels for the indicated school years:

(1) 25 percent of the difference between the state aid per student to which the district is otherwise entitled under the provisions of this Act for the 1991–1992 school year and the state aid per student to which the district is entitled under the provisions of this Act for the 1990–1991 school year;

(2) 50 percent of the difference between the state aid per student to which the district is otherwise entitled under the provisions of this Act for the 1992–1993 school year and the state aid per student to which the district is entitled under the provisions of this Act for the 1990–1991 school year;

(3) 75 percent or a different percentage as may be set by the foundation school fund budget committee of the difference between the state aid per student to which the district is otherwise entitled under the provisions of this Act for the 1993–1994 school year and the state aid per student to which the district is entitled under the provisions of this Act for the 1990–1991 school year.

(b) Unless determined to be different amounts for the 1993–1994 and 1994–1995 school years by the foundation school fund budget committee under the authority granted to it in Subsection (d), Section 16.256, Education Code, as added by this Act, the following shall be used in determining eligibility for state aid and special program allotment amounts beginning in the 1991–1992 school year:

(1) the basic allotment only for purposes of determining the amounts of funds which school districts must allot for special programs under Subchapter D, Chapter 16, Education Code, under provisions of this Act shall be $1,965 for the 1991–1992 school year, $2,019 for the 1992–1993 school year, $2,074 for the 1993–1994 school year, and $2,128 for the 1994–1995 school year; and

(2) the minimum tax effort per hundred dollars of valuation required under Section 16.252, Education Code, shall be $0.54 for the 1991–1992 school year, $0.54 for the 1992–1993 school year, $0.62 for the 1993–1994 school year, and $0.70 for the 1994–1995 school year.

SECTION 1.21. No district shall receive less funds for the 1990–1991 school year than the district would have received under the prior provisions of the Education Code, with the exception that the financial impact of the provisions relating to average daily attendance under Section 16.006, Education Code, shall not be held harmless. The commissioner of education shall provide for appropriate calculations to implement this section.

SECTION 1.22. (a) Subsection (c), Section 16.151; Subsection (e), Section 16.152, as added by Section 9, Chapter 816, Acts of the 71st Legislature, Regular Session, 1989; Section 16.176; Section 16.177; Subsections (a), (b), (c), and (e), Section 16.178; Section 16.179; and Section 16.180, Education Code, are repealed effective immediately.

(b) Effective September 1, 1991, Subsection (c), Section 16.102, Subsection (e), Section 16.103, and Subsection (d), Section 16.178, Education Code, are repealed.

SECTION 1.23. (a) Sections 1.06 and 1.07 of this article take effect September 1, 1991.

(b) Sections 1.13 and 1.15 of this article take effect immediately.

## ARTICLE II. ACCOUNTABILITY

SECTION 2.01. Section 2.01, Education Code, is amended to read as follows:

Sec. 2.01. PUBLIC EDUCATION IN GENERAL; *GOALS FOR PUBLIC EDUCATION.* The objective of state support and maintenance of a system of public education is education for citizenship and is grounded upon conviction that a general diffusion of knowledge is essential for the welfare of Texas and for the preservation of the liberties and rights of citizens. *The goals of public education are as follows:*

*GOAL A: All students shall have an opportunity to benefit from an appropriate education. The achievement gap between educationally disadvantaged students and*

11

*other populations will be closed. Through enhanced dropout prevention efforts, the graduation rate will be raised to 95 percent of students who enter the seventh grade.*

*GOAL B: The state shall be within national norms for student performance.*

*GOAL C: A well-balanced and appropriate curriculum will be provided to all students.*

*GOAL D: Qualified and effective personnel will be attracted and retained. Adequate and competitive compensation commensurate with responsibilities will be ensured. Qualified staff in critical shortage areas will be recruited, trained, and retained.*

*GOAL E: The organization and management of all levels of the educational system will be productive, efficient, and accountable.*

*GOAL F: Instruction and administration will be improved through research that identifies creative and effective methods. Demonstration programs will be developed and local initiatives encouraged for new instructional arrangements and management techniques. Technology will be used to increase the equity, efficiency, and effectiveness of classroom instruction, instructional management, and administration.*

SECTION 2.02. Section 327.005, Government Code, is amended to read as follows:

Sec. 327.005. POWERS AND DUTIES. (a) The board shall oversee and review the implementation of legislative education policy[, including fiscal policy,] by state agencies that have the statutory duty to implement that policy, *including policy relating to:*

*(1) fiscal matters;*

*(2) academic expectations; and*

*(3) evaluation of program cost-effectiveness.* The board may require information and reports from state agencies as necessary to carry out its duties.

(b) For purposes of carrying out its duties, the board may administer oaths and issue subpoenas, signed by the chairman or vice-chairman, to compel the attendance of witnesses and the production of books, records, and documents. A subpoena of the board shall be served by a peace officer in the manner in which district court subpoenas are served. On application of the board, a district court of Travis County shall compel compliance with a subpoena issued by the board in the same manner as for district court subpoenas.

(c) The board shall make recommendations to the legislature concerning needed changes in legislative education policy.

(d) *The board may appoint advisory committees composed of citizens of the state to advise the board in the discharge of the board's duties. A member of an advisory committee appointed under this section serves without compensation but is entitled to reimbursement for actual expenses incurred in the performance of the member's duties.*

(e) *The board may employ staff as necessary for the performance of its duties, as allowed by legislative appropriation, or may request and use staff provided by the Texas Legislative Council or the Legislative Budget Board. Such staff, if any, shall be available to all members of the legislature.*

(f) [The Texas Legislative Council shall provide staff for the board as necessary to the performance of its duties.

[(e)] State agencies shall cooperate with and assist the board at the board's request.

SECTION 2.03. Section 327.006, Government Code, is amended to read as follows:

Sec. 327.006. REVIEW OF *EDUCATIONAL POLICY* [CURRICULUM] IMPLEMENTATION. *(a)* The board shall *periodically* [biennially] review the *actions or proposed actions of* [curriculum rules adopted by] the State Board of Education [under Section 21.101, Education Code,] for the purpose of ensuring compliance with legislative intent.

*(b) If the board determines that any action or proposed action of the State Board of Education conflicts with legislative educational policy, the board shall submit its comments on the conflict to the State Board of Education in writing.*

*(c) If the board determines that a final action of the board conflicts with the intent of legislative educational policy, the board may:*

*(1) request additional information from the State Board of Education relating to the intent of the board's action;*

*(2) request a joint meeting with the State Board of Education to discuss the conflict between the action and legislative educational policy;*

*(3) request that the State Board of Education reconsider its action; or*

*(4) notify the governor, lieutenant governor, speaker of the house, and the legislature of the conflict presented.*

SECTION 2.04. Subchapter A, Chapter 11, Education Code, is amended by adding Section 11.2091 to read as follows:

*Sec. 11.2091. MINORITY RECRUITMENT PROGRAMS. (a) The Texas Higher Education Coordinating Board in cooperation with the commissioner of education shall establish a program to assist in the recruitment of minorities into the education profession. The program may include, but is not limited to, the following:*

*(1) tuition or grant assistance programs;*

*(2) incentive scholarship programs utilizing funds under Subchapter G, Chapter 56, of this code, to encourage minorities to enter the education profession;*

*(3) cooperation with institutions of higher education to conduct recruitment seminars, job fairs, and mentorship programs;*

*(4) cooperation with public school districts to conduct career exploration programs in the area of public education; and*

*(5) cooperation with education interest groups and organizations to conduct career exploration programs, recruitment seminars, job fairs, and mentorship programs.*

*(b) Funds appropriated for these programs shall be specifically allocated by the board in its annual budget process and shall be monitored by the board to determine that the program is meeting goals established by the board.*

SECTION 2.05. Subsections (a) and (d), Section 11.23, Education Code, are amended to read as follows:

(a) The board shall hold *four* [regular] meetings *a year* in Austin, Texas, on *dates determined by the chairman and* [the second Saturday in January, March, May, July, September, and November. It] may hold other meetings [as scheduled by its formal sessions or] as may be called by the chairman.

(d) The governor, *with the advice and consent of the senate*, appoints the chairman of the State Board of Education from among the membership of the State Board of Education. The chairman serves a term of two years.

SECTION 2.06. Section 11.24, Education Code, is amended to read as follows:

Sec. 11.24. GENERAL POWERS AND DUTIES. (a) *In addition to performing its duties under the constitution, the* [The] State Board of Education *shall take actions necessary to implement legislative policy* [is the policy-forming and planning body] for the public school system of the state. *The board shall include in the record of its meetings the legislative authority for each action taken by the board. The board shall consider any comments submitted by the Legislative Education Board on a proposed rule before voting on final adoption of the rule. If the board is unsure of the legislative intent of any legislative enactment, the board may request a joint meeting with the Legislative Education Board to discuss the intent.*

(b) *The board is* [It shall] also [be] the State Board for Vocational Education and as such, the board shall have all the powers and duties conferred on it by the various statutes relating to the State Board for Vocational Education. The State Board of

Education (State Board for Vocational Education) may contract with the *Texas Higher Education* Coordinating Board[, Texas College and University System,] so that the coordinating board may assume the leadership role and administrative responsibility of the State Board for Vocational Education for state level administration of technical-vocational education programs in Texas public community colleges, public technical institutes, and other eligible public postsecondary institutions.

[(b) As one part of the Central Education Agency, the State Board of Education shall have specific responsibility for adopting policies, enacting regulations, and establishing general rules for carrying out the duties placed on it or the Central Education Agency by the legislature.]

SECTION 2.07. Subsection (c), Section 11.26, Education Code, is amended to read as follows:

(c) With the advice and assistance of the state commissioner of education, the State Board of Education shall:

(1) [formulate and present to the governor and Legislative Budget Board the proposed budget or budgets for operating the Foundation School Program, the Central Education Agency, and the other programs for which it has responsibility;

[(2) adopt operating budgets on the basis of appropriation by the legislature;

[(3) establish procedures for budgetary control, expending, auditing, and reporting on expenditures within the budgets adopted;

[(4)] make to the legislature biennial reports covering all the activities and expenditures of the Central Education Agency;

*(2)* [(5)] adopt rules for the accreditation of schools;

*(3)* [(6)] execute contracts for the purchase of instructional aids, including textbooks, within the limits of authority granted by the legislature;

*(4)* [(7)] execute contracts for the investment of the permanent school fund, within the limits of authority granted by Chapter 15 of this code;

*(5)* [(8)] adopt rules consistent with Chapter 13 of this code for certification of teachers, administrators, and other professional personnel customarily employed in public schools;

*(6)* [(9)] adopt rules requiring school districts to notify parents of students of a teacher teaching a subject for which the teacher is not certified, unless the teacher is serving an internship under Section 13.035 of this code, or the teacher has at least 24 semester credit hours in the subject, or the teacher is teaching under an emergency permit and is making satisfactory progress toward completion of a deficiency plan;

*(7)* [(10)] consider the athletic necessities and activities of the public schools of Texas and in advance of each regular session of the legislature specifically report to the governor of Texas the proper and lawful division of time and money to be devoted to athletics, holidays, legal and otherwise, and to educational purposes; and

*(8)* [(11)] on or before May 15 of each year, formulate and transmit to the Texas Council on Vocational Education a list of evaluation topics that address developing and future concerns of the board in the field of technical-vocational education.

SECTION 2.08. Subsection (a), Section 11.29, Education Code, is amended to read as follows:

(a) The *commissioner of education* [State Board of Education] shall adopt annually a budget for *operating the Foundation School Program,* [the operation of] the Central Education Agency, *and other programs for which the State Board of Education has responsibility.* The budget shall be in accordance with the amounts appropriated by the general appropriations act and shall provide funds for the administration and operation of the Central Education Agency and any other necessary expense. *Before adopting the budget, the commissioner shall:*

*(1) submit the budget to the State Board of Education and the Legislative Education Board for review and comment; and*

*(2) after receiving the comments of those boards, present the budget to the governor and the Legislative Budget Board.*

SECTION 2.09.  Section 11.51, Education Code, is amended to read as follows:

Sec. 11.51.  SELECTION AND QUALIFICATIONS.  (a) *The State Board of Education shall recommend to the governor a person to be named commissioner of education.  The governor shall either reject the recommendation or appoint the person as commissioner of education.  The appointment requires the advice and consent of the senate.  If the governor rejects the recommendation, the board shall submit further recommendations until one is appointed by the governor and confirmed by the senate.*  [The Office of State Commissioner of Education is a unit of the Central Education Agency and shall be filled in accordance with the provisions of Section 11.25 of this code.]

(b) *The commissioner of education serves a term of office of four years expiring on March 1 of the appropriate odd-numbered year.  The governor, with the advice and consent of the senate, may remove the commissioner of education on the petition of two-thirds of the membership of the State Board of Education or may remove for good cause.  The commissioner of education may serve consecutive terms.*

*(c)* The [state] commissioner of education shall be a person of broad and professional educational experience, with special and recognized abilities of the highest order in organization, direction, and coordination of education systems and programs, and in administration and management of public schools and public education generally.  The commissioner of education shall be a citizen of the United States.

*(d)* [(e)] The commissioner shall execute an [his] official bond in a sum not to exceed $50,000, conditioned on the faithful performance of *the commissioner's* [his] duties as required by the laws of Texas [and the rules and regulations imposed by the State Board of Education], and pursuant to the provisions of Chapter 383, Acts of the 56th Legislature, Regular Session, 1959 (Article 6003b, Vernon's Texas Civil Statutes).

SECTION 2.10.  Subchapter B, Chapter 13, Education Code, is amended by adding Section 13.049 to read as follows:

*Sec. 13.049.  MODERN TEACHING PRACTICES.  (a) Standards adopted under Section 13.032 or 13.035 of this code for teacher training shall include training in the use of technology and effective teaching practices in the classroom.*

*(b) Regional education service centers, teacher centers, institutions of higher education with approved teacher education programs, and other appropriate educational entities shall offer in-service training for public school teachers and other educational personnel in the use of technology and effective teaching practices in the classroom and in making district-level decisions.*

SECTION 2.11.  Subchapter B, Chapter 19, Education Code, is amended by adding Section 19.027 to read as follows:

*Sec. 19.027.  ACADEMICALLY UNACCREDITED SCHOOL DISTRICTS.  (a)  The commissioner of education by order may annex to one or more adjoining districts a school district that has been rated as academically unaccredited for a period of two years.*

*(b) The governing board of a district to which territory of an academically unaccredited district is annexed is the governing board for the new district.*

*(c) The order of the commissioner shall define by legal boundary description the territory of the new district as enlarged.*

*(d) Title to the real property of the academically unaccredited district rests in the district to which the property is annexed.  Each district to which territory is annexed assumes and is liable for any portion of the academically unaccredited district's indebtedness that is allocated to the receiving district under Section 19.004 of this code.*

*(e) Before the commissioner orders an annexation under this section, the commissioner shall investigate the educational and financial impact of the annexation on the receiving district.  The commissioner may order the annexation only if the commis-*

*sioner finds that the annexation will not substantially impair the ability of the receiving district to educate the students located in the district prior to the annexation and to meet its financial obligations incurred prior to the annexation.*

*(f) For five years beginning with the school year in which the annexation occurs, the commissioner shall annually adjust the local fund assignment of a district to which territory is annexed under this section by multiplying the enlarged district's local fund assignment calculated under Section 16.252 of this code by a fraction, the numerator of which is the number of students residing in the district preceding the date of the annexation and the denominator of which is the number of students residing in the district as enlarged on the date of the annexation. A district that receives an adjustment to its local fund assignment under this section is not eligible for incentive aid under Subchapter G of Chapter 23 of this code.*

*(g) A district to which territory is annexed under this section is entitled to additional state aid equal to the amount by which the annual debt service required to meet the indebtedness incurred by the district due to the annexation exceeds the additional amount of state aid that results from the adjustment under Subsection (f) of this section, if any. In determining the amount of annual debt service required, the estimated tax levy from applying the receiving district's current debt service tax rate, if any, to the territory that has been annexed shall be deducted.*

SECTION 2.12. Section 21.258, Education Code, is amended to read as follows:

Sec. 21.258. PERFORMANCE REPORT. (a) Each board of trustees shall publish an annual [performance] report *describing the district's educational performance that includes campus performance objectives established under Section 21.7532 of this code and the progress of each campus toward those objectives,* which shall be available to the public and filed with the State Board of Education. *The board shall hold a hearing for public discussion of the report. The board shall notify property owners and parents in the district of the hearing. The board may combine the notice with the notice of a public hearing on a proposed tax increase required under Section 26.06, Tax Code. After the hearing the report shall be widely disseminated within the district in a manner to be determined by the district* [describing the district's educational performance and giving financial information related to the costs incurred by the district].

(b) The [State Board of Education by rule shall prescribe the form and content of the report. In adopting the rules, the board may not impose requirements that contribute unnecessarily to the length or complexity of the report, and to the extent possible shall provide for each report topic required by this subsection or by board rule to be presented in a manner that allows the presentation to be limited to not more than one page in length per topic. At a minimum, the] report *may* [must] include the following information by campus:

(1) evaluations of the quality of education based on the information contained in the report;

(2) scores on tests with national norms;

(3) reports of performance trends improvement or lack of improvement;

(4) statements of costs for instruction, instructional administration, and central administration;

(5) attendance data and dropout rates;

(6) reports on discipline;

(7) data on employees, trends in employment, and turnover;

(8) teacher ratios by grade groupings and by program; and

(9) statement of efforts to reduce the amount of paperwork required of teachers and administrators.

(c) *The report must also include a comparison provided by the Central Education Agency of:*

*(1) the performance of each campus to the performance of campuses with similar wealth and demographics and of the district to districts statewide for information*

16

*required under Subsections (b)(4), (5), (7), and (8) of this section and all academic indicators under Section 21.7531 of this code; and*

*(2) the performance of each district to the projection of expected performance of that district considering the wealth and demographics of the district.* [A report under this section must also include information about the number of students in each classroom, excluding instrumental and choral music classrooms, per class period. The report must specify, by grade, the number of classrooms, excluding instrumental and choral music classrooms, in which in any class period the number of students exceeds:

[(1) for kindergarten through 8th grade, 20;

[(2) for high school, 25; and

[(3) for special education, 10.]

(d) The State Board of Education by rule shall authorize the combination of this report with other reports and financial statements and shall restrict the number and length of reports that school districts, [and] school district employees, *and school campuses* are required to prepare.

[(e) Each district shall also annually report to the commissioner the number of teachers on the career ladder, the number of teachers at each level, and the sex and ethnicity of those teachers. That information shall be collected in a biennial report to the legislature, with the information reported by school district.

[(f) Reports to the legislature under this section shall be filed with the Legislative Budget Board and the appropriate committees of each house.]

SECTION 2.13. Section 21.551, Education Code, is amended by adding Subsections (f), (g), (h), and (i) to read as follows:

*(f) The State Board of Education shall adopt one appropriate, nationally recognized, norm-referenced assessment instrument to be administered uniformly to each pupil at each of the 4th, 6th, 8th, and 10th grade levels. The norm-referenced assessment instrument adopted must be a secured test. The state shall pay the costs of purchasing and scoring the adopted assessment instrument and of distributing the results of the adopted instrument to the school districts.*

*(g) The norm-referenced assessment instrument adopted must meet all applicable federal rules and regulations. The normative data used by the instrument must fairly represent all minority and socio-economic groups.*

*(h) The norm-referenced assessment instrument bidders shall disclose all bias information and data regarding studies and procedures used for norming and item tryouts. The publisher of the assessment instrument shall provide documentation to ensure that student test scores will be as accurate as possible.*

*(i) For accountability purposes, the norm-referenced assessment instrument shall measure the content that is appropriate for the age and grade of the students through consistent tests in the areas of reading, mathematics, language arts, science, and social studies across all targeted grade levels where beneficial for measuring academic progress. The instrument shall measure the applications of higher order thinking skills across all content areas. The proportion of higher order thinking skills measured must be appropriate for the age and grade of the students. The norm-referenced assessment instrument bidders shall disclose the procedures used, including item classifications, to ensure adequate measurement of higher order thinking skills.*

SECTION 2.14. Section 21.753, Education Code, is amended to read as follows:

Sec. 21.753. ACCREDITATION STANDARDS. (a) The State Board of Education shall adopt rules for the accreditation of school districts. The rules shall include criteria to evaluate the performance of school districts and to rate each district for accreditation purposes as:

(1) exemplary;

(2) recognized;

(3) accredited;

(4) accredited advised; *or*

17

(5) *academically unaccredited* [warned; or

[(6) unaccredited].

(b) [The board may not rate a number of school districts as exemplary that exceeds 40 percent of the number of districts rated as recognized.

[(c)]  The criteria in the accreditation rules must include consideration of:

(1) goals and objectives of the district;

(2) compliance with statutory requirements and requirements imposed by rule of the State Board of Education under statutory authority;

(3) *adequate performance under the indicators adopted under Section 21.7531 of this code;*

*(4) the relation between the academic excellence indicators adopted by the board under Section 21.7531 of this code and the campus performance objectives established under Section 21.7532 of this code, including the manner in which the campus performance objectives were established and the progress of the campus in meeting the objectives;*

*(5)* the quality of learning on each of the district's campuses based on indicators *including* [such as] scores on achievement tests;

*(6)* [(4)]  the quality of the district's appraisal of teacher performance and of administrator performance;

*(7)* [(5)]  the effectiveness of district principals as instructional leaders;

*(8) the effectiveness of the district's campuses on the basis of the most current criteria identified by research on effective schools;*

*(9)* [(6)]  the fulfillment of curriculum requirements;

*(10)* [(7)]  the effectiveness of the district's programs in special education *based on the Central Education Agency's most recent compliance review of the district* and *programs* for special populations;

*(11)* [(8) the correlation between student grades and performance on standardized tests;

[(9)]  the *effectiveness* [quality] of teacher in-service training;

[(10) paperwork reduction efforts;

[(11) training received by board members;]

(12) the *effective use of technology to enhance student achievement;* [effectiveness of the district's efforts to improve attendance;]

(13) the effectiveness of the district's remedial and support programs under Section 21.557 of this code for students at risk of dropping out of school;

(14) the effectiveness of the district's dropout prevention and recovery programs; *and*

(15) [the effectiveness of the district's drug abuse prevention programs;

[(16) parental and community involvement in the district;

[(17)]  efficient allocation of available resources[; and

[(18) adequate performance under the indicators adopted under Section 21.7531 of this code].

*(c) The Central Education Agency shall rate each campus in a district on the basis of the campus's performance on the indicators adopted under Section 21.7531 of this code using the rating categories provided for districts under Subsection (a) of this section.*

*(d) The accreditation rating of a school district or campus under this section may not be lowered solely on the basis of size.*

SECTION 2.15.  Section 21.7531, Education Code, is amended to read as follows:

Sec. 21.7531.  *ACADEMIC EXCELLENCE* [PERFORMANCE] INDICATORS. (a) The State Board of Education, *on the advice of the academic excellence indicators*

*advisory committee, the educational excellence committee, and the Legislative Education Board,* shall adopt a set of indicators of the quality of learning on a campus *and other performance standards.* The board biennially shall review the indicators for the consideration of appropriate revisions.

(b) *Performance on the indicators required by this section shall be compared to a projection of expected performance for purposes of evaluation, accreditation, and determination of exemplary status.* The indicators must include:

(1) *the results of criterion-referenced assessment instruments required under Section 21.551 of this code;* [a comparison of the district's performance to a projection of the district's expected performance; and]

(2) the results of *tests with national norms, including the Scholastic Aptitude Test and the American College Test;*

*(3) high school graduation rates;*

*(4) student attendance;*

*(5) student enrollment in advanced academic courses; and*

*(6) the degree of change from one school year to the next in the items under Subdivisions (1) through (5) of this subsection, considering the impact of student mobility* [the Central Education Agency's most recent compliance review of the district's special education program].

(c) The State Board of Education shall report the status of education in the state as reflected by the indicators to the legislature not later than February 1 of each odd-numbered year.

(d) *The academic excellence indicators adopted under this section shall be the main consideration of the Central Education Agency in the rating of a district under Section 21.753 of this code.*

(e) *The Educational Economic Policy Center shall biennially review the indicators adopted under this section and recommend changes in those indicators to the State Board of Education and the Legislative Education Board.*

SECTION 2.16. Subchapter T, Chapter 21, Education Code, is amended by adding Section 21.7532 to read as follows:

*Sec. 21.7532. CAMPUS PERFORMANCE OBJECTIVES. (a) For each school year, the principal of each school campus, with the assistance of parents, community residents, and the professional staff of the school as provided for through the procedure established in Section 21.930 of this code, shall establish academic and other performance objectives of the campus for each academic excellence indicator adopted under Section 21.7531 of this code. The objectives shall also address the performance of special needs students. The objectives must be approved by the district's board of trustees.*

*(b) In this section "parent" means a person who is a parent of or person standing in parental relation to a student enrolled at a school and who is not an employee of the school or the school district; "community resident" means a person 18 years of age or older residing in the attendance area of a school but does not include a person who is a parent of a student enrolled in that school or a person who is an employee of the school or the school district.*

SECTION 2.17. Section 21.754, Education Code, is amended to read as follows:

Sec. 21.754. INVESTIGATIONS. (a) The Central Education Agency shall annually *review the performance of each district and campus on the indicators adopted in Section 21.7531 of this code and determine if specific action is warranted. The review may include limited* [determine whether each school district satisfies the accreditation criteria from reports furnished by the school district or from an] on-site evaluation *if* necessary.

(b) The State Board of Education by rule shall establish a schedule for on-site evaluations by the Central Education Agency. The rules must require that:

19

(1) each district is visited and all accreditation criteria investigated not less than once every six years, except that the board may extend that period for districts rated:

(A) as exemplary for an additional period not to exceed two years; and

(B) as recognized for an additional period not to exceed one year;

(2) each district rated as accredited advised is visited and assisted not less than once every two years;

(3) each district rated as *academically unaccredited* [warned] is visited and assisted not less than once each year; and

(4) each district that has a poor performance under the indicators adopted under Section 21.7531 of this code is investigated more frequently than otherwise required under this section.

(c) Each annual review shall include an analysis of:

(1) student performance;

(2) attendance, promotion, and dropout rates;

(3) program costs; *and*

(4) [results of teacher and parent surveys; and]

[(5)] other information required by the board.

(d) In compliance with Section 21.925 of this code, the board shall make optimum use of the agency's public education information management system to minimize the written reporting requirements of school districts.

(e) To determine if a district qualifies for a higher rating or on identification of potential problems, the commissioner may direct the agency to conduct on-site investigations at any time and may raise or lower the accreditation rating as *a* [as] result of the investigation.

(f) [The agency shall direct investigators to be alert to any fundamental deficiencies in a district's educational system, such as failure of the district to satisfy curriculum requirements, and to report deficiencies to agency staff responsible for research and planning.

[(g)] In making an accreditation investigation, the investigators shall obtain information from campus administrators, teachers, and parents of students enrolled *at* [in] the *campus* [district]. The investigation may not be closed until information is obtained from each of those sources. The board shall adopt rules for:

(1) obtaining information from parents and using that information in the investigator's report; and

(2) obtaining information from teachers in a manner that prevents the *campus or* district from screening the information.

*(g)* [(h)] The agency shall give written notice to the superintendent and the board of trustees of any impending investigation of the district's accreditation.

*(h) If an annual review from reports furnished by the school district indicates low performance on one or more of the criteria listed in Subsection (c) of this section of one or more campuses in a district, the agency may conduct an on-site evaluation of those campuses only.*

SECTION 2.18. Section 21.757, Education Code, is amended to read as follows:

Sec. 21.757. SANCTIONS. (a) If a district does not satisfy the accreditation criteria, the commissioner *of education* shall take the following actions to the extent the commissioner determines necessary:

(1) confidential notice of the deficiency to any accreditation committee of the board of trustees and to the district superintendent;

(2) public notice of the deficiency to the board of trustees;

(3) appointment of an agency monitor to participate in and report to the agency on the activities of the board of trustees; [and]

(4) appointment of a master to oversee the operations of the district; *and*

*(5) appointment of a management team to oversee the operations of the district.*

(b) *If a campus is rated accredited advised or academically unaccredited, the commissioner shall take the following actions to the extent the commissioner determines necessary:*

*(1) appointment of a monitor, master, or management team to oversee the operations of the campus; or*

*(2) order the board of trustees or the superintendent to take certain actions relating to the operations of the campus.*

(c) If a district fails to satisfy accreditation criteria despite the actions of the commissioner under this section, the *commissioner* [State Board of Education] shall revoke the district's accreditation [and shall withhold state funds from the district].

(d) [(e)] The costs of providing a monitor, [or a] master, *or management team* shall be paid by the district.

*(e) A master or management team appointed to oversee the operations of the district may approve or disapprove any action of the principal of a campus, the superintendent of the district, or the board of trustees of the district.*

*(f) A master or management team appointed to oversee the operations of a campus may approve or disapprove any action that relates to the campus and that is taken by the principal of the campus, the superintendent of the district, or the board of trustees of the district.*

(g) [(d)] A district that *is rated academically unaccredited* [does not have a rating above accredited advised] for a period of *two* [three] years *shall be annexed to another district under Section 19.027 of this code or the commissioner shall order the creation of a state-operated school district under Section 21.758 of this code* [is unaccredited at the conclusion of that period unless the district qualifies for a rating above accredited advised at that time].

*(h) Notwithstanding any provision to the contrary, a district that is rated accredited advised or academically unaccredited for a period of two consecutive years may not enter into a contract with an administrator for a term greater than one year unless the administrator has not been previously employed by the district. This subsection does not apply if it is determined by the accreditation review that the reasons for the district being rated accredited advised or academically unaccredited are not related to substantial deficiencies in the administrator's performance.*

SECTION 2.19. Subchapter T, Chapter 21, Education Code, is amended by adding Section 21.758 to read as follows:

*Sec. 21.758. STATE-OPERATED SCHOOL DISTRICT. (a) The commissioner of education may order the suspension of the powers of the board of trustees of a school district if the school district has been rated academically unaccredited for a period of two years. The commissioner shall immediately inform the Legislative Education Board of the commissioner's decision to order the suspension.*

*(b) At the time the commissioner enters the order, the commissioner shall appoint a board of managers to execute the powers of the board of trustees during the period of suspension and shall appoint a district superintendent. The appointed superintendent shall perform all acts and duties necessary for the proper conduct, maintenance, and supervision of the schools in the district. The board of managers and the superintendent shall be appointed for terms not to exceed two years from the date that the order of suspension is entered.*

*(c) The appointed superintendent shall report annually to the commissioner on the progress of the school district toward meeting the requirements necessary for accreditation. The commissioner shall report to the Legislative Education Board annually on the district's progress.*

*(d) Based on the annual assessment of progress of the school district, but no later than two years after the date that the order of suspension is entered, the commission-*

*er shall order that the suspension be terminated or that the district be annexed under Section 19.027 of this code.*

*(e) If the commissioner determines that the suspension should be terminated, the appointed superintendent and the members of the superintendent's staff shall continue to serve for a one-year transition period.*

*(f) An appointed superintendent may apply to the commissioner for an exemption for the school district from a requirement or prohibition imposed under this code, including a rule adopted under this code, other than a prohibition of conduct that constitutes a criminal offense or a requirement or prohibition included under Section 11.272(b) of this code.*

SECTION 2.20. Section 21.920, Education Code, is amended by adding Subsection (e) to read as follows:

*(e) An appeal to the commissioner of education is not a contested case under the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes) if the issues presented relate to a student's eligibility to participate in extracurricular activities, including issues related to the student's grades or the school district's grading policy as applied to the student's eligibility. The commissioner may delegate the matter for decision to a person or entity the commissioner designates. The decision of the commissioner or the commissioner's designee in a matter governed by this subsection may not be appealed except on the grounds that the decision is arbitrary or capricious. Evidence may not be introduced on appeal other than the record of the evidence before the commissioner.*

ECTION 2.21. Subchapter Z, Chapter 21, Education Code, is amended by adding Section 21.930 to read as follows:

*Sec. 21.930. DISTRICT-LEVEL DECISION PROCESS. (a) The board of trustees of each school district shall adopt a policy to involve the professional staff of the district in establishing and reviewing the district's educational goals, objectives, and major district-wide classroom instructional programs.*

*(b) The board shall establish a procedure under which meetings are held regularly with representative professional staff and the board or board designee.*

*(c) The board shall adopt a procedure, consistent with Section 21.904(a) of this code, for the professional staff within the district to nominate and elect the representatives who will meet with the board or the board designee as required under the provisions of this section. Two-thirds of the elected representatives must be classroom teachers. The remaining representatives shall be campus-based staff.*

*(d) This section does not prohibit the board from conducting meetings with teachers or groups of teachers other than the meetings described by this section.*

*(e) Nothing in this section shall be construed to limit or affect the power of a local school board of trustees to manage and govern the public free schools of this state.*

*(f) Nothing in this section shall be construed as creating a new cause of action or as requiring collective bargaining.*

SECTION 2.22. Subsection (c), Section 11.13, Education Code, is amended to read as follows:

(c) Any person, county, or school district aggrieved by any action of the Central Education Agency or decision of the commissioner of education may appeal to a district court in Travis County, Texas. Appeals shall be made by serving the commissioner of education with citation issued and served in the manner provided by law for civil suits. The petition shall state the action or decision from which the appeal is taken. Upon trial the court shall determine all issues of law and fact, *except as provided by Section 21.920(e) of this code.*

SECTION 2.23. Subchapter B, Chapter 403, Government Code, is amended by adding Section 403.020 to read as follows:

22

*Sec. 403.020. SCHOOL DISTRICT BUDGET REVIEW. The comptroller may periodically review the effectiveness and efficiency of the budgets and operations of school districts.*

SECTION 2.24.  Subsection (a), Section 11.14, Education Code, is amended to read as follows:

(a) The provisions of this chapter shall not be construed to give the State Board of Education, the commissioner of education, the State Department of Education, or anyone whomsoever, the power to close, to consolidate, or cause by regulation or rule to be closed or consolidated, any public school district in this state.  *This subsection does not affect the powers of the commissioner under Section 19.027 of this code.*

SECTION 2.25.  All rules under Title 19, Texas Administrative Code, Chapters 29 through 74 and 76 through 93 inclusive, that were adopted by the State Board of Education before the effective date of this Act are void as of June 1, 1991, regardless of the effective date of the rules.  All rules under Title 19, Texas Administrative Code, Chapters 94 through 133 inclusive, that were adopted by the State Board of Education before September 1, 1991, are void as of June 1, 1992, regardless of the effective date of the rules.  All rules under Title 19, Texas Administrative Code, Chapters 134 through 181 inclusive, that were adopted by the State Board of Education before September 1, 1992, are void as of June 1, 1993, regardless of the effective date of the rules.  In addition, all rules relating to teaching time and methodology under Title 19, Texas Administrative Code, Chapter 75, that were adopted by the State Board of Education before the effective date of this Act are void as of September 1, 1990, regardless of the effective date of the rules.

SECTION 2.26.  (a) Before February 1, 1991, the State Board of Education shall submit to the governor the name of a person to consider for appointment as the commissioner of education.  The governor shall nominate a person to serve as the commissioner of education for a term beginning March 1, 1991, and expiring March 1, 1995.

(b) The person serving as commissioner of education on the effective date of this Act shall continue to serve until an appointment is made under Subsection (a) of this section unless that person vacates the position or is removed.  If that person vacates the position before March 1, 1991, the governor shall appoint a person to serve in that position until March 1, 1991.

SECTION 2.27.  Not later than January 1, 1991, institutions that offer teacher education programs shall develop an initial plan under Section 13.049, Education Code, as added by this Act.

SECTION 2.28.  The advisory committee appointed under Section 2.30, Chapter 813, Acts of the 71st Legislature, Regular Session, 1989, shall submit recommendations for the academic excellence indicators to the State Board of Education.  The board shall adopt academic excellence indicators under Section 21.7531, Education Code, not later than January 1, 1991.

SECTION 2.29.  The following sections of the Education Code are repealed:

(1) Subsection (c), Section 11.25;

(2) Subsection (a), Section 11.26;  and

(3) Section 21.752.

SECTION 2.30.  Section 2.13 of this article applies beginning with the 1991–1992 school year.  The former law applies for the 1990–1991 school year and is continued in effect for that purpose.

SECTION 2.31.  Section 2.23 of this article takes effect September 1, 1991.

## ARTICLE III.  EFFICIENCY

SECTION 3.01.  Section 11.208, Education Code, as added by Chapter 658, Acts of the 71st Legislature, Regular Session, 1989, is amended by amending Subsection (b) and adding Subsections (d) through (f) to read as follows:

(b) The agreement shall include provisions for:

(1) the commission to assist regional education service centers in providing inservice training in substance abuse prevention for school districts;

(2) the joint annual review by the agency and the commission of the regional education service centers' substance abuse prevention and early intervention programs;

(3) the exchange of information between the agency and the commission relating to students in need of substance abuse prevention services; and

(4) a system to provide school districts [proven] model *peer assistance* [programs] for substance abuse prevention.

*(d) The commission may provide a statewide peer assistance and leadership system to include the training of trainers, clearinghouse services, and technical assistance to school districts and to train and provide a full-time peer program coordinator for each regional education service center.*

*(e) The peer program coordinator may:*

*(1) assist school districts and campuses to develop and implement peer assistance and leadership programs;*

*(2) train teachers and other personnel for those programs;*

*(3) establish regional peer assistance and leadership networks; and*

*(4) participate in the statewide peer assistance and leadership network.*

*(f) The Central Education Agency jointly with the Texas Commission on Alcohol and Drug Abuse may design a substance abuse assessment and intervention program for the public schools. Each school district may implement the program under guidelines adopted by the agency and the commission.*

SECTION 3.02. Section 11.27, Education Code, as added by Chapter 287, Acts of the 71st Legislature, Regular Session, 1989, is amended to read as follows:

Sec. 11.27. *INNOVATIVE* [DEMONSTRATION] PROGRAMS. (a) The State Board of Education shall establish a process under which [a limited number of] programs developed by school *campuses* [districts] may be approved [by the board], notwithstanding lack of compliance with other statutory requirements, to demonstrate innovative educational practices.

(b) *Innovative programs that may be approved under this section include, but are not limited to, programs relating to:*

*(1) school year restructuring;*

*(2) alternative learning environments;*

*(3) parental literacy;*

*(4) decentralization of organizational decisions;*

*(5) instructional technology;*

*(6) student and parental choice among public schools;*

*(7) child care;*

*(8) early childhood education;*

*(9) an extended school day;*

*(10) teacher and administrator development;*

*(11) continuous progress education;*

*(12) student-teacher ratios below 22:1 in elementary grades;*

*(13) use of elementary school guidance counselors, social workers, and other personnel in successful dropout prevention programs;*

*(14) career development for students;*

*(15) bilingual training;*

*(16) the generation of more effective parental involvement with the schools;*

*(17) school-age latch-key children;*

24

*(18) volunteer efforts with the private sector;*

*(19) coordination of school activities with community health and human services programs and other community resources;*

*(20) magnet schools;*

*(21) interdisciplinary curriculum;*

*(22) peer tutoring;*

*(23) counseling of families of at-risk students; and*

*(24) comprehensive coordination with health and human service delivery systems.*

*(c) Innovative program applications shall initially be selected on a competitive, peer review basis by the program advisory committee established under Section 11.271 of this code, with final approval by the State Board of Education and, if the program requires the expenditure of state funds, the Legislative Education Board* [A demonstration program may not exceed two years in duration, and not more than 20 programs may be approved for operation at any one time.

[(c) To be approved under this section, a demonstration program must:

[(1) focus on improvements in educational productivity, efficiency, and accountability;

[(2) preserve to the satisfaction of the board the rights of students, parents, and teachers granted by law; and

[(3) provide specific procedures for the evaluation of the program].

*(d) A* school *campus's* [district's] *application for approval of a program under this section must include substantial evidence that the* campus [district] *has adequately planned the program and that the application has been approved by the district's board of trustees.*

*(e) The approval by the State Board of Education of an application under this section that requires the expenditure of state funds is ineffective unless* [A demonstration program approved under this section may not result in an increase in the amount of state funds allocated to the district or a decrease in the amount allocated to any other district.

[(f) State funds may not be expended on a demonstration program authorized by this section unless the program has been reviewed and approved in advance by] ' e Legislative Education Board *approves the* xpenditure *of state funds for the program under the authority of Article XVI, Section 69, of the Texas Constitution.*

*(f)* [(g)] *If an innovative* [a demonstration] *program proposes a deviation from a requirement or prohibition imposed by state law or rule, final approval of the program* [by the State Board of Education] *constitutes a waiver of the requirement or prohibition for the duration of the program.* A prohibition on conduct that constitutes a criminal offense may not be waived.

*(g) A school campus with an approved innovative program receiving funds under Section 11.271 of this code shall report on the progress of the program to the Central Education Agency not later than September 1 of each year after the school year that the funding is received and upon completion of the program.*

*(h) The Central Education Agency shall evaluate each program's effectiveness and shall report its findings to the Legislative Education Board and to the State Board of Education not later than December 1 preceding each regular session of the legislature.*

SECTION 3.03. Subchapter B, Chapter 11, Education Code, is amended by adding Section 11.271 to read as follows:

*Sec. 11.271. PUBLIC EDUCATION DEVELOPMENT FUND. (a) The public education development fund is an account in the General Revenue Fund. The comptroller of public accounts may receive gifts and grants for the public education development fund.*

*(b) Funds that may be credited to the public education development fund include gifts, grants, and legislative appropriations.*

*(c) The State Board of Education shall administer the public education development fund.*

*(d) Each fiscal year, the board, after deducting the cost of administration not to exceed an amount set by appropriation, shall make disbu·sements from the public education development fund to the Educational Economic Policy Center in a total amount approved by the Legislative Education Board. The board shall disburse the remainder of the fund to eligible school campuses.*

*(e) To be eligible for a disbursement from the public education development fund under this section, a school campus must have an approved innovative program application under Section 11.27 of this code. A campus may use funds received under this section for the approved innovative program only.*

*(f) A gift or grant to the public education development fund that provides the terms of its disbursement may be distributed only as specifically provided by the terms of the gift or grant.*

*(g) Seventy percent of the funds disbursed under this section must be for projects designed to improve the academic achievement of low-performing students. Priority shall be given to projects submitted by campuses that have 60 percent or fewer students who perform satisfactorily on the criterion-referenced assessment instrument required under Section 21.551 of this code or that are otherwise low-performing campuses as defined by rule of the State Board of Education.*

*(h) From funds appropriated for the public education development fund, the comptroller shall issue warrants to the Educational Economic Policy Center and to each eligible school campus's school district in the amount certified by the board to the comptroller.*

*(i) The Educational Economic Policy Committee shall appoint a program advisory committee, composed of experts in policy research and disciplines that represent the center's purposes, to make recommendations to the State Board of Education and the Legislative Education Board on the use of the public education development fund.*

SECTION 3.04.  Subsection (c), Section 12.01, Education Code, is amended to read as follows:

(c) Except as otherwise specifically defined in this chapter, "textbooks" or "books" as used herein 'hall mean books, systems of instructional materials, or combinations of books and suµµlementary instructional materials which convey information to the pupil or otherwise contribute to the learning process, computer software, including but not limited to applications using computer assisted instruction, interactive videodisc, other computer courseware, and magnetic media [provided that these can be delivered in lieu of textbooks with similar costs to the state].

SECTION 3.05.  Section 13.352, Education Code, is amended by amending Subsection (d) and adding Subsection (f) to read as follows:

(d) Each principal shall:

(1) *approve all teacher and staff appointments* [participate in the selection of teachers] *for that principal's campus from a pool of applicants selected by the district or of applicants who meet the hiring requirements established by the district, based on criteria developed by the principal after informal consultation with the faculty;*

(2) set specific education objectives for his campus, involving staff in the planning process;

(3) develop budgets for his campus; [and]

(4) work with school professionals to prepare individual development plans; *and*

*(5) attend in-service training relating to making district-level decisions provided under Section 13.049(b) of this code.*

*(f) The board of trustees of a school district shall adopt a policy for the selection of a campus principal that includes qualifications required for that position.*

SECTION 3.06.  Section 13.354, Education Code, is amended by adding Subsection (e) to read as follows:

26

(e) The appraisal of a principal shall include the performance of the principal's campus on the indicators established in Section 21.7531 of this code and the campus's objectives set under Section 21.7532 of this code, including performance gains of the campus and the maintenance of those gains.

SECTION 3.07.   Chapter 14, Education Code, is amended by adding Subchapter D to read as follows:

### SUBCHAPTER D.   TECHNOLOGY FUND

Sec. 14.061.   PURPOSE. The purpose of this subchapter is to establish a technology fund to:

(1) provide substantially equal access for students throughout the state to instruction of high quality, to all required courses of study, and to information resources;

(2) provide substantially equal access for teachers and administrators throughout the state to teaching tools of high quality, to efficient management systems, and to instruction in using technology in the classroom; and

(3) measure student productivity throughout the state.

Sec. 14.062.   ESTABLISHMENT. (a)   The technology fund is an account in the General Revenue Fund.   The Central Education Agency may receive gifts and grants for the technology fund.

(b) Funds that may be credited to the account include gifts, grants, and legislative appropriations.

Sec. 14.063.   FUND ADMINISTRATION; TECHNOLOGY ALLOTMENT. (a)   The Central Education Agency shall administer the technology fund and shall make annual disbursements from the technology fund.

(b) Each school district is entitled to an annual allotment for the purposes provided under Section 14.064 of this code equal to its unadjusted average daily attendance multiplied by:

(1) $30 for the 1992-1993 school year, or a greater amount provided by appropriation;

(2) $35 for the 1993-1994 school year, or a greater amount provided by appropriation;

(3) $40 for the 1994-1995 school year, or a greater amount provided by appropriation;

(4) $45 for the 1995-1996 school year, or a greater amount provided by appropriation; and

(5) $50 for the 1996-1997 school year and for each school year thereafter, or a greater amount provided by appropriation.

(c) The cost of the technology allotment is shared by the state and district in the same percentages as the district's Foundation School Program under Chapter 16 of this code.   The state's share is paid from the technology fund.

(d) The State Board of Education shall establish rules for the administration of this section.   The rules shall provide that the equipment purchased shall meet the standards established under this chapter.

(e) If an insufficient amount is available in the fund for the state's share of the allotments under Subsection (b) of this section, the agency shall reduce each district's allotment by application of the formula adopted under Section 16.254(d) of this code.

Sec. 14.064.   USE OF ALLOTMENT. (a)   A district's allotment under Section 14.063 of this code may be used only for:

(1) the acquisition of technological equipment and related services, including hardware, software, courseware, training, subscription fees for telecommunications and data base services, and other related services for the purposes of this subchapter; and

27

*(2) the research and development of emerging instructional technology.*

*(b) The Central Education Agency shall monitor the use of each district's allotment to ensure that at least 75 percent of the allotment is used to provide classroom instructional services and programs.*

*Sec. 14.065. TECHNOLOGY PLAN. To be eligible for an allotment under this chapter, a school district shall file with the Central Education Agency and with the Department of Information Resources a five-year plan for the use of a technology allotment. Each year the district uses a technology allotment, the district shall report to the agency how the use of the allotment relates to the training of the district's personnel using the technology and to the five-year plan or to a proposed plan to train personnel.*

SECTION 3.08. Section 16.003, Education Code, is amended to read as follows:

Sec. 16.003. STUDENT ELIGIBILITY. *(a)* A student is entitled to the benefits of the Foundation School Program if he is 5 years of age or older and under 21 years of age at the beginning of the scholastic year and has not graduated from high school.

*(b) A student to whom Subsection (a) of this section does not apply is entitled to the benefits of the Foundation School Program if the student is enrolled in a prekindergarten class under Section 21.136 of this code.*

*(c) The commissioner of education, in consultation with the Commissioner of Human Services, shall monitor and evaluate prekindergarten programs in the State of Texas as to their developmental appropriateness. Furthermore, the commissioner of education, in consultation with the Commissioner of Human Services, shall evaluate the potential for coordination on a statewide basis of prekindergarten programs with government-funded early childhood care and education programs such as child care administered under Chapter 44 of the Human Resources Code and federal Head Start programs. This evaluation shall utilize recommendations contained in the report to the 71st Legislature required by Chapter 717, Acts of the 70th Legislature, Regular Session, 1987. For the purpose of providing cost-effective care for children during the full work day with developmentally appropriate curriculum, the commissioners shall investigate the use of existing child care program sites as prekindergarten sites.*

*(d)* A child may be enrolled in the first grade if he is at least six years of age at the beginning of the scholastic year or has been enrolled in the first grade or has completed kindergarten in the public schools in another state prior to transferring to a Texas public school.

SECTION 3.09. Section 16.007, Education Code, is amended to read as follows:

Sec. 16.007. PUBLIC EDUCATION INFORMATION MANAGEMENT SYSTEM (PEIMS). *(a)* Each school district shall participate in the Public Education Information Management System (PEIMS) and shall provide through that system information required for the administration of this chapter and of other appropriate provisions of this code.

*(b) Each school district shall use a uniform accounting system adopted by the commissioner of education for the data required to be reported for the Public Education Information Management System.*

SECTION 3.10. Section 16.056, Education Code, is amended by adding Subsection (h) to read as follows:

*(h) In determining the placement of a teacher on the salary schedule under Subsection (c) of this section, a district shall credit the teacher for each year of experience, whether or not the years are consecutive. Notwithstanding the provision of this subsection, no teacher shall be placed on the salary schedule at a step above the step where the teacher would have been placed had that teacher remained in continuous service.*

SECTION 3.11. Subsection (a), Section 21.031, Education Code, is amended to read as follows:

(a) All children who are citizens of the United States or legally admitted aliens and who are [over the age of] five years *of age or older* and under the age of 21 years on the first

28

day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year. *All other children enrolled in a prekindergarten class under Section 21.136 of this code are entitled to the benefits of the Available School Fund.*

SECTION 3.12. Subsection (a), Section 21.033, Education Code, is amended to read as follows:

(a) The following classes of children are exempt from the requirements of compulsory attendance:

(1) any child in attendance upon a private or parochial school which shall include in its course a study of good citizenship;

(2) any child who is handicapped as defined in Section 21.503 of this code and who cannot be appropriately served by the resident district in accordance with the requirements of Section 21.032 of this code;

(3) any child who has a physical or mental condition of a temporary and remediable nature which renders such child's attendance infeasible and who holds a certificate from a qualified physician specifying the temporary condition, indicating the treatment prescribed to remedy the temporary condition, and covering the anticipated period of the child's absence from school for the purpose of receiving and recuperating from such remedial treatment; [and]

(4) any child expelled in accordance with the requirements of law;

(5) *any child who is at least 17 years old and in attendance upon a course of instruction to prepare for the high school equivalency examinations; and*

(6) *any child who is at least 16 years old and in attendance upon a course of instruction to prepare for the high school equivalency examinations provided that the person is recommended to the course of instruction by a public agency which has supervision or custody of the person under a court order.*

SECTION 3.13. Section 21.136, Education Code, is amended to read as follows:

Sec. 21.136. PREKINDERGARTEN. (a) Any school district may offer prekindergarten classes, but a district shall offer prekindergarten classes if the district identifies 15 or more eligible children *who are at least four years of age. To receive state funds for children three years of age, the board of trustees of a district may submit an application for the funds to the commissioner of education. Subject to the availability of appropriated funds, the commissioner shall approve the application if there are 15 or more eligible three-year-old children in the district.*

(b) To be eligible for enrollment in a prekindergarten class a child must be at least *three* [four] years of age and must be:

(1) unable to speak and comprehend the English language; or

(2) from a family whose income, according to standards set by the State Board of Education, is at or below subsistence level.

(c) Prekindergarten classes shall be operated on a half-day basis. A district is not required to provide transportation for prekindergarten classes, but transportation, if provided, is included for funding purposes as part of the regular transportation system.

(d) On application of a school district, the commissioner of education may exempt a district from the application of this section if the district would be required to construct classroom facilities in order to provide prekindergarten classes.

(e) For the [1989–1990 and] 1990–1991 school *year* [years] the cost of the program is shared by the state and district in the same percentages used to determine the state/local shares under Chapter 16 of this code. The state's share is paid from the foundation school fund and may not exceed $55 million a year. If that amount will not fully fund the program, the commissioner shall proportionately reduce each district's allocations.

(f) Each school district shall develop a system to notify the population in the district with children who are eligible for enrollment in a prekindergarten class of the availability of the class. The system must include public notices issued in English and Spanish.

*(g)* [(f)] A district's prekindergarten program shall be designed to develop skills necessary for success in the regular public school curriculum, including language, mathematics, and social skills.

SECTION 3.14. Subsection (b), Section 21.205, Education Code, is amended to read as follows:

(b) The hearing shall be conducted in accordance with rules promulgated by the district. *The board of trustees may designate a person to serve as an impartial hearing officer to develop a record for consideration by the board. The board shall make its decision based on a review of the record developed by the impartial hearing officer and on oral argument before the board of the teacher or the teacher's representative and the district's representative.*

SECTION 3.15. (a) Subchapter Z, Chapter 21, Education Code, is amended by adding Section 21.9012 to read as follows:

*Sec. 21.9012. ENERGY CONSERVATION MEASURES. (a) The board of trustees of a school district may enter into a contract for energy conservation measures to reduce energy consumption or operating costs of school facilities in accordance with this section.*

*(b) A contract to which this section applies includes a contract for the installation of:*

*(1) insulation of the building structure and systems within the building;*

*(2) storm windows or doors, caulking or weatherstripping, multiglazed windows or doors, heat absorbing or heat reflective glazed and coated window or door systems, or other window or door system modifications that reduce energy consumption;*

*(3) automatic energy control systems, including computer software and technical data licenses;*

*(4) heating, ventilating, or air-conditioning system modifications or replacements;*

*(5) lighting fixtures that increase energy efficiency; or*

*(6) energy recovery systems.*

*(c) The person with whom the board contracts must be experienced in the design, implementation, and installation of energy conservation measures.*

*(d) Before entering into a contract for energy conservation measures, the board shall require the provider of the energy conservation measures to file with the board a performance bond that is in an amount the board finds reasonable and necessary to protect the interests of the school district and that covers the value of the guaranteed savings on the contract and is conditioned on the faithful execution of the terms of the contract.*

*(e) The board may enter into a contract for a period of more than one year for energy conservation measures with a person if the board finds that the amount the school district would spend on the energy conservation measures will not exceed the amount to be saved in energy and operating costs over 10 years from the date of installation. If the term of a contract for energy conservation measures exceeds one year, the district's contractual obligation in any year during the term of the contract may not exceed the total energy and operating cost savings, including but not limited to electrical, gas, or other utility cost savings and operating cost savings resulting from automatic monitoring and control, as determined by the board in this subsection, divided by the number of years in the contract term. The board shall consider all costs of the energy conservation measures, including costs of design, engineering, installation, maintenance, repairs, and debt service.*

*(f) A contract for energy conservation measures, with respect to existing buildings or facilities, may be a lease/purchase contract, with a term not to exceed 10 years, that meets federal tax requirements for tax-free municipal leasing or long-term financing.*

30

*(g) A contract under this section may be let under competitive proposal procedures. Notice of the request for proposals shall be published in the manner provided for competitive bidding. Requests for proposals must solicit quotations and must specify the relative importance of guaranteed savings, price, financial performance and stability, quality, technical ability, experience, and other evaluation factors. The contract shall be awarded to the responsible offeror whose proposal, following negotiations, is determined to be the most advantageous to the school district considering the guaranteed savings and other evaluation factors set forth in the request for proposals.*

*(h) In accordance with the terms of a request for proposals under Subsection (g) of this section and with regulations adopted by the board of trustees, the school district may conduct discussions with offerors who submit proposals and who are determined to be reasonably qualified for the award of the contract. Offerors shall be treated fairly and equally with respect to any opportunity for discussion and revision of proposals. To obtain the best final offers, the school district may allow proposal revisions after submissions and before the award of the contract.*

*(i) If provided in a request for proposals under Subsection (g) of this section, proposals shall be opened in a manner that avoids disclosure of the contents to competing offerors and keeps the proposals secret during negotiations.*

*(j) Upon completion of all negotiations, the board shall give notice of intent to award a contract to the selected offeror. The notice of intent shall be published in the same manner as the notice of request for proposals. All proposals are open for public inspection after the notice of intent to award is published, but trade secrets and proprietary information clearly identified in the proposals are not open for public inspection.*

(b) Section 21.9012, Education Code, as added by this section, takes effect September 1, 1990, and applies to a contract for energy conservation measures entered on or after that date.

SECTION 3.16.    Section 23.023, Education Code, is amended by amending Subsections (a), (b), (c), (e), (h), (i), and (k) and by adding Subsection (m) to read as follows:

(a) Any independent school district, whether created by special or general law, with *64,000* [66,000] or more students in average daily attendance [for the 1975-1976 school year or thereafter] shall be under the management and control of a board of nine trustees elected in accordance with the provisions of this section.

(b) *Seven* [At all elections held after December 31, 1977, seven] members of the board of trustees shall be elected by the qualified voters of single-member districts and two members, who shall be the president and vice-president of the board, shall be elected at large.

(c) At least 120 days before the *first* school board election *at which a district elects trustees under this section* [to be held in April, 1978], the board shall divide the school district into seven trustee districts which are compact, contiguous, and contain as nearly as practicable an equal population according to the last preceding federal decennial census.

(e) The candidate receiving a majority of the votes cast in each position is elected.  If no candidate receives a majority of the votes cast for that position, the board shall order a runoff to be held on *a date authorized by Section 2.025, Election Code* [the third Saturday in April immediately following the first election], and only the names of the two candidates receiving the highest number of votes in the first election shall be listed on the ballot.  The candidate receiving the majority of the votes cast in the runoff election is elected.

(h) In districts with seven board members on *the date the district becomes subject to this section* [January 1, 1978], members of the board serving on that date shall serve for the remainder of their terms, except those choosing to resign.  At the *first* election *at which a district first elects trustees under this section* [held in April, 1978], *six* [four] members shall be elected—the president, vice-president, and *four* [two] regular members. The president and vice-president then elected shall serve for a term of two years.  The other [two] members then elected shall [draw lots so that one will serve for a term of two

years, and one will] serve for a term of four years. The [five] members of the board holding the offices for which there was no election shall draw lots to determine which trustee district they will represent during the remainder of their terms. Thereafter, all members shall be elected to staggered terms of four years.

(i) A school district having *64,000* [66,000] or more students in average daily attendance [for the 1975–1976 school year or thereafter] which has previously adopted single-member district representation may continue to operate under that plan.

(k) A school district with less than *64,000* [66,000] students in average daily attendance for the 1975–1976 school year that later becomes subject to this section shall begin electing trustees from single-member districts in accordance with this section no later than the first regular election *held in* [following] the next calendar year *or subsequent year* [in which the federal census is taken]. A school district subject to this section whose average daily attendance drops below *64,000* [66,000] students shall continue to be governed by this section. *This section does not apply to a district which has adopted a plan of electing a board of trustees in whole or in part from single-member districts prior to August 31, 1991.*

*(m) For the purposes of this section, average daily attendance is defined as the number of students enrolled and in attendance on average during the last 10 school days of September in each school year.*

SECTION 3.17. Section 23.30, Education Code, is amended by adding Subsection (e) to read as follows:

*(e) A school district may employ, retain, contract with, or compensate a licensed real estate broker or salesman for assistance in the acquisition or sale of real property.*

SECTION 3.18. Subchapter Z, Chapter 212, Local Government Code, is amended by adding Section 212.902 to read as follows:

*Sec. 212.902. SCHOOL DISTRICT LAND DEVELOPMENT STANDARDS. (a) This section applies to agreements between school districts and any municipality which has annexed territory for limited purposes.*

*(b) On request by a school district, a municipality shall enter an agreement with the board of trustees of the school district to establish review fees, review periods, and land development standards ordinances and to provide alternative water pollution control methodologies for school buildings constructed by the school district. The agreement shall include a provision exempting the district from all land development ordinances in cases where the district is adding temporary classroom buildings on an existing school campus.*

*(c) If the municipality and the school district do not reach an agreement on or before the 120th day after the date on which the municipality receives the district's request for an agreement, proposed agreements by the school district and the municipality shall be submitted to an independent arbitrator appointed by the presiding district judge whose jurisdiction includes the school district. The arbitrator shall, after a hearing at which both the school district and municipality make presentations on their proposed agreements, prepare an agreement resolving any differences between the proposals. The agreement prepared by the arbitrator will be final and binding upon both the school district and the municipality. The cost of the arbitration proceeding shall be borne equally by the school district and the municipality.*

*(d) A school district that requests an agreement under this section, at the time it makes the request, shall send a copy of the request to the commissioner of education. At the end of the 120-day period, the requesting district shall report to the commissioner the status or result of negotiations with the municipality. A municipality may send a separate status report to the commissioner. The district shall send to the commissioner a copy of each agreement between the district and a municipality under this section.*

*(e) In this section, "land development standards" includes impervious cover limitations, building setbacks, floor to area ratios, building coverage, water quality controls,*

*landscaping, development setbacks, compatability standards, traffic analyses, and driveway cuts, if applicable.*

*(f) Nothing in this section shall be construed to limit the applicability of or waive fees for fire, safety, health, or building code ordinances of the municipality prior to or during construction of school buildings, nor shall any agreement waive any fee or modify any ordinance of a municipality for an administration, service, or athletic facility proposed for construction by a school district.*

SECTION 3.19. (a) Each fiscal year before the end of the Center for Educational Technology's first three years of operation, the State Board of Education shall make disbursements from the public education development fund under Section 11.271, Education Code, as added by this Act, to the Center for Educational Technology in an amount approved by the Legislative Education Board before making disbursements to eligible school campuses.

(b) From funds appropriated for the fund, the comptroller of public accounts shall issue warrants to the center in the amount certified by the commissioner of education.

SECTION 3.20. The legislature recommends that the governor, lieutenant governor, and speaker of the house of representatives appoint a special study committee to develop a plan for the coordination of youth services into a community effort and to remove nonacademic-related problems of youth from school responsibility and that the committee be required to make preliminary recommendations to the legislature before January 1, 1991.

SECTION 3.21. The commissioner of education, in consultation with the Commissioner of Human Services, shall submit a report to the 72nd Legislature, with specific legislative recommendations on the developmental appropriateness of prekindergarten programs, the potential for using existing child care program sites as prekindergarten sites, and the coordination of those programs under Subsection (c), Section 16.003, Education Code, as added by this Act.

SECTION 3.22. The Teacher Retirement System of Texas, the commissioner of education, and the State Board of Education shall jointly develop a recommendation for a state health insurance plan for public school employees. The retirement system, commissioner, and board shall report the recommendations to the 72nd Legislature not later than February 1, 1991.

SECTION 3.23. Notwithstanding any provision to the contrary:

(1) the pilot program established under Section 2.14, Chapter 813, and Section 2, Chapter 1179, Acts of the 71st Legislature, Regular Session, 1989, shall continue through the 1990–1991 school year only; and

(2) the Central Education Agency shall report the findings of the study under Subsection (e) of those sections to the 73rd Legislature not later than February 1, 1993.

SECTION 3.24. (a) Sections 3.08, 3.11, and 3.13 of this article apply beginning with the 1991–1992 school year. The prior law applies for the 1990–1991 school year and is continued in effect for that purpose.

(b) Section 3.07 of this article takes effect September 1, 1992.

## ARTICLE IV. PERFORMANCE INCENTIVES

SECTION 4.01. Subchapter B, Chapter 11, Education Code, is amended by adding Sections 11.272 and 11.273 to read as follows:

*Sec. 11.272. EXCELLENCE EXEMPTIONS. (a) Except as provided by Subsection (b) of this section, a school campus or district that is rated exemplary under Section 21.753 of this code is exempt from requirements and prohibitions imposed under this code, including rules adopted under this code.*

*(b) A school campus or district is not exempt under this section from a prohibition on conduct that constitutes a criminal offense. A school campus or district is not exempt under this section from requirements imposed by federal law or rule, including requirements for special education or bilingual education programs. Except as*

33

*provided by Subsection (e) of this section, a school campus or district is not exempt under this section from a requirement or prohibition imposed by state law or rule relating to:*

*(1) curriculum essential elements, excluding the methodology used by a teacher and the time spent by a teacher or a student on a particular task or subject;*

*(2) restrictions on extracurricular activities;*

*(3) health and safety;*

*(4) competitive bidding;*

*(5) textbook selection;*

*(6) elementary school class size limits;*

*(7) removal of a disruptive student from the classroom;*

*(8) suspension or expulsion of a student;*

*(9) at risk programs;*

*(10) prekindergarten programs;*

*(11) minimum graduation requirements; or*

*(12) educational employee and educational support employee rights and benefits. In this section, "educational support employee" means a full-time or part-time school employee not defined as a "teacher" by Section 21.201(1) of this code.*

*(c) The Central Education Agency shall monitor and evaluate deregulation of a school campus or district under this section and Section 11.273 of this code and report annually on the effect of deregulation on student achievement to the State Board of Education, the Legislative Education Board, the governor, the lieutenant governor, the speaker of the house of representatives, and the legislature. The report must include a list of the exemptions utilized and a review of the effectiveness of the waivers and exemptions programs.*

*(d) The State Board of Education in considering exemptions or waivers shall provide as much regulatory relief as is practical and reasonable to campuses or districts that are considered high performing, beginning in the 1990–1991 school year.*

*(e) The commissioner may exempt an exemplary school campus from elementary class size limits under this section if the school campus submits to the commissioner a written plan showing steps that will be taken to ensure that the exemption from the class size limits will not be harmful to the academic achievement of the students on the school campus. The commissioner shall review achievement levels annually. The exemption remains in effect until the commissioner determines that achievement levels of the campus have declined.*

*Sec. 11.273. WAIVERS AND EXEMPTIONS. (a) Except as provided under Subsection (e) of this section, a school campus or district may apply to the State Board of Education for a waiver of a requirement or prohibition imposed by law or rule that the campus or district determines inhibits student achievement.*

*(b) An application under this section must include a written plan developed by the campus principal or district superintendent, as appropriate, and faculty of the campus or district that states the achievement objectives of the campus or district and the inhibition imposed on those objectives by the requirement or prohibition and shall be approved by the district's board of trustees.*

*(c) The board may grant a waiver under this section for a period not to exceed three years. A prohibition on conduct that constitutes a criminal offense may not be waived.*

*(d) A school campus or district for which a requirement or prohibition is waived under this section for a period of three years may receive an exemption from that requirement or prohibition at the end of that period if the campus or district has fulfilled the achievement objectives submitted to the board under Subsection (b) of this section. The exemption remains in effect until the board determines that achievement levels of the campus or district have declined.*

*(e) A school campus or district may not receive an exemption or waiver under this section from requirements imposed by federal law or rule, including requirements for special education or bilingual education programs. A school campus or district may not receive an exemption or waiver under this section from a requirement or prohibition imposed by state law or rule relating to:*

*(1) curriculum essential elements, excluding the methodology used by a teacher and the time spent by a teacher or a student on a particular task or subject;*

*(2) restrictions on extracurricular activities;*

*(3) health and safety;*

*(4) competitive bidding;*

*(5) elementary school class size limits;*

*(6) minimum graduation requirements;*

*(7) removal of a disruptive student from the classroom;*

*(8) suspension or expulsion of a student;*

*(9) at risk programs;*

*(10) prekindergarten programs;*

*(11) educational employee and educational support employee rights and benefits. In this section, "educational support employee" means a full-time or part-time school employee not defined as a "teacher" by Section 21.201(1) of this code; or*

*(12) special education or bilingual education programs.*

*(f) A school district or campus that receives a waiver under this section for textbook selection may select for purchase a textbook not on a state-adopted multiple list. The textbook shall be purchased by the district and shall be used for the same number of years for which the textbooks for the subject or course are adopted by the State Board of Education. The unit cost of the textbooks selected shall not exceed the unit cost of the costliest textbook on the multiple list for the subject or course. The commissioner of education shall calculate the allowable cost and transmit from the state textbook fund that amount to the district for purchase of the textbooks. The State Board of Education shall adopt rules necessary for the implementation of this subsection.*

*(g) The State Board of Education in considering exemptions or waivers shall provide as much regulatory relief as is practical and reasonable to campuses or districts that are considered high performing, beginning in the 1990–1991 school year.*

SECTION 4.02. Section 21.101, Education Code, is amended by adding Subsection (h) to read as follows:

*(h) The State Board of Education shall adopt rules for the implementation of this section, except that the board may not designate the methodology used by a teacher nor the time spent by the teacher or a student on a particular task or subject.*

SECTION 4.03. Subchapter D, Chapter 21, Education Code, is amended by adding Section 21.116 to read as follows:

*Sec. 21.116. POSTSECONDARY ENROLLMENT OPTIONS. The commissioner of education and the commissioner of higher education shall jointly develop recommendations for a statewide program allowing public high school students to enroll in courses in postsecondary institutions for both secondary credit and postsecondary credit. The recommendations shall include a method for apportioning state funds for the student's education between the public school and the postsecondary institution. The commissioners shall report their recommendations to the 72nd Legislature not later than February 1, 1991.*

SECTION 4.04. Subsection (b), Section 34.004, Education Code, is amended to read as follows:

(b) The State Board of Education with the advice and approval of the educational excellence committee shall establish the criteria and standards for the awards. *The awards for school campuses shall be based primarily on the indicators established under Section 21.7531 of this code and the campus objectives established under Section*

35

*21.7532 of this code.* The board shall incorporate criteria for the performance of students in special education programs. The criteria for schools and school districts must be measurable criteria and may include criteria related to:

(1) student achievement;

(2) operational efficiency;

(3) central administrative support;

(4) student and teacher attendance;

(5) graduates who enter college, receive advanced training, or are employed;

(6) principals participating in instructional leadership training; and

(7) other matters selected by the committee that are related to scholastic gains.

SECTION 4.05. Chapter 56, Education Code, is amended by adding Subchapter G to read as follows:

### SUBCHAPTER G. TEXAS TUITION ASSISTANCE GRANT PROGRAM

*Sec. 56.101. PROGRAM NAME. The student financial assistance program authorized by this subchapter is known as the Texas tuition assistance grant program, and an individual grant awarded under this subchapter is known as a Texas tuition assistance grant.*

*Sec. 56.102. PURPOSE. The purpose of this subchapter is to provide an eligible person a grant of money for tuition to enable that person to attend an institution of higher education.*

*Sec. 56.103. ELIGIBLE PERSON. (a) To be eligible for a Texas tuition assistance grant, a person must:*

*(1) be a Texas resident as defined by coordinating board rules;*

*(2) enroll for a full course load in an institution of higher education as defined by Section 61.003 or 61.222 of this code;*

*(3) be from a low-income or middle-income family and establish financial need as defined by coordinating board rules;*

*(4) within the two years preceding the person's grant application, have graduated from a secondary school with a cumulative grade average that is equal to or greater than the equivalent of 80 on a scale of 100;*

*(5) have applied for any available financial assistance; and*

*(6) have complied with any other requirements adopted by the coordinating board under this subchapter.*

*(b) A person is not eligible to receive a Texas tuition assistance grant if the person:*

*(1) has been granted a baccalaureate degree; or*

*(2) has been convicted of a felony or a crime involving moral turpitude, unless the person has met the eligibility requirements under Subsection (a) of this section and has:*

*(A) received a certificate of discharge by the Texas Department of Criminal Justice or a correctional facility or completed a period of probation ordered by a court, and at least two years have elapsed from the date of the receipt or completion; or*

*(B) been pardoned or otherwise released from the resulting ineligibility to participate in the Texas tuition assistance grant program.*

*Sec. 56.104. ADMINISTRATIVE AUTHORITY. The coordinating board shall provide a Texas tuition assistance grant to an eligible person enrolled in an institution of higher education based on the financial need of that person. The total amount of Texas tuition assistance grants distributed by the coordinating board may not exceed the amount appropriated for the Texas tuition assistance grant program.*

*Sec. 56.105. PAYMENT OF GRANT; AMOUNT. (a) On receipt of a person's Texas tuition assistance grant application, an enrollment report from the institution of higher education enrolling the person, and a certification of the amount of financial need from the institution of higher education, the coordinating board shall distribute the amount of the grant for the person to the institution of higher education.*

*(b) The amount of a Texas tuition assistance grant may not exceed the amount of tuition the student would be charged at a public senior institution of higher education and, when added to other gift aid, may not exceed the financial need of the student.*

*Sec. 56.106. LIMITATIONS ON GRANT. A person entitled to a Texas tuition assistance grant loses that person's right to future payments of money from the grant program if the person:*

*(1) does not make steady academic progress toward a baccalaureate degree as determined under coordinating board rules;*

*(2) does not maintain full-time enrollment standing for at least two semesters in any academic year;*

*(3) has a grade average that is in the lower 50 percent of the total grade averages of all full-time students enrolled in the same college or other department in the institution of higher education; or*

*(4) is convicted of a felony or a crime involving moral turpitude, unless the person has met eligibility requirements as defined in Section 56.103(a) of this code and has:*

*(A) received a certificate of discharge by the Texas Department of Criminal Justice or a correctional facility or has completed a period of probation ordered by a court, and at least two years have elapsed from the date of the receipt or completion; or*

*(B) been pardoned or otherwise released from the resulting ineligibility to participate in the Texas tuition assistance grant program.*

*Sec. 56.107. ADOPTION AND DISTRIBUTION OF RULES. (a) The coordinating board shall adopt rules to administer this subchapter.*

*(b) The coordinating board shall distribute to each institution of higher education and to each school district copies of all rules adopted under this subchapter.*

*Sec. 56.108. FUNDING. (a) The coordinating board may accept gifts and grants from any public or private source for the purposes of this subchapter.*

*(b) Texas tuition assistance grants are payable from gifts, grants, and funds appropriated by the legislature.*

SECTION 4.06. The Texas Higher Education Coordinating Board shall adopt and distribute initial rules required by Subchapter G, Chapter 56, Education Code, as added by this Act, not later than January 1, 1991. The coordinating board shall make grants to eligible persons under this Act beginning with the fall semester 1991.

SECTION 4.07. The following provisions of the Education Code are repealed:

(1) Section 11.27, as added by Section 2.03, Chapter 813, Acts of the 71st Legislature, Regular Session, 1989;

(2) Subsection (b), Section 21.001; and

(3) Subchapter B, Chapter 56.

## ARTICLE V. YEAR-ROUND SCHOOLS

SECTION 5.01. Subsection (a), Section 21.008, Education Code, is amended to read as follows:

(a) Each school district shall operate for either two or three semesters during each school year, at the option of the district, *except as provided under Section 21.010 of this code or under rules adopted under Section 21.009 of this code.* The semesters must

provide the required number of days of instruction for students and inservice education and preparation for teachers[, except as provided under Section 16.052(b) of this code].

SECTION 5.02. Subsection (a), Section 21.009, Education Code, is amended to read as follows:

(a) The State Board of Education *shall* [may] adopt rules under which a school district may operate its schools year-round, *including rules necessary for the operation of a multitrack school year under Section 21.010 of this code.*

SECTION 5.03. Subchapter A, Chapter 21, Education Code, is amended by adding Section 21.010 to read as follows:

*Sec. 21.010. MULTITRACK SCHOOL YEAR. (a) In this section:*

*(1) "Track" means a group of students and teachers scheduled to attend school and take vacation periods on the same schedule.*

*(2) "Multitrack" means multiple tracks, with staggered instructional blocks and vacation periods.*

*(b) The board of trustees of a school district may operate a school on a multitrack school year.*

SECTION 5.04. The State Board of Education shall adopt rules under Subsection (a), Section 21.009, Education Code, as amended by this Act, not later than January 1, 1991.

### ARTICLE VI. SEVERABILITY; EFFECTIVE DATE; EMERGENCY

SECTION 6.01. If any provision of this Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act that can be given effect without the invalid provision or application, and to this end the provisions of this Act are declared to be severable.

SECTION 6.02. This Act takes effect September 1, 1990, except as otherwise provided by this Act.

SECTION 6.03. The importance of this legislation and the crowded condition of the calendars in both houses create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each house be suspended, and this rule is hereby suspended, and that this Act take effect and be in force according to its terms, and it is so enacted.

Passed the Senate on June 5, 1990, by the following vote: Yeas 29, Nays 1; passed the House on June 6, 1990, by the following vote: Yeas 136, Nays 12.

Approved June 7, 1990.

Effective Sept. 1, 1990 except §§ 1.06, 1.07, 2.23 eff. Sept. 1, 1991; §§ 1.13, 1.15 eff. June 7, 1990; and § 3.07 eff. Sept. 1, 1992.

### CHAPTER 2

### S.B. No. 12

AN ACT

relating to debt service on certain state bonds.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 5, Chapter 387, Acts of the 71st Legislature, Regular Session, 1989, is amended to read as follows:

Sec. 5. The Texas Public Finance Authority may not issue bonds under Subdivision (2), Subsection (a), Section 4, Chapter 696, Acts of the 70th Legislature, Regular Session, 1987 (Article 601d-1, Vernon's Texas Civil Statutes), as added by this Act, before September 1, 1991, unless the comptroller has determined that the total amount of debt service that the state will be required to pay during the biennium ending September 1, 1991, on those

7.

(b) If the agency's findings in an investigation under Subsection (a)(6) indicate that the board of trustees has observed a lawfully adopted policy, the agency may not substitute its judgment for that of the board.

(c) Based on the results of a special accreditation investigation, the commissioner may lower the district's accreditation rating and may take appropriate action under Subchapter G.

Sec. 39.076. CONDUCT OF INVESTIGATIONS. (a) The agency shall adopt written procedures for conducting on-site investigations under this subchapter. The agency shall make the procedures available to the complainant, the alleged violator, and the public. Agency staff must be trained in the procedures and must follow the procedures in conducting the investigation.

(b) After completing an investigation, the agency shall present preliminary findings to any person the agency finds has violated a law, rule, or policy. Before issuing a report with its final findings, the agency must provide a person the agency finds has violated a law, rule, or policy an opportunity for an informal review by the commissioner or a designated hearing examiner.

[Sections 39.077–39.090 reserved for expansion]

## SUBCHAPTER E.  SUCCESSFUL SCHOOL AWARDS

Sec. 39.091. CREATION OF SYSTEM. The Texas Successful Schools Awards System is created to recognize and reward those schools and school districts that demonstrate progress or success in achieving the education goals of the state.

Sec. 39.092. TYPES OF AWARDS. (a) The governor may present a financial award to the schools or districts that the commissioner determines have demonstrated the highest levels of sustained success or the greatest improvement in achieving the education goals. For each student in average daily attendance, each of those schools or districts is entitled to an amount set for the award for which the school or district is selected by the commissioner, subject to any limitation set by the commissioner on the total amount that may be awarded to a school or district.

(b) The governor may present proclamations or certificates to additional schools and districts determined to have met or exceeded the education goals.

(c) The commissioner may establish additional categories of awards and award amounts for a school or district determined to be successful under Subsection (a) or (b) that are contingent on the school's or district's involvement with paired, lower-performing schools.

Sec. 39.093. AWARDS. (a) The criteria that the commissioner shall use to select successful schools and districts must be related to the goals in Section 4.002 and must include consideration of performance on the academic excellence indicators adopted under Section 39.051. For purposes of selecting schools and districts under Section 39.092(a), each school's performance shall be compared to state standards and to its previous performance.

(b) The commissioner shall select annually schools and districts qualified to receive successful school awards for their performance and report the selections to the governor and the State Board of Education.

(c) The agency shall notify each school district of the manner in which the district or a school in the district may qualify for a successful school award.

Sec. 39.094. USE OF AWARDS. (a) In determining the use of a monetary award received under this subchapter, a school or district shall give priority to academic enhancement purposes. The award may not be used for any purpose related to athletics, and it may not be used to substitute for or replace funds already in the regular budget for a school or district.

(b) The campus-level committee established under Section 11.253 shall determine the use of the funds awarded to a school under this subchapter. The professional staff of the district shall determine the use of the funds awarded to the school district under this subchapter.

Sec. 39.095. FUNDING. The award system may be funded by donations, grants, or legislative appropriations. The commissioner may solicit and receive grants and donations for

the purpose of making awards under this subchapter. A small portion of the award funds may be used by the commissioner to pay for the costs associated with sponsoring a ceremony to recognize or present awards to schools or districts under this subchapter. The donations, grants, or legislative appropriations shall be accounted for and distributed by the agency. The awards are subject to audit requirements established by the State Board of Education.

Sec. 39.096. CONFIDENTIALITY. All information and reports received by the commissioner under this subchapter from schools or school districts deemed confidential under Chapter 552, Government Code, are confidential and may not be disclosed in any public or private proceeding.

[Sections 39.097–39.110 reserved for expansion]

## SUBCHAPTER F. ADDITIONAL REWARDS

Sec. 39.111. RECOGNITION AND REWARDS. The State Board of Education shall develop a plan for recognizing and rewarding school districts and campuses that are rated as exemplary or recognized and for developing a network for sharing proven successful practices statewide and regionally. The reward may be used to provide educators with summer stipends to develop curricula based on the cited successful strategies. The educators may copyright the curricula they develop.

Sec. 39.112. EXCELLENCE EXEMPTIONS. (a) Except as provided by Subsection (b), a school campus or district that is rated exemplary is exempt from requirements and prohibitions imposed under this code including rules adopted under this code.

(b) A school campus or district is not exempt under this section from:

(1) a prohibition on conduct that constitutes a criminal offense;

(2) requirements imposed by federal law or rule, including requirements for special education or bilingual education programs; or

(3) a requirement, restriction, or prohibition relating to:

(A) curriculum essential knowledge and skills under Section 28.002 or minimum graduation requirements under Section 28.025;

(B) public school accountability as provided by Subchapters B, C, D, and G;

(C) extracurricular activities under Section 33.081;

(D) health and safety under Chapter 38;

(E) competitive bidding under Subchapter B, Chapter 44;

(F) elementary school class size limits, except as provided by Subsection (d) or Section 25.112;

(G) removal of a disruptive student from the classroom under Subchapter A, Chapter 37;

(H) at risk programs under Subchapter C, Chapter 29;

(I) prekindergarten programs under Subchapter E, Chapter 29;

(J) rights and benefits of school employees;

(K) special education programs under Subchapter A, Chapter 29; or

(L) bilingual education programs under Subchapter B, Chapter 29.

(c) The agency shall monitor and evaluate deregulation of a school campus or district under this section and Section 7.056.

(d) The commissioner may exempt an exemplary school campus from elementary class size limits under this section if the school campus submits to the commissioner a written plan showing steps that will be taken to ensure that the exemption from the class size limits will not be harmful to the academic achievement of the students on the school campus. The commissioner shall review achievement levels annually. The exemption remains in effect until the commissioner determines that achievement levels of the campus have declined.

[Sections 39.113–39.130 reserved for expansion]

8.

*(g) A peace officer may operate an all-terrain vehicle on a public street, road, or highway that is not an interstate or limited-access highway only if:*

*(1) the transportation is in connection with the performance of the officer's official duty;*

*(2) the officer attaches to the back of the vehicle on top of an eight-foot-long pole a triangular orange flag;*

*(3) the vehicle's headlights and taillights are illuminated;*

*(4) the officer holds a driver's license, as defined by Section 521.001; and*

*(5) the operation of the all-terrain vehicle does not exceed a distance of 25 miles from the point of origin to the destination.*

SECTION 2. This Act takes effect September 1, 2003.

Passed by the House on April 2, 2003, by a non-record vote; passed by the Senate on May 22, 2003: Yeas 31, Nays 0.

Approved June 20, 2003.

Effective September 1, 2003.

---

## CHAPTER 484

### H.B. No. 912

#### AN ACT

relating to the distribution of school district employment policies to teachers employed under term contracts.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 21.204(d), Education Code, is amended to read as follows:

(d) The board of trustees shall provide each teacher with a copy of the teacher's contract with the school district and, *on the teacher's request,* a copy of the board's employment policies. *If the district has an Internet website, the district shall place the board's employment policies on that website. At each school in the district, the board shall make a copy of the board's employment policies available for inspection at a reasonable time on request.*

SECTION 2. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2003.

Passed by the House on April 8, 2003, by a non-record vote; passed by the Senate on May 27, 2003: Yeas 31, Nays 0.

Approved June 20, 2003.

Effective September 1, 2003.

---

## CHAPTER 485

### H.B. No. 917

#### AN ACT

relating to the authority of counties and municipalities to incur debt to participate in erosion response projects undertaken by the General Land Office.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Section 421.002, Local Government Code, is amended to read as follows: